UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JOANNA GRIFFITHS,

                                            Plaintiff,

                                                                    5:22-cv-00199
v.                                                                  (DNH/TWD)


SAINT JOSEPHS HOSPITAL, et al.,

                                            Defendants.
_____

APPEARANCES:

JOANNA GRIFFITHS
  Plaintiff, *pro se*
7075 South Court St.
Canastota, NY 13032

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

### REPORT-RECOMMENDATION AND ORDER

The Clerk has sent to the Court for review a *pro se* complaint submitted by Joanna

Griffiths ("Plaintiff"), together with an application to proceed *in forma pauperis* ("IFP

Application"). (Dkt. Nos. 1, 2.) For the reasons discussed below, the Court grants Plaintiff's

IFP Application and recommends that the complaint be dismissed in its entirety with leave to

amend.

**I.      PLAINTIFF'S IFP APPLICATION**

When a civil action is commenced in a federal district court, the statutory filing fee,

currently set at $402, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized,

however, to permit a litigant to proceed *in forma pauperis* status if a party "is unable to pay" the

standard fee for commencing an action. 28 U.S.C. § 1915(a)(1). After reviewing Plaintiff's IFP

Application (Dkt. No. 2), the Court finds she meets this standard.  Therefore, Plaintiff's IFP

Application is granted.[1]

## II.    SCREENING OF THE COMPLAINT

Section 1915(e) directs that when a plaintiff proceeds *in forma pauperis*, "the court shall

dismiss the case at any time if the court determines . . . the action . . . (i) is frivolous or

malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief

against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must look to see whether the

complaint lacks an arguable basis either in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325

(1989).  "An action is frivolous when either: (1) the factual contentions are clearly baseless such

as when the claims are the product of delusion or fantasy; or (2) the claim is based on an

indisputably meritless legal theory."  *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437

(2d Cir. 1998) (citation omitted).  Although extreme caution should be exercised in ordering *sua*

*sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties

have had an opportunity to respond, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), the

court still has a responsibility to determine that a claim is not frivolous before permitting a

plaintiff to proceed.  *See, e.g.*, *Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (per curiam)

(holding a district court has the power to dismiss a complaint *sua sponte* if the complaint is

frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to

state a claim that is "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

---

[1]  Plaintiff is reminded that, although her IFP Application has been granted, she will still be
required to pay fees that she may incur in this action, including copying and/or witness fees.

(2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me accusation." *Id*.

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836 (1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. Similarly, allegations that "are so vague as to fail to give the defendants adequate notice of the claims against them" are subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009). Where a plaintiff proceeds *pro se*, the pleadings must be read liberally and construed to raise the strongest arguments they suggest. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citation omitted).

Generally, when the court dismisses a *pro se* complaint *sua sponte*, the court should afford the plaintiff the opportunity to amend at least once; however, leave to replead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Futility is present when the problem with the plaintiff's causes of action is substantive such that better pleading will not cure it. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

### III.    SUMMARY OF PLAINTIFF'S COMPLAINT

Utilizing a form complaint pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 1201 *et seq*, Plaintiff brings this action against Defendants Saint Joseph's Hospital ("Hospital") and CEO Jeremy Zochs.  (Dkt. No. 1.[2])  As a basis for the Court's jurisdiction, Plaintiff has indicated "Federal Jurisdiction" and specifies the ADA and "disparate treatment resulting in loss of dentures, causing personal injury."  (Dkt. No. 1-1.)  She lists the following disabilities in the complaint:

> severe mental disability, bi-polar, post traumatic stress, ADD, borderline personality disorder.  My physical condition has greatly worsened due to the loss of my dentures, my face has sunken in and I have lost 31 pounds.

(Dkt. No. 1 at ¶ 4.)  As to the conduct at issue in this action, she checked "failure to make alterations to accommodate disability" and "other acts."  *Id*. at ¶ 5.  Plaintiff states that on November 20, 2021, she was having a nervous breakdown and was brought to "CPAP"[3] and was given "additional meds".  *Id*.  She has "little memory" of that day, "but some memory."  *Id*. According to Plaintiff, her dentures were lost, stolen, or misplaced while she was in the Hospital's care.  *Id*.  She has "since gone 3 months with no teeth causing [her] to lose 31 pounds, emotional distress."  *Id*.  Plaintiff wants a jury trial where she can "prove disparate treatment."

---

[2]  The Court assumes Plaintiff is referring to St. Joseph's Health Hospital.  The address that Plaintiff has listed for this Defendant is that of St. Joseph's Health Hospital.  The Court takes judicial notice of the fact that St. Joseph's Health Hospital is a regional non-profit health care system based in Syracuse, New York, and is part of Trinity Health, the nation's second-largest Catholic Health System.  *See* https://www.sjhsyr.org/about-us/ (last visited Apr. 4, 2022); *see also Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (noting that, for the purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a court may take judicial notice of information publicly available on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'").

[3]  Plaintiff may be referring to the Comprehensive Psychiatric Emergency Program, also known as "CPEP".  *See* https://www.sjhsyr.org/location/st-josephs-health-hospital-comprehensive-psychiatric-emergency-program-cpep (last visited Apr. 4, 2022).

*Id*. at ¶ 7.  She has "suffered greatly both physically and mentally from their discrimination." *Id*.  Plaintiff seeks $100,000.00 in damages.  *Id*.

In an "Affidavit of Disparate Treatment" which is attached to the complaint, Plaintiff states that from what she can remember, she "was not treated well at all."  (Dkt. No. 1, Exhibit A.[4])  She avers she had her dentures when she arrived at "CPAP" but did not have them when she returned home.  *Id*.  On "numerous occasions" she contacted the Hospital and received "more disparate treatment from the internal investigation done by . . . Jennifer from Loss Prevention."  *Id*.  Plaintiff claims employees of the hospital "colluded their statements as to prevent the hospital's correct responsibility."  *Id*.  "Jennifer told [Plaintiff] that the hospital in no way lost [her] teeth in a disparaging manner, and in fact very rudely."  *Id*.  As a result, she has suffered physical and mental stress and loss of enjoyment.  *Id*.

## IV.    DISCUSSION

The complaint refers to the ADA generally, and does not identify the title of the ADA allegedly violated by Defendants.  (*See generally* Dkt No. 1.)  The ADA is divided in five separate titles.  Reading the complaint liberally, the Court considers whether Plaintiff has stated a claim under Title III of the ADA."[5]

---

[4]  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference).

[5]  Based on the facts alleged, Plaintiff could not proceed with a claim under Title I of the ADA, which addresses employment discrimination, because she has not alleged that she was employed by Defendants.  42 U.S.C. § 12117; *see Mary Jo C. v. New York State and Local Retirement Sys.*, 707 F.3d 144, 169 (2d Cir. 2013) ("Title I of the ADA expressly deals with th[e] subject of employment discrimination . . . .") (citation and internal quotation marks omitted).  Title II of the ADA covers disability discrimination in public services, programs, and activities, defined as "state or local governments and their instrumentalities."  *Sherman v. Black*, 510 F. Supp. 2d 193, 197 (E.D.N.Y. 2007) (citing 42 U.S.C. § 12131(1)).  However, "[a] private hospital performing services pursuant to a contract with a municipality[,] even if it does so according to the municipality's rules and under its direction, is not a creature of any governmental entity."  *Green*

5

### A.    Title III of the ADA

Title III of the ADA prevents discrimination on the basis of a disability in places of public accommodation.  42 U.S.C. § 12182.  "[P]ublic accommodations" are defined under 42 U.S.C. § 12181(7)(F), which includes a long list of qualifying private facilities, provided that their operations "affect commerce," such as an "insurance office, professional office of a health care provider, hospital, or other service establishment."  To state a claim under Title III of the ADA, a plaintiff must allege (1) that she is a qualified individual with a disability;[6] (2) that defendants are a public accommodation as defined under Title III; and (3) that she was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants on the basis of her disability.  *Doe v. NYSARC Tr. Serv., Inc.*, No. 1:20-CV-801 (BKS/CFH), 2020 WL 5757478, at *4 (N.D.N.Y. Sept. 28, 2020), *report-recommendation adopted*, 2020 WL 7040982 (N.D.N.Y. Dec. 1, 2020); *see Roberts v. Royal Atlantic Corp.*, 542 F.3d 363, 368 (2d Cir. 2008).  Title III provides a private right of action for injunctive relief but no right of action for monetary relief.  42 U.S.C. §

---

*v. City of New York*, 465 F.3d 65, 79 (2d Cir. 2006).  Moreover, Title IV of the ADA does not appear to be applicable to Plaintiff's claims because Title IV prohibits disability discrimination in telecommunications.  *See Genco v. Sargent & Collins LLP*, No. 18-CV-0107, 2018 WL 3827742, at *3, n.5 (W.D.N.Y. June 4, 2018).  Lastly, Title V of the ADA, sometimes referred to as the "retaliation provision," also does not appear applicable because Plaintiff does not allege that she engaged in activity protected by the ADA, that Defendants were aware of that activity, or any causal connection between the allegedly adverse actions that Defendant took against her and the protected activity.  *See Chiesa v. New York State Dep't of Labor*, 638 F. Supp. 2d 316, 323 (N.D.N.Y. 2009) (Hurd, J.).

[6]  Under the ADA, the term "disability" means "a physical or mental impairment that substantially limits one or more major life activities of such individual."  42 U.S.C. § 12102.  A physical or mental impairment can be "[a]ny mental or psychological disorder, such as an intellectual disability [or an] emotional or mental illness[.]"  29 C.F.R. § 1630.2(h)(2).  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending speaking, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102.

12188; *see Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 94 (2d Cir. 2012) (holding that Title III of the ADA "authorizes private actions only for injunctive relief, not monetary damages."); *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 86 (2d Cir. 2004) ("Monetary relief . . . is not available to private individuals under Title III of the ADA.").

As an initial matter, because Plaintiff seeks only monetary relief, the complaint "fails to state a plausible claim for relief under Title III of the ADA." *Sandler v. Benden*, 15-CV-1193, 2016 WL 9944017, at *16 (E.D.N.Y. Aug. 19, 2016), *aff'd*, 16-3218, 2017 WL 5256812 (2d Cir. Nov. 13, 2017); *see, e.g., Doe v. NYSARC Tr. Serv., Inc.*, 2020 WL 7040982, at *3 (*sua sponte* dismissing the plaintiff's claims for monetary damages pursuant to Title III of the ADA with prejudice and without leave to amend).

Additionally, even assuming the Hospital is a public accommodation, 42 U.S.C. § 12181(7), and that Plaintiff is a qualified individual with a disability under the ADA, 42 U.S.C. § 12131(2), the complaint is devoid of factual allegations concerning "policies, practices, [or] procedures" by Defendants that deprived Plaintiff of the ability to access goods, services, or privileges available to those without Plaintiff's disabilities. *See Benyi v. New York*, No. 3:20-CV-1463 (DNH/ML), 2021 WL 1406649, at *14 (N.D.N.Y. Mar. 23, 2021), *report-recommendation adopted*, 2021 WL 1404555 (N.D.N.Y. Apr. 13, 2021) (citations omitted); *see, e.g., Heendeniya v. St. Joseph's Hosp. Health Ctr. (SJHHC)*, No. 5:15-CV-1238 (GTS/TWD), 2017 WL 1013081, at *9 n.14 (N.D.N.Y. Mar. 14, 2017) (dismissing Title III ADA claims against St. Joseph's Hospital Health Center for failure to state a claim where the plaintiff failed to alleged that he was denied the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" and that Defendants discriminated against him "based on [his] disability"). Rather, as described above, Plaintiff was provided with medication

at "CPAP" due to her "nervous breakdown" and seems to argue that employees of the Hospital were negligent and/or rude. Thus, the complaint does not state a Title III ADA claim against the Hospital.

As to CEO Jeremey Zochs, "the question of whether a person is a proper defendant under the ADA turns . . . on . . . whether the defendant owns, leases, or operates a place of public accommodation within the meaning of the ADA." *Doe v. NYSARC Tr. Serv., Inc.*, 2020 WL 5757478, at *4 (quoting *Coddington v. Adelphi Univ.*, 45 F. Supp. 2d 211, 215 (E.D.N.Y. 1999) (emphasis removed)). In assessing whether an individual is a proper defendant under Title III of the ADA, "[c]ourts . . . have focused on the issue of control and whether the named defendant 'operates' a place of public accommodation within the meaning of the ADA." *Id*. at *4. "Under Title III, 'to operate' means 'to put or keep in operation,' 'to control or direct the functioning of,' or 'to conduct the affairs of; manage.'" *Id.* (quoting *Green v. DGG Properties Co., Inc.*, No. 3:11-CV-01989, 2013 WL 395484, at *13 (D. Conn. Jan. 31, 2013) (quoting *Celeste v. East Meadow Union Free School Dist.*, 373 F. App'x 85, 91 (2d Cir. 2010)) (summary order) (additional internal quotation marks and citation omitted))). Further, "[t]he term 'operate' has been interpreted as being in a position of authority and having the power and discretion to perform potentially discriminatory acts." *Coddington*, 45 F. Supp. 2d at 215. Moreover, courts have explained that "[s]uch discriminatory acts may result in the imposition of liability under the ADA where they are the result of the exercise of the individual's own discretion, and not merely the implementation of institutional policies or the mandates of superiors." *Id*.

However, courts have held that "naked assertions devoid of further factual enhancement" concerning an individual defendant's level of control over a public accommodation are insufficient for purposes of establishing individual liability under Title III of the ADA. *Doe v.*

*NYSARC Tr. Serv., Inc.*, 2020 WL 5757478, at *4 (quoting *Iqbal*, 556 U.S. at 678); *see Green*, 2013 WL 395484, at *14.  For example, in *Green*, where "[p]laintiff merely assert[ed] the names of the individual defendants and their respective titles," without more, the court held that, although the individual defendants could "be proper defendants in [the] action if they exercised the requisite control over [the public accommodation], the plaintiff "failed to allege any facts in his complaint that would allow the court to conclude that [the individual defendants] exercised such control over the functioning of affairs of [the public accommodation]."

Here, even affording the complaint the most liberal construction possible, Plaintiff has not pleaded *any* facts to state a claim against CEO Jeremy Zochs under Title III of the ADA.  In this regard, CEO Jeremy Zochs is listed as a party and his name is not referenced in body of Plaintiff's complaint.  Thus, Plaintiff has not stated a Title III ADA claim against CEO Jeremey Zochs.

Based on the foregoing, the Court recommends that Plaintiff claims brought pursuant to Title III of the ADA for monetary damages against Defendants be dismissed.  *See Benyi*, 2021 WL 1406649, at *15.

### B.    State Law Claims

Inasmuch as this Court is recommending that Plaintiff's federal claims—to the extent that she alleged any—be dismissed, the Court also recommends that the District Court decline to exercise supplemental jurisdiction over any state law claims.  *See Kolari v. New York Presbyterian Hosp.*, 455 F.3d 118, 120 (2d Cir. 2006) ("[A] district court has discretion to decline to exercise supplemental jurisdiction over state law claims because all claims over which the federal court has jurisdiction have been dismissed.").  Of course, Plaintiff may also pursue any state law claims in state court.

### C.    Opportunity to Amend

This Court has serious doubts about whether Plaintiff can amend to assert actional ADA claims against Defendants.  Nevertheless, in light of Plaintiff's *pro se* status and out of an abundance of caution, the Court recommends that Plaintiff be granted leave to file an amended complaint, except that Plaintiff's claims for monetary damages pursuant to Title III of the ADA be dismissed with prejudice and without leave to amend.[7]

**ACCORDINGLY,** it is hereby

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 2) is **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's complaint (Dkt. No. 1) be **DISMISSED WITH LEAVE TO AMEND**; and it is further

**RECOMMENDED** that Plaintiff's claims for monetary damages pursuant to Title III of the ADA be **DISMISSED WITH PREJUDICE AND WITHOUT LEAVE TO AMEND**; and it is further

**RECOMMENDED** that the District Court decline to exercise supplemental jurisdiction over any state law claims; and it is further

---

[7] If the District Court adopts this Report-Recommendation, and if Plaintiff chooses to file an amended complaint, the pleading must comply with Rules 8 and 10 of the Federal Rules.  The revised pleading will replace the original complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court.  *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").  The revised pleading should not attempt to resurrect any claims dismissed with prejudice in this action  Additionally, although Plaintiff may submit objections to this Report-Recommendations, *see infra*, Plaintiff should wait for the District Court to rule on this Report-Recommendation before submitting an amended pleading.

**ORDERED** that the Clerk shall file a copy of this Order and Report-Recommendation on Plaintiff, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[8]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated:  April 5, 2022
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[8]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

2020 WL 5757478
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

John DOE, Plaintiff,
v.
NYSARC TRUST SERVICE, INC. et al., Defendants.

No. 1:20-CV-801 (BKS/CFH)
|
Signed 09/28/2020

**Attorneys and Law Firms**

John Doe, P.O. Box 1482, New York, New York, Plaintiff pro se.

**REPORT-RECOMMENDATION AND ORDER**

Christian F. Hummel, U.S. Magistrate Judge

**I. In Forma Pauperis**

**\*1** Plaintiff pro se ("plaintiff") [1] commenced this action on February 20, 2020, by filing a complaint. See Dkt. No. 1 ("Compl."). In lieu of paying this Court's filing fee, he submitted a motion to proceed in forma pauperis ("IFP"). See Dkt. No. 2. The undersigned has reviewed plaintiff's IFP motion and determines that he may properly proceed IFP. [2]

[1] The undersigned notes that plaintiff is a particularly litigious individual who has filed numerous actions in other courts. See, e.g., Lau v. Am. Eagle Outfitters, No. 17-CV-6055 (GBD/BCM), 2017 WL 6987996, at *1 (S.D.N.Y. Dec. 1, 2017) ("Plaintiff ... is not a stranger to this [c]ourt. Because of his "extensive history of filing frivolous complaints," both here and in other courts, he has been barred from filing any new cases in forma pauperis (IFP) "without first obtaining from the [c]ourt leave to file." ") (quoting Lau v. Match.Com, et. al, Case No. 13-CV-2938 (S.D.N.Y. Jan 28, 2014) (Order), report and recommendation adopted, No. 17-CV-6055 (GBD/BCM), 2018 WL 461102 (S.D.N.Y. Jan. 16, 2018).

[2] Plaintiff is advised that although he has been granted IFP status, he is still required to pay any fees and costs he may incur in this action, including but not limited to copying fees, transcript fees, and witness fees.

**II. Initial Review**

**A. Legal Standard**

Section 1915 of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Thus, it is a court's responsibility to determine that a plaintiff may properly maintain his complaint before permitting him to proceed with his action.

Where, as here, the plaintiff proceeds pro se, "the court must construe his submissions liberally and interpret them to raise the strongest arguments that they suggest." Kirkland v. Cablevision Sys., 760 F.3d 223, 224 (2d Cir. 2014) (per curiam) (internal quotation marks omitted). However, this does not mean the Court is required to accept unsupported allegations that are devoid of sufficient facts or claims. Although detailed allegations are not required at the pleading stage, the complaint must still include enough facts to provide the defendants with notice of the claims against them and the grounds upon which these claims are based. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atlantic v. Twombly, 550 U.S. 544, 555-56 (2007). Ultimately, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.

Pleading guidelines are set forth in the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Specifically, Rule 8 provides that a pleading which sets forth a claim for relief shall contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "The purpose ... is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." Flores v. Graphtex, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (internal quotation marks and citations omitted). Rule 8 also requires the pleading to include:

**\*2** (1) a short and plain statement of the grounds for the court's jurisdiction ...

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought ....

FED. R. CIV. P. 8(a). Although "[n]o technical form is required," the Federal Rules make clear that each allegation contained in the pleading "must be simple, concise, and direct." Id. at 8(d).

Further, Rule 10 of the Federal Rules provides in pertinent part that:

> [a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

FED. R. CIV. P. 10(b). This serves the purpose of "provid[ing] an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" Flores, 189 F.R.D. at 54 (internal quotation marks and citations omitted). A complaint that fails to comply with the pleading requirements "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y. 1996). As the Second Circuit has held, "[w]hen a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative ... to dismiss the complaint." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (citations omitted). However, "[d]ismissal ... is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Id. (citations omitted). In such cases of dismissal, particularly when reviewing a pro se complaint, the court generally affords the plaintiff leave to amend the complaint. See Simmons v. Abruzzo, 49 F.3d 83, 86-87 (2d Cir. 1995). A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citation omitted).

**B. Plaintiff's Amended Complaint**

Plaintiff filed his original complaint on July 16, 2020. See Dkt. No. 1. He then filed an amended complaint on August 31, 2020, which supersedes his original complaint. See Dkt. No. 10 ("Amen. Compl."); see also Int'l Controls Corp. v. Vesco, 556 F.2d 665, 668 (2d Cir. 1977) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect."). Thus, presently pending before the undersigned for review pursuant to 28 U.S.C. § 1915 is plaintiff's amended complaint.

Liberally construed, plaintiff's amended complaint asserts causes of action pursuant to Title III of the Americans with Disabilities Act ("ADA") and the New York State Human Rights Law ("NYSHRL"), alleging disability discrimination and failure to provide reasonable accommodations; and New York State law claims for intentional infliction of emotional distress, assault and battery, and respondeat superior liability. See Dkt. Not. 10 (Amen. Compl.) at 12-14. Plaintiff names as defendants NYSARC Trust Services, Inc. ("NYSARC"), a non-profit business in Albany County; Warren H. Heillbronner, Esq. ("Heillbronner"), the Trustee and Chairman of the Board of NYSARC; Heidi J. Flatt, CPA ("Flatt"), Director and Chief Operating Officer of NYSARC; Nancy E. Cannon, CPA ("Cannon"), Director and Assistant Chief Operating Officer of NYSARC; Nadia Arginteano, Esq. ("Arginteano"), Trust Attorney at NYSARC; Dorothy Zyskowski ("Zyskowski"), Director of Trusts at NYSARC; Alison Wilkinson ("Wilkinson"), plaintiff's former case manager at NYSARC; Candace Johnstone ("Johnstone"), trust manager/administrator at NYSARC; Jaimie Harla ("Harla"), team leader-trust administration;[3] Laura A. Kennedy ("Kennedy"), President of NYSARC; Tina F. Seaburg, Esq. ("Seaburg"), interim Executive Director of NYSARC; John or Jane Doe, II, Vice President of NYSARC; Jamie Doe, assistant trust manager; and Julie Doe. See Amen. Compl. at 1.

3      Jamie Harla is not listed as a defendant on CM/
ECF, but is listed as a defendant n plaintiff's
amended complaint. See Dkt. No. 10 ("Amen.
Compl.") at 1. The Clerk of the Court is respectfully
directed to add Jamie Harla as a defendant in this
action.

**\*3**  Plaintiff alleges that, on January 5, 2019, he travelled
to Albany, New York, for an appointment with Johnstone
concerning his pooled supplemental needs trust. See Amen.
Compl. at 4 ¶ 20, 5 ¶ 21. Plaintiff posits that, at some
point after arriving inside NYSARC's lobby, Heillbronner,
Flatt, Zyskowski, Arginteano, Wilkinson, Harla, Seaburg,
and "John Doe or Jane Doe as the Vice President of
the NYSARC ... ejected and removed [p]laintiff against
his will from the subject premises." Id. at 5 ¶ 21. He
contends that Heillbronner, Flatt, Zyskowski, Arginteano,
Wilkinson, Jamie Doe, Seaburg, and "John Doe or Jane
Doe as the Vice President of the NYSARC ... [a]dvised
[p]laintiff that his eject [sic] because schizophrenia and
mild mental retardation, both of which impairments have
lasted several years and significantly impair [sic] one or
more of his major life activities[,] including working and
self[-]care." Id. at 5-6 ¶ 22. Plaintiff alleges that, "[r]ather than
engaged [sic] in a dialogue with [p]laintiff to identify some
mutually agreeable or otherwise reasonable accommodation
to [p]laintiff[,]" Heillbronner, Flatt, Zyskowski, Arginteano,
Wilkinson, Harla, Seaburg, and "John Doe or Jane Doe as the
Vice President of the NYSARC "barred [p]laintiff from the
premises." Id. at 6 ¶ 24. Moreover, plaintiff contends that,
"[o]n information and belief," NYSARC, Heillbronner, Flatt,
Zyskowski, Arginteano, Wilkinson, Jamie Doe, Seaburg, and
"John Doe or Jane Doe as the Vice President of the NYSARC"
"does not treat similarly situated non-disabled person [sic] in
the manner in which [p]laintiff was treated." Id. at 7 ¶ 25.
Plaintiff argues that, "[a]s a result, [he] was forced to leave
the premises, was rendered [sic] in the midst of winter." Id.
at ¶ 26.

Plaintiff further alleges that NYSARC, Heillbronner, Flatt,
Zyskowski, Arginteano, Wilkinson, Jamie Doe, Seaburg,
John Doe or Jane Doe as the Vice President of
the NYSARC, "suddenly entered the [l]obby area that
[p]laintiff occupied" and that NYSARC, Heillbronner, Flatt,
Zyskowski, Arginteano, Wilkinson, Harla, Seaburg, and John
or Jane Doe as the Vice President of NYSARC, "using
baton-like object [sic], and the [d]efendants' [s]ecurity guard
and also [sic] the [d]efendants too threatened [plaintiff] and
without [p]laintiff's consent [sic] by using a number of
derogatory and offensive language [sic] ... calling [him] 'a

dumb bastard," and saying, "[y]ou are retarded," and "[y]our
are a retarded motherfucker." Amen. Compl. at 8 ¶ 27, 9 ¶
28. Plaintiff also asserts that NYSARC, Heillbronner, Flatt,
Zyskowski, Arginteano, Wilkinson, Harla, Seaburg, and John
or Jane doe as Vice President of NYSARC "threatened [him]
in sum and substance[ ] stating[,] 'I will kill [y]ou and
whole [sic] motherfuck [sic] family and friends." Id. at 9 ¶
29. Plaintiff also appears to allege that Harla told him that
"we do not let your disability kind [sic] in the [NYSARC
premises] as a matter of fact." Id. at 10 ¶ 30 (italics omitted).
Plaintiff alleges that, "[a]s a direct and proximate result
of the aforementioned conduct on the part of both [sic]
[d]efendants, [p]laintiff suffered great emotional distress,
anxiety and depression, and in the alternative, [p]laintiff's
[p]re-existing distress, anxiety and depression were thereby
greatly exacerbated." Id. at 11 ¶ 31.

Plaintiff alleges that, "[d]efendants NYSARC ..., through
the action of" Heillbronner, Flatt, Zyskowski, Arginteano,
Wilkinson, Jamie Doe, Seaburg, and John or Jane Doe
as the Vice President of NYSARC, "discriminated against
[him] on the basis of his disabilities." Amen. Compl. at 12
¶ 33. Further, plaintiff contends that, "[d]ue to both [sic]
[d]efendants disparate treatment of [p]laintiff as an
individual with an actual and/or perceived disability, and
their refusal to reasonably accommodate him[, d]efendants
have violated both the anti-discrimination and reasonable
accommodation provision of [the ADA and NYSHRL]."
Id. at ¶ 35; see id. at 14 ¶ 40. Plaintiff also states that
"[d]efendants' conduct denied [him] equal access to their
facilities because of his disability" and, as a result, he
"suffered inconvenience, embarrassment, and humiliation,
inter alia." Id. at 13 ¶ 37; 14 ¶¶ 41, 44. He posits that
defendants' "wrongful behavior [sic] [his] rights under the
[ADA] caused [him] psychological suffering." Id. at 12
¶ 33. Moreover, plaintiff alleges that "NYSARC ... and
Heillbronner ... are liable under [r]espondeat [s]uperior
[c]laims." Id. at 15 ¶ 49.

Plaintiff requests as relief (1) compensatory and punitive
damages "under the ADA ... and the ... NYSHRL"; (2)
declaratory judgement; (3) injunctive relief; and (4) any
further relief the "Court deems appropriate, including costs
pursuant to 42 U.S.C. § 1988." Amen. Compl. at 16 ¶¶ 48-49,
17.

## C. Analysis of the Amended Complaint [4]

4     All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

### 1. Requested Relief

**\*4** As an initial matter, insofar as plaintiff seeks monetary relief for alleged violations of Title III of the ADA, his claims must be dismissed with prejudice because "Title III[ ] authorizes private actions only for injunctive relief, not monetary damages." Krist v. Kolombos Rest. Inc., 688 F.3d 89, 94 (2d Cir. 2012). In addition, to the extent plaintiff seeks punitive damages pursuant to the NYSHRL, his claims must likewise be dismissed with prejudice because, except in cases of housing discrimination, "the NYSHRL does not permit [recovery of] punitive damages." Hauff v. State Univ. of New York, 425 F. Supp. 3d 116, 138 (E.D.N.Y. 2019); see N.Y. EXEC. LAW § 297(9) ("Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages, **including, in cases of housing discrimination only, punitive damages**, and such other remedies as may be appropriate...." (emphasis added)).

### 2. Intentional Disability Discrimination Claims under Title III of the ADA and the NYSHRL Against NYSARC

"To state a claim under the ADA and the NYSHRL, a plaintiff must allege (1) that [ ]he is a qualified individual with a disability; (2) that defendants are a public accommodation as defined under Title III; and (3) that [ ]he was denied the opportunity to participate in or benefit from defendants' services, programs or activities, or was otherwise discriminated against by defendants on the basis of [his] disability." Oakley v. Dolan, No. 17-CV-6903 (RJS), 2020 WL 818920, at \*15 (S.D.N.Y. Feb. 19, 2020) (internal quotation marks and citation omitted); see also Rodal v. Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 117 n.1 (2d Cir. 2004) ("New York State disability discrimination claims are governed by the same legal standards as federal ADA claims."); Romanello v. Shiseido Cosmetics Am. Ltd., No. 00-CV-7201 (JGK), 2002 WL 31190169, at \*7 (S.D.N.Y. Sept. 30, 2002) ("[T]he same standards used to evaluate claims under the ADA also apply to cases involving the NY[S]HRL.").

Under the ADA, the term "disability" means "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102. A physical or mental impairment can be "[a]ny mental or psychological disorder, such as an intellectual disability [or an] emotional or mental illness[.]" 29 C.F.R. § 1630.2(h)(2). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending speaking, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102. "[P]ublic accommodations" are defined under 42 U.S.C. § 12181(7) (F), which includes a long list of qualifying private facilities, provided that their operations "affect commerce," such as an "insurance office, professional office of a health care provider, hospital, or other service establishment."

Here, plaintiff alleges that he suffers from schizophrenia and mild mental retardation, which he posits impair his ability to work and care for himself. See Amen. Compl. at 5-6 ¶ 22. Further, he states that NYSARC is a non-profit entity that services, among other things, pooled supplemental needs trusts and that he is a beneficiary of such a trust that is serviced by NYSARC. See id. at 2 ¶ 3, 4 ¶ 20. Moreover, liberally construing the amended complaint, plaintiff alleges that employees of NYSARC ejected him from NYSARC's place of business explicitly because of his disabilities, thereby depriving him of NYSARC's services. See id. at 5 ¶ 21. Accordingly, affording plaintiff's pro se pleading a liberal construction, the undersigned concludes that plaintiff's intentional discrimination claims against NYSARC pursuant to Title III of the ADA for injunctive relief and the NYSHRL for injunctive relief and/or compensatory damages survive initial review. However, the undersigned makes no finding as to whether these claims would survive a properly supported dispositive motion.

### 3. Disability Discrimination Claims under Title III of the ADA and the NYSHRL Against the Individual Defendants

**\*5** "[T]he question of whether a person is a proper defendant under the ADA turns ... on ... whether the defendant owns, leases, or operates a place of public accommodation within the meaning of the ADA." Coddington v. Adelphi Univ., 45 F. Supp. 2d 211, 215 (E.D.N.Y. 1999) (emphasis removed). In assessing whether an individual is a proper defendant under the ADA, "[c]ourts ... have focused on the issue of

control and whether the named defendant 'operates' a place of public accommodation within the meaning of the ADA." Id. at 216. "Under Title III, 'to operate' means 'to put or keep in operation,' 'to control or direct the functioning of,' or 'to conduct the affairs of; manage.' " Green v. DGG Properties Co., Inc., No. 3:11-CV-01989 (VLB), 2013 WL 395484, at *13 (D. Conn. Jan. 31, 2013) (quoting Celeste v. East Meadow Union Free School Dist., 373 F. App'x 85, 91 (2d Cir. 2010)) (summary order) (additional internal quotation marks and citation omitted). Further, "[t]he term 'operate' has been interpreted as being in a position of authority and having the power and discretion to perform potentially discriminatory acts." Coddington, 45 F. Supp. 2d at 215. Moreover, courts have explained that "[s]uch discriminatory acts may result in the imposition of liability under the ADA where they are the result of the exercise of the individual's own discretion, and not merely the implementation of institutional policies or the mandates of superiors." Id.

However, courts have held that "naked assertions devoid of further factual enhancement" concerning an individual defendant's level of control over a public accommodation are insufficient for purposes of establishing individual liability under Title III of the ADA or the NYSHRL. Iqbal, 556 U.S. at 678; see Green, 2013 WL 395484, at *14. For example, in Green, where "[p]laintiff merely assert[ed] the names of the individual defendants and their respective titles," without more, the court held that, although the individual defendants could "be proper defendants in [the] action if they exercised the requisite control over [the public accommodation], the plaintiff "failed to allege any facts in his complaint that would allow the court to conclude that [the individual defendants] exercised such control over the functioning of affairs of [the public accommodation]." Id. Similarly, in Bebry, the court held that the plaintiff failed to sufficiently plead facts to establish individual liability under Title III of the ADA or the NYSHRL where the plaintiff alleged only that the individual defendant was "the lessee and/or operator of the [r]estaurant and the owner of the improvements where the [r]estaurant [wa]s located" and that, although plaintiff established that the individual defendant was "the [c]hairman or CEO of" the entity that ran the restaurant and the tenant of the property where the restaurant was located, the complaint "provide[d] no additional factual allegations." Bebry v. ALJAC LLC, 954 F. Supp. 2d 173, 178, 179 (E.D.N.Y. 2013).

Here, even affording the amended complaint the most liberal construction possible, plaintiff has not pleaded facts to establish the liability of any of the individual defendants

under the ADA or the NYSHRL. Similar to Bebry and Green, although plaintiff states the names and titles of the individual defendants in making his claims, the amended complaint does not advance any facts from which the undersigned is able to infer that any of the individual defendants "were in such positions of authority, or had such power and discretion" such that they can be said to "operate" NYSARC. Green, 2013 WL 395484, at *14; see Bebry, 954 F. Supp. 2d at 178, 179. In addition, despite placing all or most of the individual defendants' names before each of his allegations concerning the purportedly discriminatory comments and threats, plaintiff does not proffer any facts indicating which of these defendants made the alleged threats or remarks complained of. See Amen. Compl. at 8 ¶ 27, 9 ¶¶ 28-29, 10 ¶ 30. Moreover, although plaintiff appears to allege that a security guard at NYSARC was responsible for at least some of the purportedly discriminatory conduct, the security guard is not named as a defendant in this action. See id. at 8 ¶ 27. Thus, in light of plaintiff's pro se status, it is recommended that plaintiff's claims pursuant to Title III of the ADA and the NYSHRL against the individual defendants be dismissed without prejudice and opportunity to amend.

### 4. Failure to Provide Reasonable Accommodations under Title III of the ADA and the NYSHRL Against NYSARC and the Individual Defendants

**\*6** "Title[ ] ... III of the ADA prohibit[s] discrimination against qualified disabled individuals by requiring that they receive 'reasonable accommodations' that permit them to have access to and take a meaningful part in public services and public accommodations." Powell v. Nat'l Bd. of Med. Examiners, 364 F.3d 79, 85 (2d Cir.), opinion corrected, 511 F.3d 238 (2d Cir. 2004) (citations omitted). To adequately plead a claims pursuant to Title III of the ADA and the NYSHRL for failure to provide reasonable accommodations, a plaintiff must allege facts establishing that the defendant's "failure to make 'reasonable modifications' to their policies, practices, and procedures deprived plaintiff of the ability to access the 'goods, services, facilities, privileges, advantages, or accommodations' available to those lacking [the] plaintiff's disabilities." Andersen v. N. Shore Long Island Jewish Healthcare Sys. Zucker Hillside Hosp., No. 12-CV-1049 (JFB/ETB), 2013 WL 784391, at *9 (E.D.N.Y. Jan. 23, 2013) (quoting 42 U.S.C. 12182(b)(2)(A)(i)-(ii) (additional citation omitted), report and recommendation adopted as modified, No. 12-CV-1049 (JFB/ETB), 2013 WL 784344 (E.D.N.Y. Mar. 1, 2013).

Here, plaintiff alleges that, "[r]ather than engaged [sic] in a dialogue with [p]laintiff to identify some mutually agreeable or otherwise reasonable accommodation to [p]laintiff[,]" Heillbronner, Flatt, Zyskowski, Arginteano, Wilkinson, Harla, Seaburg, and "John Doe or Jane Doe as the Vice President of the NYSARC "barred [p]laintiff from the premises." Id. at 6 ¶ 24. He alleges that defendants took this action solely because of his schizophrenia and mild mental retardation. See id. at 5-6 ¶ 22. Plaintiff's allegations in this regard are wholly conclusory and the amended complaint is devoid of factual allegations concerning NYSARC's "policies, practices, [or] procedures." Andersen, 2013 WL 784391, at *9. Accordingly, it is recommended that plaintiff's claims for disability discrimination based on failure to provide reasonable accommodations be dismissed. In light of plaintiff's pro se status, it is recommended that these claims be dismissed without prejudice and leave to amend.

### 5. Disability Discrimination based on Disparate Treatment of Similarly Situated Individuals under Title III of the ADA and the NYSHRL Against NYSARC and the Individual Defendants

"A showing of disparate treatment—that is, a showing that the [defendant] treated plaintiff less favorably than a similarly situated [person] outside his protected group—is a recognized method of raising an inference of discrimination." Mandell v. Cty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003). Here, insofar as plaintiff's amended complaint may be construed as attempting to establish disability discrimination based on disparate treatment by stating that defendants "do[ ] not treat similarly situated non-disabled person [sic] in the manner in which [p]laintiff was treated," Amen. Compl. at 7 ¶ 25, plaintiff's claim in this regard is wholly conclusory in that he fails to proffer any facts in support thereof. Consequently, it is recommended that plaintiff's claims for disability discrimination based on disparate treatment be dismissed. In light of plaintiff's pro se status, it is recommended that these claims be dismissed without prejudice and with opportunity to amend.

### 6. State Law Claims

Liberally construing the amended complaint, plaintiff appears to allege New York State law claims of intentional infliction of emotional distress ("IIED"), assault and battery, and respondeat superior liability. See Amen. Compl. at 8 ¶ 27, 9 ¶ 28, 11 ¶ 31, 15 ¶¶ 45-47. Plaintiff's New York State law claims for IIED and assault and battery are barred by the one-year statute of limitations that governs those claims. See C.P.L.R. 215(3) ("The following actions shall be commenced within one year: an action to recover damages for assault [and] battery."); see also Forbes v. Merrill Lynch, Fenner & Smith, Inc., 957 F. Supp. 450, 455 (S.D.N.Y. 1997) ("It is well established under New York law that a claim of intentional infliction of emotional distress has a one-year statute of limitations.") (internal quotation marks and citations omitted). Thus, because plaintiff's claims accrued on January 5, 2019—the date of the alleged incidents at NYSARC—and plaintiff did not file this action until July 7, 2020, see Dkt. No. 1, the statute of limitations for his state law tort claims has expired. See C.P.L.R. 215(3); Forbes, 957 F. Supp. at 455. Consequently, as plaintiff's state law tort claims must be dismissed as time-barred, "it necessarily follows that any cause of action against [NYSARC or Heillbronner] based on the theory of respondeat superior and premised upon the alleged [state law torts] must also be dismissed" as time-barred. Magriz v. St. Barnabas Hosp., 43 A.D.3d 331, 333, 841 N.Y.S.2d 245, 246 (2007). Accordingly, it is recommended that plaintiff's state law claims be dismissed with prejudice and without opportunity to amend.

### D. Request to be Proceed Under a Pseudonym

**\*7** Also presently pending before the undersigned is plaintiff's request to be listed as an anonymous plaintiff and to proceed using a pseudonym. See Dkt. No. 9. Plaintiff's asserted reasons for seeking to proceed anonymously are that (1) there "was a threat to [his] life by [d]efendants' employment [sic], and during that person's work with the [d]efendant"; and (2) certain documents he has submitted to the Court contain personal information, such as his social security number. Id. at 1. Plaintiff argues that he has "a right to ... privacy by law in the event of identity theft." Id.

Courts consider the following non-exhaustive list of factors in determining whether to allow a plaintiff to remain anonymous and proceed under a pseudonym:

> (1) whether the litigation involves matters that are highly sensitive and of a personal nature; (2) whether identification poses a risk of retaliatory

physical or mental harm to the party seeking to proceed anonymously or even more critically, to innocent non-parties; (3) whether identification presents other harms and the likely severity of those harms; (4) whether the plaintiff is particularly vulnerable to the possible harms of disclosure; (5) whether the suit is challenging the actions of the government or that of private parties; (6) whether the defendant is prejudiced by allowing the plaintiff to press his claims anonymously, whether the nature of that prejudice (if any) differs at any particular stage of the litigation, and whether any prejudice can be mitigated by the district court; (7) whether the plaintiff's identity has thus far been kept confidential; (8) whether the public's interest in the litigation is furthered by requiring the plaintiff to disclose his identity; (9) whether, because of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigants' identities; and (10) whether there are any alternative mechanisms for protecting the confidentiality of the plaintiff.

Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 189 (2d Cir. 2008) (internal quotation marks, citations, brackets, and ellipses omitted).

In this case, plaintiff's request neither discusses these relevant factors nor provides any basis for extending the rare privilege of proceeding in the action using a pseudonym. Although he has provided documents containing personal identifying information, he has not identified any real or specific risk of harm, including theft of his identity, if his request to proceed anonymously is denied. Indeed, it is rare that the personal identifying information of parties in litigation is not contained in their filings in this Court. Moreover, having considered plaintiff's amended complaint, the undersigned concludes that plaintiff's privacy interests do not outweigh the public's interest in full disclosure of these judicial

proceedings. Plaintiff has voluntarily opted to commence this action and air his grievances in a quintessentially public forum. Therefore, in the interest of facilitating public scrutiny of judicial proceedings, and in the interest of basic fairness, the undersigned finds that plaintiff should be required to proceed in this action using his true identity. See Doe v. Frank, 951 F.2d 320, 323 (11th Cir. 1992) ("The ultimate test for permitting a plaintiff to proceed anonymously is whether [he] has a substantial privacy right which outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings. It is the exceptional case in which a plaintiff may proceed under a fictitious name." (quotation marks, footnote, citation omitted)); Doe v. Shakur, 164 F.R.D. 359, 361 (S.D.N.Y. 1996) ("Fairness requires that [the plaintiff] be prepared to stand behind her charges publicly.").

**E. Motion to Register and Consent for Electronic Service of Orders and Notices Issued by the Court in Civil Cases**

**\*8** Plaintiff has also filed a form from the United States District Court for the Eastern District of New York titled "Pro Se Registration and Consent for Electronic Service of Orders and Notices Issued by the Court in Civil Cases." Dkt. No. 8. Although similar in some respects, the Eastern District's form is significantly different than the form used in this Court. Should plaintiff wish to obtain ECF access, he is directed to properly complete and submit this Court's Pro Se Motion to Obtain ECF Login. [5] Accordingly, it is recommended that plaintiff's motion to obtain ECF access is denied with opportunity to submit of the appropriate form with this Court. Plaintiff is advised that, if he chooses to file this Court's form and request to obtain ECF access, that he must legibly provide all requested information.

[5]    The Northern District pro se motion to obtain ECF login and password form can be found at the following url:    https://www.nynd.uscourts.gov/sites/nynd/files/forms/Pro_Se_Motion_Obtain_ECF_Login.pdf.

### III. Conclusion

**WHEREFORE**, for the reasons set forth herein, it is hereby

**ORDERED**, that plaintiff's application to proceed IFP (Dkt. No. 2) is **GRANTED**, and it is further

**RECOMMENDED**, that plaintiff's claims for monetary damages pursuant to Title III of the ADA and claims for punitive damages pursuant to the NYSHRL be **DISMISSED WITH PREJUDICE AND WITHOUT LEAVE TO AMEND**; and it is further

**RECOMMENDED**, that the following of plaintiff's claims be **DISMISSED WITHOUT PREJUDICE WITH LEAVE TO AMEND**: [6] ADA Title III and NYSHRL intentional disability discrimination claims against the individual defendants; and ADA Title III and NYSHRL claims based on failure to provide reasonable accommodations and disparate treatment against all defendants; and it is further

[6]    Plaintiff is advised that an amended complaint is intended to completely replace the prior complaint in the action, and thus it "renders [any prior complaint] of no legal effect." International Controls Corp. v. Vesco, 556 F.2d 665, 668 (2d Cir. 1977), cert. denied sub nom., Vesco & Co., Inc. v. International Controls Corp., 434 U.S. 1014(1978); see also Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). Therefore, any amended complaint must include all of the allegations against each of the defendants against whom the case is going forward so that the amended complaint may stand alone as the sole complaint in this action.

**RECOMMENDED**, that the following of plaintiff's claims proceed: ADA Title III and NYSHRL claims for intentional discrimination against NYSARC but only insofar as plaintiff seeks injunctive relief pursuant to Title III of the ADA and injunctive relief and/or compensatory damages pursuant to the NYSHRL; and it is further

**RECOMMENDED**, that plaintiff's state law claims be **DISMISSED WITH PREJUDICE AND WITHOUT OPPORTUNITY TO AMEND** as time-barred; and it is further

**ORDERED**, that plaintiff's motion to proceed as an anonymous plaintiff is **DENIED WITHOUT OPPORTUNITY TO RENEW**, and it is further

**ORDERED**, that plaintiff's request to obtain ECF access is **DENIED** with opportunity to file the appropriate form with the Court within thirty (30) days from the date of this Report-Recommendation & Order; and it is further

**RECOMMENDED**, that should the District Judge adopt this Report-Recommendation and Order, plaintiff be given thirty (30) days from the date of the Order adopting this Report-Recommendation and Order to file an amended complaint, and if plaintiff does not file an amended complaint, (1) it will be deemed as an abandonment of any claims for which leave to replead has been granted and will result in judgment being entered against plaintiff on these claims without further order by the Court, and (2) the matter be returned to the Magistrate Judge for service of the original complaint for any claims that were permitted to proceed in the original complaint, with all other claims deemed stricken.

**\*9  IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), plaintiff has **FOURTEEN (14)** days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a). [7]

[7]    If you are proceeding pro se and are served with this Report-Recommendation & Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(c).

**All Citations**

Slip Copy, 2020 WL 5757478

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 7040982
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

John DOE, Plaintiff,
v.
NYSARC TRUST SERVICE, INC., et al., Defendants.

1:20-cv-0801 (BKS/CFH)
|
Signed 12/01/2020

**Attorneys and Law Firms**

Plaintiff, pro se: John Doe, New York, NY 10156.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, United States District Judge:

## I. INTRODUCTION

**\*1** Plaintiff pro se, seeking to proceed under the pseudonym John Doe, has filed this action against Defendant NYSARC Trust Service, Inc. and eleven individual Defendants alleging violations of Title III of the Americans with Disabilities Act (ADA), violations of New York State Human Rights Law (NYSHRL) and state law tort claims. (Dkt. No. 10). Plaintiff has filed a letter request seeking to proceed by pseudonym. (Dkt. No. 9). This matter was referred to United States Magistrate Judge Christian F. Hummel who, on September 28, 2020, issued a Report-Recommendation and Order recommending that certain claims be dismissed with prejudice and that certain claims be dismissed without prejudice and with leave to amend. (Dkt. No. 11). Specifically, Magistrate Judge Hummel recommended that the following claims be dismissed with prejudice: Plaintiff's claims for monetary relief under Title III of the ADA; Plaintiff's claims for punitive damages under the NYSHRL; and Plaintiff's state law tort claims, which were time-barred. (*Id.* at 8-9; 15-16). Magistrate Judge Hummel recommended that the following claims be dismissed without prejudice and with leave to amend: Plaintiff's claims against the individual defendants under Title III of the ADA and the NYSHRL for intentional disability discrimination; and Plaintiff's claims against the Defendants under Title III of the ADA and the NYSHRL based on failure to provide reasonable accommodations and disparate treatment. (*Id.* at 10-15). Magistrate Judge Hummel concluded that Plaintiff's intentional discrimination claims

against NYSARC under Title III of the ADA for injunctive relief and under the NYSHRL for injunctive relief and/ or compensatory damages survived initial review. (*Id.* at 10). Finally, Magistrate Judge Hummel denied Plaintiff's motion to proceed under the pseudonym John Doe, without opportunity to renew. (*Id.* at 19).

Plaintiff has filed partial objections to the Report-Recommendation and Order. (Dkt. No. 12). For the reasons set forth below, the Report-Recommendation is adopted in its entirety, and the Order denying leave to proceed by pseudonym is affirmed.

## II. STANDARD OF REVIEW

This court reviews *de novo* those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). "A proper objection is one that identifies the specific portions of the [report-recommendation] that the objector asserts are erroneous and provides a basis for this assertion." *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 296 (E.D.N.Y. 2013) (internal quotation marks omitted). Properly raised objections must be "specific and clearly aimed at particular findings" in the report. *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009). "[E]ven a pro se party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal...." *Machicote v. Ercole*, No. 06-cv-13320, 2011 WL 3809920 at *2, 2011 U.S. Dist. LEXIS 95351, at *4 (S.D.N.Y. Aug. 25, 2011) (citation omitted). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Id.*

**\*2** This Court may reconsider a magistrate judge's decision denying a request to proceed under a pseudonym "where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." *United States v. Pilcher*, 950 F.3d 39, 42 (2d Cir. 2020).

## III. DISCUSSION [1]

[1] The Court assumes familiarity with Magistrate Judge Hummel's thorough Report-Recommendation and Order. (Dkt. No. 11).

Plaintiff has raised two objections that this Court has reviewed de novo. First, Plaintiff objects to Magistrate Judge

Hummel's order denying Plaintiff's request to proceed under a pseudonym. (Dkt. No. 12, at 2-5). Plaintiff argues that Magistrate Judge Hummel "overlook[ed]" the applicable factors that make it appropriate for him to proceed by pseudonym. (Dkt. No. 12, at 2) (quoting *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 189 (2d Cir. 2008)). Plaintiff asserts that he should be able to proceed by a pseudonym because his social security number and street address are on an exhibit attached to the complaint and because the complaint alleges that his life and safety were threatened. (Dkt. No. 12, at 2-5). Plaintiff's objection is without merit. Magistrate Judge Hummel did not "overlook" any factors; the court expressly considered and rejected the factors Plaintiff has raised. Magistrate Judge Hummel correctly applied the governing caselaw, *Sealed Plaintiff*, 537 F.3d 185, and determined that "the rare privilege of proceeding in this action using a pseudonym" was not warranted here. (Dkt. No. 11, at 17). Magistrate Hummel noted that Plaintiff had "not identified any real or specific risk of harm ... if his request to proceed anonymously is denied," and concluded that Plaintiff's "privacy interests do not outweigh the public's interest in full disclosure of these judicial proceedings." [2] Plaintiff has failed to identify any factual or legal error that would warrant rejecting that determination. (Dkt. No. 11, at 19). The factors Plaintiff has cited are insufficient to support an exception to the presumption of disclosure, and Magistrate Judge Hummel's decision was well within the range of permissible decisions. *See Pilcher*, 950 F.3d at 43. The Court thus affirms that decision.

[2]     The Court notes that to the extent Plaintiff is concerned about the publication of a home address or a social security number, the Local Rules require that home street addresses and all but the four last digits of a social security number be redacted from any filings with the Court. N.D.N.Y. Local Rule 8.1(a).

Plaintiff also argues that Magistrate Judge Hummel erred in finding Plaintiff's NYSHRL claims to be time barred. (Dkt. No. 12, at 6). This objection is without merit because Magistrate Judge Hummel made no such finding. While the Recommendation does refer to dismissal of Plaintiff's "state law claims" with prejudice, (Dkt. No. 11, at 16, 19), the Court construes this to refer to Plaintiff's state law *tort* claims because the only claims that Magistrate Judge Hummel determined are time barred are Plaintiff's "state law tort claims"—intentional infliction of emotional distress, assault, battery—and respondeat superior, which was premised on

the state law tort claims. (*Id.* at 15-16). In fact, Magistrate Judge Hummel recommended that Plaintiff's NYSHRL compensatory damage claim against NYSARC for intentional discrimination be permitted to proceed and that Plaintiff's NYSHRL claims based on failure to provide reasonable accommodations and disparate treatment be dismissed with leave to amend. (*Id.* at 19).

 **\*3**  Plaintiff has not objected to the remaining portion of the Report-Recommendation. (Dkt. No. 12). The Court has reviewed the remaining portion for clear error and found none. Accordingly, the Report-Recommendation is adopted in its entirety for the reasons stated therein.

## IV. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Magistrate Judge Hummel's Report-Recommendation (Dkt. No. 11) is **ADOPTED** in all respects and that Magistrate Judge Hummel's Order denying Plaintiff leave to proceed by pseudonym is **AFFIRMED**; and it is further

**ORDERED** that Plaintiff's claims for monetary damages under Title III of the ADA and his claims for punitive damages under the NYSHRL are **DISMISSED WITH PREJUDICE** and without leave to amend; and it is further

**ORDERED** that the following claims are **DISMISSED WITHOUT PREJUDICE** and with leave to amend: Plaintiff's claims against the individual defendants under Title III of the ADA and the NYSHRL for intentional disability discrimination; and Plaintiff's claims against the Defendants under Title III of the ADA and the NYSHRL based on failure to provide reasonable accommodations and disparate treatment; and it is further

**ORDERED** plaintiff's state law tort claims and any cause of action premised on the state law tort claims, such as respondeat superior, are **DISMISSED WITH PREJUDICE** and without opportunity to amend as time-barred; and it is further

**ORDERED** that Plaintiff must file a second amended complaint within thirty (30) days from the date of this Order properly identifying himself, in compliance with Fed. R. Civ. P. 10(a). If Plaintiff fails to file a second amended complaint identifying himself within 30 days from the date of this Order, or to request an extension of time to do so, this action will

2020 WL 7040982

be dismissed, without further order of the Court, for failure to comply with Rule 10(a). To the extent Plaintiff files a second amended complaint without amending claims which have been dismissed with leave to replead, Plaintiff will be deemed to have abandoned such claims. Upon the filing of a second amended complaint, the Clerk is directed to return this matter to Magistrate Judge Hummel; and it is further

**ORDERED** that the Clerk serve a copy of this Order on the plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 7040982

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Sandler v. Benden, Not Reported in Fed. Supp. (2016)

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 23 of 87

2016 WL 9944017

2016 WL 9944017
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Tracey SANDLER, Plaintiff,
v.
Joseph BENDEN, Bayview Manor LLC d/b/a South Point Plaza Nursing and Rehabilitation Center, Ilene L. Nathanson, Pamela Brodlieb, and Long Island University, Defendants.

15-CV-1193(SJF)(AKT)
|
Signed 08/19/2016

**Attorneys and Law Firms**

David Zevin, Roslyn, NY, for Plaintiff.

Clifford Paul Chaiet, William Matthew Groh, Naness, Chaiet & Naness, L.L.C., Jericho, NY, Catherine Murphy, Long Island University, Greenvale, NY, for Defendants.

ORDER

Sandra J. Feuerstein, United States District Judge

I. Introduction
**\*1** On March 8, 2015, plaintiff Tracey Sandler ("plaintiff") commenced this action against defendants Joseph Benden ("Benden") and Bayview Manor LLC d/b/a South Point Plaza Nursing and Rehabilitation Center ("South Point") (collectively, "the Bayview defendants"), and defendants Ilene L. Nathanson ("Nathanson"), Pamela Brodlieb ("Brodlieb"), and Long Island University ("LIU") (collectively, "the LIU defendants"), seeking damages for, *inter alia*, defendants' alleged unjust enrichment, breach of contract, breach of fiduciary duty, defamation, fraud, tortious interference with contract and violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*; Articles 6, 19 and 20-C of the New York State Labor Law ("NYLL"); the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*; the Rehabilitation Act, 29 U.S.C. §§ 701, *et seq.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290, *et seq.*; Article 23-A of the New York Corrections Law; and Chapter XXI, Title C2 of the Nassau County Administrative Code ("the Nassau County Code"). Pending before the Court are the motions of the

Bayview defendants and the LIU defendants (collectively, "defendants") for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, defendants' motions are granted to the extent set forth herein.

II. Background

A. Factual Allegations [1]

[1] The factual allegations in the complaint are assumed to be true for purposes of this motion and do not constitute findings of fact by the Court.

Plaintiff "has a criminal history ... for acts performed nearly two decades ago[,]" (Amended Complaint ["Am. Compl."], ¶ 19), and was issued a Certificate of Good Conduct by the New York State Board of Parole on or about September 4, 2007. (*Id.*, ¶ 19; the Bayview defendants' Answer to the Amended Complaint ["Bayview Ans."], ¶ 19). Plaintiff claims that she has the following disabilities as a result of two (2) car accidents in which she was involved in 2008 and 2010: "bulging and herniated disks, nerve damage and post traumatic stress disorder [PTSD]." (Am. Compl., ¶ 17). According to plaintiff, as a result of those disabilities "[s]he is limited in her ability to sit, stand or walk for long periods without experiencing pain, in performing manual tasks, ... in her ability to lift and bend[,] ... [and] in her ability to concentrate under circumstances which trigger [PTSD], such as driving in hazardous conditions[,] [but] [s]he was and is able to perform all functions of a student, a social worker and social work intern with, at most, minor accommodations." (*Id.*; *see also id.*, ¶¶ 104, 110, 116, 122).

At all relevant times, plaintiff was enrolled as a part-time student in LIU's Masters of Social Work ("MSW") program ("the Program" or "the MSW Program"). (Am. Compl., ¶¶ 2, 17, 24; the LIU defendants' Answer to the Amended Complaint ["LIU Ans."], ¶¶ 2, 24; Bayview Ans., ¶ 17). As part of the Program, plaintiff "was assigned to a field practicum," (LIU Ans., ¶ 2) [2], *i.e.*, she performed an unpaid internship, at South Point from September 2013 until March 10, 2014. (Am. Compl., ¶¶ 2, 17, 37, 49; Bayview Ans., ¶¶ 2, 17, 49). According to plaintiff, LIU "promised," *inter alia*, that the unpaid internships "would provide education and training in social work for each student, including [her][,] ... and provided school credit to students for its completion, such credit being a requirement for graduation." (Am. Compl., ¶ 25).

[2]
According to the LIU defendants, "the second-year curriculum requires a field education component[.]" (LIU Ans., ¶ 25). Pursuant to LIU's Field Instruction Manual for the Program, the terms and effect of which the amended complaint "relies heavily," (*see* Am. Compl., ¶¶ 26, 28-29, 31-33, 45-47, 58-59, 60-62), and which is, thus, rendered "integral" to the complaint, *see Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152-53 (2d Cir. 2002), second-year students "are required to complete a total of 300 hours [in the field] during each of the standard Fall and Spring semesters." (Affirmation of Catherine Murphy in Support of the LIU defendants' motion ["Murphy Aff."], Ex. E at 17).

**\*2** Nathanson is a licensed social worker and, at all relevant times, was the chairwoman and director of LIU's Social Work Department. (Am. Compl., ¶ 22; LIU Ans., ¶ 22). According to plaintiff, Nathanson, *inter alia,* was "responsible for all decisions made within the department regarding enrollment, placement, expulsion, grading, internships, hiring, firing, pay, and employment[;] ... [and] supervised, directed and instructed all professors in the social work department including those who taught [plaintiff]." (Am. Compl., ¶ 22).

Brodlieb is a social worker and, at all relevant times, was the director of field education for the Program at LIU. (Am. Compl., ¶ 23; LIU Ans., ¶ 23). Pursuant to the Field Instruction Manual, the field director was responsible for, *inter alia*: (1) visiting, interviewing, recruiting and processing new agencies as potential field sites; (2) interviewing, advising and providing students with possible agency choices; (3) matching and overseeing placement of the students in agencies; (4) providing "student orientation in conjunction with faculty to discuss ... task assignments, process recordings, other expectations in the field and the field course outline[;]" (5) responding to field problems and issues of an administrative nature; (6) monitoring placements "to assure compliance with program and field competencies, policies and procedures[;]" (7) changing "placements only when absolutely necessary and in consultation with faculty liaison and agency field instructor[;]" (8) overseeing the field liaisons; and (9) disseminating, collecting and maintaining all evaluations in files, including the field instructor's evaluations of the student and the Program, the student's evaluation of the placement and the field liaison's evaluation of the field site. (Murphy Aff., Ex. E at 6-7).

Pursuant to the Field Instruction Manual, the field liaison "is assigned a maximum of 15 students per semester[,]" (Murphy

Aff., Ex. E at 7), and is responsible, *inter alia,* for keeping "regular contacts" with the student and field supervisor; monitoring the student's workload, assignments and progress in the field through written task sheets and written evaluations from field instructors; and responding to and attempting to resolve field problems and issues between students and field instructors or other agency personnel. (*Id.* at 7-8; *see also* Am. Compl., ¶¶ 60-61).

Plaintiff alleges, *inter alia,* that "[p]er LIU's student handbooks, LIU is required to locate and vet such internships for its students, and provide its students with contact information for the chosen facility(ies) [sic]. Students then apply for such internships." (Am. Compl., ¶ 26; *see also id.*, ¶ 28). Pursuant to the Field Instruction Manual,

"Generally, once a potential field site becomes known to the program, the agency is expected to provide written information on their programs, completing an agency data base form and experience outline for all potential field instructors. If the agency is interested in serving as a field site, it must specify the learning experiences available to students and the qualification of the personnel available to supervise students. In addition, if the agency is new to hosting MSW interns, the agency must pass a 'site evaluation' that is conducted by the Field Director....

Specifically, the Field Director looks for agencies whose programs have competent staff to provide effective supervision and professional learning; a commitment to social work ethics, values, social justice, and training of social work professionals, and a mission that includes service to diverse populations and populations at risk. In addition, students must be able to employ a broad range of technologies and modalities, consonant with both generalist and specialist practice at the field site...."

**\*3** (Murphy Aff., Ex. E at 9; *see also* Am. Compl., ¶¶ 28-29, 33). The Field Instruction Manual sets forth certain criteria for selecting field sites, including: "[c]learly defined services, whose mission and values are compatible with Social Work[;]" "[w]illingness to provide for the duration of the placement a qualified field instructor with adequate time to carry out expected educational tasks[;]" "[p]rovision of appropriate learning experiences for students including direct service work assignments, participating in staff conferences, training, and seminars which complement and supplement the goals of generalist and/or specialist practice[;]" "[a]vailable work space and resources for the student to carry out the professional

Sandler v. Benden, Not Reported in Fed. Supp. (2016)

2016 WL 9944017

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 25 of 87

role[;]" "[w]illingness to cooperate and participate with the Program in the development, monitoring and review of a well-integrated generalist/specialist curriculum[;]" and "[f]lexibility in providing the field instructor with adequate time to provide supervision and guidance to the student, as well as to review process recordings, prepare written evaluations, confer with the field liaison and attend, if possible, orientation and Advisory Committee meetings at the school." (Murphy Aff., Ex. E at 9; *see also* Am. Compl., ¶ 28).

Pursuant to the Field Instruction Manual, "[p]rior to the commencement of field, all students are required to attend a Field Orientation, at which field instruction policies and procedures are outlined[,]" (Murphy Aff., Ex. E at 13; *see also* Am. Compl., ¶ 45), and "[o]nce field instruction begins, students are encouraged to problem solve any issues in the field with their liaisons." (Murphy Aff., Ex. E at 13).

The Field Instruction Manual provides that the first semester of field instruction should include, *inter alia*, the following activities and assignments: (1) "[a]n orientation to the agency, its mission, programs, policies, safety procedures, staff, resources and geographic and professional community of the agency[;]" (2) "[e]xposure to and inclusion in professional/ staff meetings, seminars, task forces, committees, educational workshops, and training[;]" (3) "[p]rovision of 1 ½ hours of regularly scheduled weekly supervision that includes discussion of agency functions, process recordings, values and ethics, the integration of theory with practice, the formulation, monitoring and evaluation of learning goals, and role playing client-worker scenarios whenever possible[;]" and (4) "[p]rovision of varied opportunities to observe the social workers ethically engaging, assessing, contracting, and/or working with client systems of various types and sizes, ... [and] to[ ] utilize the problem-solving process[,] develop communication and relationship-building skills[,]" etc. (Murphy Aff., Ex. E at 21-22; *see also* Am. Compl., ¶¶ 45-46).

In addition, the Field Instruction Manual provides, in relevant part:

> "Overall, the professional development of students is the responsibility of all faculty members. Faculty are committed and obligated to assist students with any academic or field difficulties.... In the field, a student who is having difficulties is instructed to first try to resolve the situation with the field instructor. If unable to resolve the problem directly with the field instructor, the student should bring the matter to the attention of his or her

Field Liaison. The Field Liaison may involve the Field Director if the problem persists. Depending on the nature of the situation, the student may be granted the option to change field placements if it is found that there is a problem with the field instructor or agency. However, if the problem is found to be within the student, then a corrective plan of action is devised for the student. If continued problems exist, whether it is on the part of the student or field instructor, the problem would be brought before the Grievance & Appeals Committee ["GAC"].

...

The [GAC] is comprised of 4 graduate faculty members representing both the LIU Post and Brooklyn Campuses. The structure of this committee provides objectivity in view of the student's situation. The [GAC's] purpose is to arbitrate student grievances and appeals and attempt to resolve any conflicts between students and faculty that require mediation. An *appeal* refers exclusively to situations regarding student's perception of unfair grading practices. A *grievance* refers to a situation regarding the student's perception of discriminatory treatment."

**\*4** (Murphy Aff., Ex. E at 34-35; *see also* Am. Compl., ¶¶ 58, 62) (emphasis in original). If the student is not satisfied with the GAC's decision on either an appeal or a grievance, he or she can appeal that decision to the Dean of the School of Health Professions and Nursing. (Murphy Aff., Ex. E at 37-38). The Dean's decision may be appealed to the Office of the Vice President of Academic Affairs. (*Id.* at 38).

During the Fall 2013 semester, LIU provided plaintiff "with one 'choice' in internships," *i.e.*, South Point. (Am. Compl., ¶ 27). Before providing plaintiff with that internship, Nathanson allegedly asked her, "pursuant to her criminal history, 'If you didn't have a conscience then, what makes you think you have one now?' " (*Id.*, ¶ 35). In addition, Nathanson purportedly commented: "Based on your ... criminal record I don't know where we'll ever find you placement [at an internship].' " (*Id.*)

Plaintiff alleges that "Nathanson had also protested [her] need for a minor disability-based accommodation regarding classroom study—[her] physician had noted in writing that [she] required a 10-minute break to stretch and walk after sitting in class continually for 1 ½ hours[,] ... [which] amounted to one short break per three-hour class[.]" (Am. Compl., ¶ 36). According to plaintiff, "Nathanson went so far

Sandler v. Benden, Not Reported in Fed. Supp. (2016)

2016 WL 9944017

as to call a meeting with LIU's Disabilities Support Services office to express her disapproval." (*Id.*).

Plaintiff applied for the internship at South Point by completing a "lengthy" application "in which she noted her criminal history and disabilities[.]" (Am. Compl., ¶ 37; *see also id.*, ¶ 20). "At South Point, [plaintiff] was never supplied with notice regarding her regular hourly rate of pay, overtime rate, pay day, method of pay calculation, name and address of employer and other information[;] was not required to provide written confirmation of receipt of such notice[;] and was never provided with a wage statement[.]" (*Id.*, ¶ 48; Bayview Ans., ¶ 48). According to the Bayview defendants, "as an unpaid student intern, [p]laintiff was not an employee of [South Point] and thus [it] was not obligated to provide such notice." (Bayview Ans., ¶ 48).

At all relevant times, Benden was the administrator of South Point. (Am. Compl., ¶ 20; Bayview Ans., ¶ 20). According to plaintiff, Benden, *inter alia*, "had power over personnel decisions at South Point, interns, hiring and firing, setting and paying wages, establishing work schedules and duties, and maintaining records[,]" (Am. Compl., ¶ 20); and supervised her during her internship at South Point. (*Id.*, ¶¶ 2, 20).

Plaintiff interned at South Point for approximately sixteen (16) hours per week from September through mid-December 2013, and approximately seventeen (17) hours per week from mid-January until on or about March 10, 2014. (Am. Compl., ¶ 49). On or about September 26, 2013, plaintiff executed a "Three-Party Field Contract" ("Field Contract") between herself, South Point and LIU, providing, *inter alia*, that South Point agreed (1) to "[p]rovide an experienced MSW level field instructor, who has completed the required Seminar in Field Instruction Training and is committed to educating students for social work practice[,]" (Field Contract at 2, ¶ 2; *see also* Am. Compl., ¶ 50; Bayview Ans., ¶ 50); (2) to "[a]ssign at least one case by the second week of placement and increase the load at a pace which keeps the student challenged but not overwhelmed," and to make such assignments "with educational value as the primary consideration, appropriate to the level and skill of the student[,]" (Field Contract at 2, ¶ 3; *see also* Am. Compl., ¶ 51; Bayview Ans., ¶ 51); (3) to "[p]rovide a minimum of one to one and a half hours of supervision at a regularly scheduled, mutually agreed upon time[,]" (Field Contract at 3, ¶ 7; *see also* Am. Compl., ¶ 52; Bayview Ans., ¶ 52); and (4) to "[v]ary assignments to include clients from different cultural, social, and religious backgrounds and call for

different helping roles: i.e., counseling, advocacy, brokerage, outreach, etc.[,]" and "[w]here possible, [to] include work with individuals, groups, families and communities." (Field Contract at 3, ¶ 9; *see also* Am. Compl., ¶ 53; Bayview Ans., ¶ 53). According to plaintiff, "[f]or a good deal of [her] internship," she was not provided with an experienced MSW level field instructor, (Am. Compl., ¶ 50); she was not assigned "at least one case by the second week of placement[,]" (*id.*, ¶ 51); "[n]early no ... supervision was provided during the entire internship[,]" (*id.*, ¶ 52); and she "had no clients at all except for one, who started very late in her first semester, and a sole, ill-fated group meeting in her second semester." (*Id.*, ¶ 53).

**\*5** Plaintiff alleges, *inter alia*, (1) that "Brodlieb and LIU failed to properly vet South Point by failing to carry out all or substantially all of its required and promised vetting procedures, resulting in [her] placement in a worthless internship in which [she] received nearly no training in social work, and was subjected to a unethical, dishonest, discriminatory and unsafe environment[,]" (Am. Compl., ¶ 38); (2) that she received "very little," "few" and/or "nearly no" educational or training benefits from the internship, (*id.*, ¶¶ 2, 39, 49),"as it consisted primarily of secretarial and receptionist duties such as filing, photocopying, fetching food, organizing paperwork and making and receiving ordinary phone calls[,]" (*id.*, ¶ 2; *see also id.*, ¶¶ 39, 49), and "grunt work," including "wheeling patients, running errands, ... making phone calls to patients' families to arrange for basic patient maintenance, finding clothes for patients, ordering from catalogs, relaying messages to patients, etc.," (*id.*, ¶ 49); (3) that "LIU, knowing of [her] old criminal record, ... intentionally placed [her] at an educationally-useless internship [ ] ... at a facility which had recently been cited for numerous deficiencies and was under investigation by the New York State Department of Health[,]" (*id.*, ¶ 3; *see also id.*, ¶ 44); (4) that LIU failed to provide her with the field orientation, guidelines and "varied opportunities" promised in its student handbook, (*id.*, ¶¶ 45-47); (5) that she "received nearly none of th[e] supervision" promised in LIU's student handbook, (*id.*, ¶ 45; *see also id.*, ¶ 49); (6) that the field liaison to which she was assigned (a) was assigned "significantly more" students that the fifteen (15)-student maximum, and (b) failed to keep in regular contact with her and her field supervisor and to monitor her workload, assignments and progress in the field, (*id.*, ¶ 61); and (7) that "the ratio of students to full time faculty [at LIU] was significantly higher" than the 1:12 ratio LIU was required to maintain. (*Id.*).

Sandler v. Benden, Not Reported in Fed. Supp. (2016)

2016 WL 9944017

According to plaintiff, "[h]ad Brodlieb conducted, or properly conducted, the promised 'field evaluation,' she would have observed that, past the first floor, which includes the floor on which [plaintiff's] office was located, hallways were nearly always covered in urine and/or feces, deposited there by residents of the facility, which would remain for long periods of time with no indicating signs, as South Point failed to hire adequate janitorial staff[,] ... constitut[ing] both a health and slipping hazard and plac[ing] [her] in daily danger, contrary to LIU's promise that students would 'never be placed' in danger." (*Id.*, ¶ 40). In addition, "an extremely high percentage of the residents of South Point were infected with Hepatitis B, presenting such a danger to [plaintiff] that she had herself vaccinated[,]" (*id.*, ¶ 41); and there was an "ever-present" danger to plaintiff because, although she was never assaulted, "it was not uncommon for certain residents in the population to become violent." (*Id.*, ¶ 42). According to plaintiff, "during much of the internship, [she] was not permitted to leave the tiny office into which she had been placed, even to go to the bathroom—Benden would call her and instruct her not to leave the office because the New York State Department of Health was on the premises performing an investigation into alleged health violations by South Point, and [he] did not want [her] to speak with them." (*Id.*, ¶ 49).

Plaintiff alleges that "[n]o other student interned with [her], none had ever interned at [South Point] before, other than one who, upon information and belief, had a poor experience there [3], and upon information and belief, no LIU student has interned there since." (*Id.*)

[3]      Plaintiff also contradictorily alleges that "LIU had never before placed any student at South Point for an internship." (Am. Compl., ¶ 44).

Plaintiff alleges, *inter alia*, that Benden, (1) "criticized and insulted [her] for her lack of ability to perform physical labor due to her disability, such as pushing patients in their wheelchairs or bending down to plug in a computer, functions which are not properly assignable to a social worker in the first place, but rather to a nurse or an aide[,]" (Am. Compl., ¶ 54); (2) "would often say things such as, 'What good are you, you can't do anything,' or 'You'll never amount to anything [because of your disabilities][,]' " (*id.*) (brackets in original); (3) denied her "the 10-minute breaks to walk and stretch after every hour and a half of continuous sitting, which her doctor had specified in writing that she needed, denied [her] a lunch break, and denied [her] request to work three

shorter days rather than two longer ones[,]" (*id.*, ¶ 55); (4) commented "that interns did not receive 'special treatment' in his day, and that accordingly, [plaintiff] should not be treated differently than he had been, despite her disabilities[,]" (*id.*); (5) "forced [her] to work in an office so tiny that, although she could stand up from her desk, there was no room to walk or stretch sufficiently to prevent and/or alleviate disability-related pain[,]" (*id.*); and (6) "chastised [her] and complained to LIU regarding [her] few absences during blizzards ..., although he was fully aware that [she] suffered from [PTSD] as a result of the two car accidents in which [she] had been involved, and which condition he knew was triggered by driving in hazardous weather conditions." (*Id.*, ¶ 56).

**\*6**  According to plaintiff, (1) she complained "throughout the fall semester to Benden about his verbal abuse and lack of accommodations, to no avail[,]" (Am. Compl., ¶ 55); (2) she complained to Brodlieb about Benden's purported "verbal abuse, refusal to provide accommodations, and lack of supervision and training, and requested a change of internships, ... [but she] was consistently and repeatedly refused assistance[,]" (*id.*, ¶ 57); and (3) she also "complained to her 'field liaison,' ... [but] th[o]se complaints fell on deaf ears also." (*Id.*, ¶ 60). In or about December 2013, "after it became clear that ... Brodlieb and the field liaison would not help, [plaintiff] complained of the hostile work environment and refusal to accommodate to LIU's Disability Support Services ["DSS"] office, which finally forced South Point and Benden to at least provide the needed accommodations." (*Id.*, ¶ 63).

Following the "intervention" by LIU's DSS, Benden's purported abuse of plaintiff increased and "his harassing comments became more severe and even more frequent." (Am. Compl., ¶ 64). "During the spring semester [Benden] would frequently chastise [plaintiff] for her request to spread her work over three days, saying that 'everyone else' spread it out over only two, and that the three days was 'unacceptable in [his] ... book.' " (*Id.*) In addition, Benden (1) commented, *inter alia*, that plaintiff "would never amount to anything," "would never get a job," "should have remained a cab driver," and "should have stayed in jail," (*id.*); and (2) sent plaintiff "to work for the billing department to perform work which bore no resemblance to social work whatsoever." (*Id.*) According to plaintiff, she "continued to complain to Brodlieb and her field liaison regarding the hostile work environment and lack of supervision and training at South Point and continued to request a change of internship, but still assistance was refused." (Am. Compl., ¶ 65).

On or about February 28, 2014, plaintiff submitted a "process recording" to Benden and LIU "disclos[ing] improper quality of patient care at South Point, specifically in regard to an incident in which the social work director at South Point, ... had disrupted a group meeting with residents by noisily arriving late with an inappropriate patient (who in turn disrupted the meeting), and failed to introduce herself to patients who were discussing personal life circumstances who did not know who she was, and then publicly contradicted [plaintiff] by providing inaccurate, misleading information to the group." (Am. Compl., ¶ 67). Plaintiff reported that the director of social work purportedly violated certain rules of ethics by "later badmouth[ing]" plaintiff and "telling a non-social worker the details of the life situation of a patient in the group meeting." (Id.)

According to plaintiff, "[w]ithin days, if not hours, of reading the process recording, in a letter dated March 10, 2014, Benden made several discriminatory, retaliatory, untrue and defamatory statements regarding [her] ... [and] published th[e] letter to Brodlieb and LIU[,] ... [who] immediately republished [it] to Nathanson and other faculty and staff at LIU." (Am. Compl., ¶ 68). The alleged defamatory statements include, *inter alia*: (1) that plaintiff's "attendance continue[d] to be an issue[,]" (id., ¶ 68); (2) that Benden "requested and [plaintiff] agreed [to] check in with [him] when she arrive[d] at [South Point] so [he] [could] update her on pertinent information and ... monitor her attendance[,] ... [but] she ha[d] not done so[,]" (id., ¶ 69); (3) that Benden "asked and [plaintiff] agreed that she write progress notes on the residents she sees and give[ ] them to [him] to sign off on and discuss[,] ... [but] she ha[d] not done so[,]" (id., ¶ 70); (4) that when Benden asked plaintiff about the failure to give him progress notes, "she reported she gave them to another Social Worker to read and sign off on and then she put them in the chart[,] ... [and] she does not remember who the people are she wrote th[o]se notes on[,]" (id.); (5) that on March 5, 2014, plaintiff "either signed out and then went back upstairs and continued working or she falsified her attendance sheet[,] [and] [e]ither action is unacceptable[,]" (id., ¶ 71); (6) that plaintiff "was observed by the Director of Social Work giving residents false information in the group she was running[,] [and] [w]hen the Director of Social Work intervened and tried to clarify the information [plaintiff] became very defensive and stated the Director of Social Work was interrupting her group[,]" (id., ¶ 72); (7) that plaintiff "has clearly demonstrated an inability to complete the most basic tasks that are required for [Benden] to supervise an

intern and for [South Point] to have an intern conduct their field placement effectively[,]" and although he "spoke[ ] to [plaintiff] on several occasions about what is expected and she agreed[,] [she] ha[d] not followed through[,]" (id., ¶ 73); and (8) that "[w]hen issues are discussed, [plaintiff] says she only comes to field placement 'because it's better than sitting home on my ass' and other remarks which demonstrate her lack of interest and a sense of hostility toward her field placement." (Id., ¶ 74). "Benden ended the letter with a request that [plaintiff] be removed from her placement at South Point." (Id., ¶ 76).

**\*7** According to plaintiff, Benden's assertions in the letter were "untrue," "misleading" and/or "defamatory" and "written willfully and maliciously, with actual malice and with intent to injure and damage [her] good name and reputation as a student, intern, and future social work, and ... to encourage her expulsion from the social work program." (Am. Compl., ¶¶ 68-74). Plaintiff alleges: (1) that "Benden knew that [she] missed time only during blizzards during which the school was closed, and on two occasions on which her physician informed her that she was contagious and should not expose the vulnerable population at South Point to her illness[,]" (id., ¶ 68); (2) that she "always made up any lost time[,]" (id.); (3) that "Benden was aware that [she] suffered from [PTSD] related to driving, ... and that such PTSD was triggered by driving in blizzards[,]" (id.); (4) that Benden had only requested that she check in with him when she arrived at South Point and to give him progress notes on the residents she saw in or about the beginning of February 2014, and she attempted to comply with those agreements for approximately one week, but each time Benden was unavailable to meet with her, then he left on vacation and returned "only shortly prior to [her] termination" from the Program, (id., ¶¶ 69-70); (5) that "after being unable to meet with Benden, [she] resourcefully provided the [progress] notes to ... [another] social worker ... who reviewed them and instructed [her] to place them in the client's file, not to provide them to Benden[,]" (id., ¶ 70); (6) that she never informed Benden that she did not know "the identity of the client for whom she had prepared the [progress] notes[,]" (id.); (7) that she "was never asked to not work beyond 5:00 p.m. until March 7, 2014, making it impossible for her to have violated any such directive on March 5, 2014, ... and [d]uring this period of her internship, [she] consistently left ... at 5:00 p.m[,]" (id., ¶ 71); (8) that she "gave residents completely accurate information which was based on a specific inquiry and details provided by a resident prior to the Director of Social Work's inappropriate and late arrival to the

Sandler v. Benden, Not Reported in Fed. Supp. (2016)
2016 WL 9944017

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 29 of 87

meeting[,]" (*id.*, ¶ 72); (9) that "[t]he Director of Social Work failed to ascertain the details of the resident's inquiry and ... herself provided incorrect information to the resident[,]" (*id.*); (10) that "Benden was fully informed of ... the Director of Social Work's unprofessional behavior, lack of understanding of context, and incorrectness of conclusion[,]" (*id.*); (11) that plaintiff "was rarely given the opportunity to perform social work intern tasks ... and performed all tasks, though most of them menial, effectively[,]" (*id.*, ¶ 73); (12) that "Benden communicated his expectations to [plaintiff] only twice, once at the beginning of each semester," (*id.*); and (13) that the comments attributed to her by Benden as demonstrating "her lack of interest and a sense of hostility toward her field placement" were "pure fiction. (*Id.*, ¶ 74).

In addition, plaintiff alleges that in order "to support his false contentions [in the letter], Benden supplied Brodlieb with misleadingly incomplete samples of [plaintiff's] work, which made it appear as if [her] work was inadequate[,]" (Am. Compl., ¶ 75); and "represented that the samples were complete when he supplied them, though he knew that they were incomplete, and willfully and maliciously did so ... in order to cast [plaintiff] in an untrue and negative light, with intent to injure and damage [her] good name and reputation as a student, intern, and future social worker, and ... to encourage her expulsion from the ... [P]rogram." (*Id.*)

On or about March 11, 2014, LIU expelled plaintiff from the Program without ever "attempt[ing] to ascertain [her] version of events or conduct[ing] a meaningful investigation of the matter[.]" (Am. Compl., ¶ 77).

Plaintiff alleges, *inter alia*, (1) that she "was denied reasonable accommodations by all defendants relating to certain disabilities which she had as a result of two automobile accidents," (Am. Compl., ¶ 4); (2) that "she was subject [sic] to a hostile work environment at [Bayview], consisting of pervasive disability-based and criminal history-based insults from Benden while interning[,]" (*id.*); (3) that LIU and Brodlieb breached their contract with, and fiduciary duty to, her, and "behaved discriminatorily [sic] in refusing to support [her] or assist in any resolution" after she made them "fully aware ... of Benden's discriminatory treatment[,]" (*id.*; *see also id.*, ¶¶ 57-59); (4) that "[i]mmediately after [she] wrote a report to Benden and LIU which disclosed improper quality of patient care at [Bayview], Benden retaliatorily [sic] and discriminatorily [sic] terminated [her] from the internship, wrote a defamatory letter regarding her to LIU, and provided false records of [her] work to LIU[,]" (*id.*, ¶ 5); and (5)

that LIU "then retaliatorily [sic] and discriminatorily [sic] expelled [her] from its Masters of Social Work Program the very next day, ... performing little to no investigation of the matter and failing to inquire as to [her] version of events at all." (*Id.*)

Plaintiff "appealed her expulsion to Nathanson, who upheld the decision, ... by letter dated March 24, 2014." (Am. Compl., ¶ 78; LIU Ans., ¶ 78). On a subsequent appeal "to a panel drawn from Nathanson's social work department[,] ... the panel upheld the decision to expel her." (*Id.*, ¶ 79).

"While pursuing the appeal, [plaintiff] was permitted, per LIU's rules, to continue her classroom studies in the Program, and she did so." (*Id.*, ¶ 80). According to plaintiff, "[t]he breaching [sic] and discriminatory treatment continued however, as [she] received a failing grade on a paper for allegedly failing to properly follow protocol, though [she] had followed the school syllabus in precisely the same manner as she had done previously without issue[,]" (*id.*); and she "received a 'C' and a 'C-' on two other papers ... from Nathanson[,] ... [when] [she] had earned a 3.33 GPA until that point." (*Id.*) According to plaintiff, "it is necessary for a student in LIU's social work program to maintain a 3.0 GPA in order to remain matriculated[,]" (*id.*); and her "protestations regarding discriminatory grading were ignored." (*Id.*) Plaintiff alleges that "[t]he stress of the breaching [sic] and discriminatory treatment forced [her] to take a mid-semester leave of absence from the [P]rogram during the spring, 2014 semester, pending the outcome of the appeal[,] [but] LIU refused to return the semester's tuition." (*Id.*, ¶ 81).

**\*8** Plaintiff appealed her dismissal from the Program "to a panel composed of faculty drawn from outside of the social work department[,]" (Am. Compl., ¶ 82), which reversed the decision to expel her and reinstated her into the Program. (*Id.*; LIU Ans., ¶ 82). Nonetheless, plaintiff alleges that she "lost a semester of study, work and tuition during th[e] process[;] ... any possible graduation was delayed by a year[,]" (Am. Compl., ¶ 5; *see also id.*, ¶¶ 82-83); and she "suffered a great deal of emotional trauma." (*Id.*, ¶ 82).

Plaintiff alleges that after her reinstatement, "Nathanson emailed the Dean of LIU's School of Health Professions and others in the social work department, and intimated that she did not want [plaintiff] to 'continue in the program,' while expressing the fear that taking such a stance could 'open us up to another legal conflict.' " (Am. Compl., ¶

Sandler v. Benden, Not Reported in Fed. Supp. (2016)

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 30 of 87

2016 WL 9944017

84). Although plaintiff continued her studies in the Program, "many small acts of discrimination, retaliation, and breach of contract and fiduciary duty[ ]" occurred, (*id.*, ¶ 85), including: (1) one occasion when she "was marked 'late' for class, though entering the classroom at the stroke of starting time, and immediately behind a fellow student who was not so marked[,]" (*id.*); (2) one occasion when she "was the only student who was reprimanded for viewing her cell phone's screen during class, although she was viewing the class textbook on the phone screen at the time, and ... several other students were doing likewise at the same moment[,]" (*id.*, ¶ 86); and (3) special restrictions being placed on her next internship, *e.g.*, "instructing her to start two weeks after all other students, which made it very difficult to timely complete all required hours[ ] [a]nd ... provid[ing] [her] with a special letter providing that she was not permitted to take time off from the internship during spring break." (*Id.*, ¶ 87).

On or about November 10, 2014, plaintiff filed separate charges with the United States Equal Employment Opportunity Commission ("EEOC") against the Bayview defendants and LIU alleging violations of the ADA and the Rehabilitation Act, which were purportedly served upon the Bayview defendants and LIU "in approximately late February, 2015." (Am. Compl., ¶ 6). According to plaintiff, "up until that point," she had amassed a grade point average ("GPA") of 3.33, but "immediately after LIU received the EEOC complaint, and at the first moment possible after reinstatement to LIU, [she] began to receive very poor grades from the social work departments, grades so low that, per social work department policy, her expulsion from LIU was mandated at the end of the Spring, 2015 semester." (*Id.*; *see also id.*, ¶ 88 ["[I]n the Spring, 2015 semester, ... at the explicit or implicit request of Nathanson, [plaintiff's] teachers began to give her a series of very poor grades on all assignments which could be graded subjectively."] ). According to plaintiff, "[o]n the one test which [she] took which must have been graded objectively (a multiple choice/ fill in the blank test), [she] received a 90 out of 100, and [her] evaluations from her current internship, (prepared by non-LIU personnel, ...), were excellent." (*Id.*, ¶ 88).

Plaintiff alleges that "[p]er the social work school's policy, any student who received final class grades below B- in any three semester-long classes during the student's time at LIU is expelled[,]" (Am. Compl., ¶ 89), and she had received one (1) such grade from Nathanson in a prior semester. (*Id.*) According to plaintiff, "one of the teachers in the Spring of 2015 who gave [her] a poor grade mentioned to [her] that

she knew of th[e] old grade, indicating that she knew of the consequences of two more such grades." (*Id.*).

**\*9** After plaintiff received final grades of a "C" and a "C+" in the Spring 2015 semester, she was expelled from LIU by letter dated May 13, 2015. (Am. Compl., ¶¶ 6, 89).

B. Procedural History
Plaintiff received separate "Notice[s] of Right to Sue (Issued on Request)," both dated "2/27/2014 [sic]," from the EEOC with respect to charges against the Bayview defendants and LIU. (Am. Compl., Ex. A).

On March 8, 2015, plaintiff commenced this action against defendants seeking damages for, *inter alia*, defendants' alleged unjust enrichment, breach of contract, breach of fiduciary duty, defamation, fraud, tortious interference with contract and violations of the FLSA, the NYLL, the ADA, the Rehabilitation Act, the NYSHRL, Article 23-A of the New York Corrections Law and Chapter XXI, Title C2 of the Nassau County Code. On July 6, 2015, plaintiff filed an amended complaint against defendant asserting the following claims: (1) that defendants violated the FLSA, 29 U.S.C. § 206, and the NYLL, by willfully failing to pay her the federally-mandated and New York State minimum wage for the hours she worked at South Point and failing to keep records of her work (First and Second Causes of Action, respectively, against all defendants), (Am. Compl., ¶¶ 90-100); (2) that defendants violated Section 195 of the NYLL by willfully failing to provide her "with notice regarding her regular hourly rate of pay, overtime rate, pay day, method of pay calculation, name and address of employer and other information, and ... [to] request [that she] ... provide written confirmation of receipt of such notice" (Third Cause of Action against all defendants), (*id.*, ¶¶ 101-103); (3) that defendants knew of her disabilities, and perceived her as disabled, and willfully discriminated against her in violation of the ADA, the Rehabilitation Act, the NYSHRL and the Nassau County Code (Fourth and Fifth Causes of Action against South Point and the LIU defendants; Sixth Cause of Action against all defendants; and Seventh Cause of Action against the LIU defendants, respectively),[4] (*id.*, ¶¶ 104-127); (4) that defendants knew of her criminal history and that she had been issued a Certificate of Good Conduct in relation to her criminal history, and willfully discriminated against her in violation of the NYSHRL and the New York Correction Law (Eighth Cause of Action against all defendants), (*id.*, ¶¶ 128-132); (4) that all defendants

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 31 of 87

Sandler v. Benden, Not Reported in Fed. Supp. (2016)

2016 WL 9944017

terminated her from her internship at South Point, and the LIU defendants expelled her from the Program, in willful retaliation for her disclosure in the February 28, 2014 process recording of an activity that constituted improper quality of patient care at South Point in violation of Section 741 of the NYLL (Ninth Cause of Action against all defendants), (*id.*, ¶¶ 133-135); (5) that defendants breached their fiduciary duty to plaintiff "to act in her best interest and not engage in conduct adverse or detrimental to her," (Twelfth Cause of Action against LIU and Thirteenth Cause of Action against the Bayview defendants), (*id.*, ¶¶ 151-161); (6) that defendants were unjustly enriched by her internship at South Point insofar as, (a) the LIU defendants benefitted therefrom, at her expense, "by allowing such participation to be used to fulfill accreditation requirements, thereby receiving continued accreditation from the Commission on Accreditation of the Council on Social Work Education, which ... in turn encouraged student to attend LIU and pay tuition there[,]" (*id.*, ¶ 164), and failing to "compensate her ... in course credit[,]" (*id.*, ¶ 163), and (b) the Bayview defendants benefitted therefrom, at her expense, by having her perform "educationally-useless tasks ..., which otherwise would have had to be performed by a paid employee," (*id.*, ¶ 165), and failing to compensate her in wages (Fourteenth Cause of Action against all defendants), (*id.*, ¶¶ 162-167); (7) that the Bayview defendants "libeled" plaintiff, "caus[ing] and contribut[ing] to [her] expulsion from LIU," (*id.*, ¶¶ 168-169), and "disparaged [her] in her profession[,] ... constitut[ing] slander per se[,]" (*id.*, ¶ 170) (Fifteenth Cause of Action against the Bayview Defendants); and (8) that the Bayview defendants "committed fraud against [her] by knowingly submitting false samples of her work to Brodlieb and LIU and representing that such samples accurately reflected [her] work[,]" (*id.*, ¶ 172), knowing that the LIU defendants "would view these work samples unfavorably and use them to evaluate [her], and intend[ing] same[,]" (*id.*, ¶ 173), thereby "caus[ing] and contribut[ing] to [her] expulsion from LIU[,]" (*id.*, ¶ 175) (Sixteenth Cause of Action against the Bayview defendants).

4    By order dated September 16, 2015, *inter alia*, plaintiff's fourth and fifth causes of action were dismissed as against Benden, and her seventh cause of action was dismissed as against the Bayview defendants. (DE 22).

**\*10** In addition, plaintiff alleges, (1) that LIU's "promises and obligations to its students, including [plaintiff]," contained in its "website, [MSW] Degree Program Student Handbook, [MSW] Program Field Instruction Manual, and

field contract, ... among other documents and promises, ... [which] incorporated by reference the publication and codes of ethics of the Council of Social Work Education and National Association of Social Workers[,]" (Am. Compl., ¶ 136), constituted a contract requiring LIU "to, *inter alia*, place [plaintiff] at an educationally-useful internship, properly vet South Point as an internship facility, perform a site evaluation at South Point, properly monitor South Point to ensure its compliance with internship requirements, properly respond to [plaintiff's] complaints in regard to the South Point internship, properly investigate Benden's complaints regarding [plaintiff], ensure that the internship provided 1 ½ hours of supervision per week, provide a field orientation, ensure skill development at South Point, not place [plaintiff] in an unsafe environment, provide [plaintiff] with internship clients, ensure the provision of competent internship staff with sufficient time to train [her], provide internship practice opportunities, refrain from discriminating against [her] in any way, recognize and accept diverse backgrounds and points of view, treat [her] fairly, compassionately and with care, integrity and justice, consistent with the highest ethical standards, refrain from allowing personal animosity to affect judgment and actions in regard to [her], make every effort to facilitate [her] professional development, adhere to promised teacher/student ratios, follow the procedures denoted in its publication, and provide the assistance denoted in its publications[,]" (*id.*, ¶ 138); and (2) that LIU breached its contract with plaintiff by failing to "provide that which it promised to [her]" (Tenth Cause of Action against LIU). (*Id.*, ¶¶ 136-141).

Moreover, plaintiff alleges that the Bayview defendants tortiously interfered with the contract between LIU and plaintiff by "knowingly," "willfully" and "maliciously" providing false information and documents to the LIU defendants, causing and contributing to LIU's breach of its contract with plaintiff (Seventeenth Cause of Action against the Bayview defendants). (Am. Compl., ¶¶ 177-181).

Plaintiff further alleges, *inter alia*, (1) that the Bayview defendants established a contract with plaintiff by employing her, acted as agents of LIU and were, therefore, subject to the contract between LIU and plaintiff, and/or were contractually obligated to plaintiff by the Field Contract; (2) that pursuant to their contract with plaintiff, the Bayview defendants were required, *inter alia*, (a) to "provide [her] with an educationally-useful internship, ... 1 ½ hours of supervision per week, ... learning and practice opportunities to prepare her for social work practice, ... skill-development

Sandler v. Benden, Not Reported in Fed. Supp. (2016)

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 32 of 87

2016 WL 9944017

opportunities, ... [and] competent staff with sufficient time to train and guide [her]," (Am. Compl., ¶ 147), (b) to timely provide her with clients, (c) to "refrain from providing [her] with non-educational duties, ... from discriminating against [her] in any way, ... [and] from allowing personal animosity to affect judgment and actions in regard to [her]," (id.), (d) to "recognize and accept diverse backgrounds and points of view," (id.), (e) to "treat [her] fairly, compassionately and with care, integrity and justice, consistent with the highest ethical standards[,]" (id.), and (f) to "make every effort to facilitate [her] professional development, [and] follow the procedures ... and provide the assistance denoted in LIU's publications[,]" (id.); and (3) that the Bayview defendants breached their contact with plaintiff by failing to "provide that which they promised to [her]" (Eleventh Cause of Action against the Bayview defendants). (Am. Compl., ¶¶ 142-150).

Plaintiff seeks, *inter alia*, (1) unpaid minimum wages, liquidated damages and/or statutory damages, together with reasonable attorney's fees, costs, expenses, and interest on her FLSA and NYLL claims; (2) (a) reimbursement of her tuition, with interest thereon, (b) damages to compensate her (i) for the time, effort and money she spent working, studying and fighting her "expulsion;" (ii) for "lost future wages;" and (iii) for "severe emotional distress," (c) reasonable attorney's fees, and (d) punitive damages on her ADA, Rehabilitation Act, NYSHRL, Nassau County Code, Correction Law and Section 741 of the NYLL claims; (3) "compensatory, consequential and punitive damages for loss of tuition, loss of income, loss of time, lost future wages, waste of time, energy and work, pain and mental anguish, expense, inconvenience and trouble" on her breach of contract, breach of fiduciary duty, defamation, fraud and tortious interference with contract claims; and (4) compensatory damages and interest on her unjust enrichment claim. (Am. Compl. at 45-47).

**\*11** Defendants now move, *inter alia*, for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

III. Discussion

A. Standard of Review

In deciding a Rule 12(c) motion, the same standard as applicable to a motion to dismiss under Rule 12(b)(6) is employed. *See Alcantara v. Bakery & Confectionery Union & Indus. Int'l Pension Fund Pension Plan*, 751 F.3d 71, 75 (2d Cir. 2014); *Hogan v. Fischer*, 738 F.3d 509, 514-15 (2d Cir. 2013). The standard of review on a motion made pursuant to

Rule 12(b)(6) of the Federal Rules of Civil Procedure is that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974, 167 L.Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L.Ed. 2d 868 (2009). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937 (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. 1955). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. 544, 127 S. Ct. at 1959.

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 176 (2d Cir. 2013) (quotations and citation omitted); *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013). However, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679, 129 S. Ct. 1937. "In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.*; *see also Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010).

Nonetheless, a plaintiff is not required to plead "specific evidence or extra facts beyond what is needed to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120-1 (2d Cir. 2010); *accord Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 729-30 (2d Cir. 2013). "When there are well-pleaded factual allegations, a court

should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679, 129 S. Ct. 1937.

**\*12** In deciding a motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must limit itself to the facts alleged in the complaint, which are accepted as true; to any documents attached to the complaint as exhibits or incorporated by reference therein; to matters of which judicial notice may be taken; or to documents upon the terms and effect of which the complaint "relies heavily" and which are, thus, rendered "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *see also ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 715, 190 L.Ed. 2d 441 (2014). As the complaint relies heavily upon, *inter alia*, the Field Contract, (*see* Am. Compl., ¶¶ 50-53), and the Field Instruction Manual, (*see id.*, ¶¶ 26, 28-29, 31-33, 45-47, 58-59, 60-62), those documents are integral to the complaint and properly considered on defendants' motions for judgment on the pleadings. All other extrinsic evidence submitted by the parties' in support of, and in response to, defendants' motions have not been considered by the Court.

### B. FLSA and NYLL Claims

"The strictures of both the FLSA and NYLL apply only to employees." *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 534 (2d Cir. 2015). With exceptions not relevant here, the FLSA defines the term "employee" to mean "any individual employed by an employer." 29 U.S.C. § 203(e). The NYLL similarly defines the term "employee" as "any individual employed or permitted to work by an employer in any occupation[.]" N.Y. Labor Law § 651(5). "Because the statutes define 'employee' in nearly identical terms, [courts] construe the NYLL definition as the same in substance as the definition in the FLSA." *Glatt*, 811 F.3d at 528.

In determining whether an unpaid intern is an employee entitled to compensation under the FLSA and NYLL, "the proper question is whether the intern or the employer is the primary beneficiary of the relationship." *Glatt*, 811 F.3d at 536. This "primary beneficiary test has three salient features[:] First it focuses on what the intern receives in exchange for his work[;] [s]econd, it ... accords courts the flexibility to examine the economic reality as it exists between the intern and the employer[;] ... [and] [t]hird, it acknowledges that the intern-employer relationship should not be analyzed in the same manner as the standard employer-employee relationship because the intern enters into the

relationship with the expectation of receiving educational or vocational benefits that are not necessarily expected with all forms of employment...." *Id.* (citations omitted).

In determining whether an unpaid intern is an employee under *Glatt*'s "primary beneficiary test," courts should consider the following factors:

"1. The extent to which the intern and the employer clearly understand that there is no expectation of compensation. Any promise of compensation, express or implied, suggests that the intern is an employee—and vice versa.

2. The extent to which the internship provides training that would be similar to that which would be given in an educational environment, including the clinical and other hands-on training provided by educational institutions.

3. The extent to which the internship is tied to the intern's formal education program by integrated coursework or the receipt of academic credit.

4. The extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar.

5. The extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning.

6. The extent to which the intern's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the intern.

7. The extent to which the intern and the employer understand that the internship is conducted without entitlement to a paid job at the conclusion of the internship."

**\*13** *Glatt*, 811 F.3d at 536-537. In considering those "non-exhaustive" factors, a court must "weigh[ ] and balanc[e] all of the circumstances[,]" *id.* at 537, and "may consider relevant evidence beyond the specified factors in appropriate cases." *Id.* "No one factor is dispositive and every factor need not point in the same direction for the court to conclude that the intern is not an employee [within the meaning of the FLSA and NYLL]." *Id.* Since "the touchstone of [the primary beneficiary] analysis is the 'economic reality' of the relationship, ... a court may elect ... to consider evidence about an internship program as a whole rather than the experience of a specific intern." *Id.* "[T]he question of an intern's

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 34 of 87

Sandler v. Benden, Not Reported in Fed. Supp. (2016)

2016 WL 9944017

employment status is a highly context-specific inquiry." *Id.* at 539.

Defendants contend, *inter alia*, that the balance of factors under the primary beneficiary test weigh in favor of finding that plaintiff was not their employee. Plaintiff contends, in essence, *inter alia*, that it is premature to apply the primary beneficiary test on a motion to dismiss at the pleadings stage.

It is undisputed that plaintiff had no expectation of compensation from her internship at South Point and that the internship was conducted without entitlement to a paid job at South Point upon its conclusion. (*See* Am. Compl., ¶¶ 2, 18, 25, 49). Moreover, it is clear from the allegations in plaintiff's amended complaint that plaintiff's internship at South Point corresponded to LIU's academic calendar, *i.e.*, LIU's Fall 2013 and Spring 2014 semesters. (*See, e.g. id.*, ¶ 2 ["At all relevant times [p]laintiff ... was a student in the [MSW] Program at defendant LIU and, as part of the program, performed an internship, ... at South Point ... during the fall, 2013 semester and part of the spring, 2014 semester."]; ¶ 49 ["[Plaintiff] worked for approximately 16 hours per week for South Point from September through mid-December of 2013 and approximately 17 hours per week from mid-January to her termination [from the MSW Program by LIU] on or about March 10, 2014 ...."] ). Accordingly, the first, fourth and seventh factors weigh in favor of finding that plaintiff was not an "employee" for purposes of the FLSA and NYLL.[5]

[5]    In addition, the Field Instruction Manual expressly discourages students "from utilizing their places of employment for field internships" and provides certain criteria that must be met in any case "where the employment site is requested for approval as a practicum site." (Murphy Aff., Ex. E at 10).

Furthermore, LIU required plaintiff, *inter alia*, to take a "field work class" concurrently with her internship, to complete assigned tasks, and to create reports or "process recordings" about her internship experience.[6] (*See* Am. Compl., ¶¶ 66-67; Field Contract at 1 and 3). Thus, plaintiff's internship at South Point was closely integrated with her curriculum in the Program at LIU. In addition, just a few weeks before she was dismissed from the MSW Program, plaintiff had participated in a group meeting with the residents at South Point, (*see* Am. Compl., ¶ 67), thus indicating that her internship at South Point did not extend beyond the period in which she received beneficial learning. Accordingly, the third and fifth

factors also weigh in favor of finding that plaintiff was not an "employee" for purposes of the FLSA and NYLL.

[6]    Pursuant to the Field Instruction Manual, "[s]tudents are required to submit a minimum of ... three process recordings per week in the second year of the program." (Murphy Aff., Ex. E at 26) (emphasis omitted).

Plaintiff's claims that she received "very little," "few" or "nearly no" educational benefit or training from the internship at South Point, and that she performed "primarily" secretarial and receptionist duties and "grunt work" at South Point, (Am. Compl., ¶¶ 2, 39, 49), do not warrant finding that she was an employee under the FLSA and NYLL. *See, e.g. Vlad-Berindan v. NYC Metro. Transp. Auth.*, No. 14-cv-10304, 2016 WL 1317700, at * 8 (S.D.N.Y. Apr. 1, 2016) (finding that the plaintiff's allegations, *inter alia*, that she " 'did not learn anything during the internship,' did not alter the conclusion that the plaintiff was the primary beneficiary of the internship and, therefore, would not be an 'employee' for purposes of the FLSA....") Indeed, in light of, *inter alia*, the above-quoted qualifying language in the amended complaint, and the fact that plaintiff was assigned at least one client and one group assignment, (*see* Am. Compl., ¶ 53), and was required to create reports or "process recordings" about her internship experience, (*see,* Am. Compl., ¶ 67; Field Contract at 1 and 3), it is clear that plaintiff received at least some educational benefit and training from the internship at South Point. In any event, the fact that plaintiff would have received academic credit toward her MSW degree had she successfully completed the internship at South Point weighs in favor of finding that she was the primary beneficiary of the internship at South Point. *See, e.g. Vlad-Berindan*, 2016 WL 1317700, at * 8 ("It is unfortunate, if true, that Plaintiff learned nothing during her internship but even if that is true, it does not erase the fact that she received credit toward her degree by virtue of the internship ... [and] was the primary beneficiary of the internship....")

 **\*14**  Moreover, the mere fact that the Bayview defendants may have obtained some "perks" or benefits from offering unpaid internships to LIU's students[7], and that LIU preserved its accredited status by placing its students in internships, "cannot, standing alone, render the student interns 'employees' for purposes of the FLSA." *Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1211 (11th Cir. 2015). So long "as the relationship at issue has the qualities of a bona fide internship, providing educational or vocational

Sandler v. Benden, Not Reported in Fed. Supp. (2016)

2016 WL 9944017

benefits in a real-world setting, the intern can be the primary beneficiary of the relationship even if her activities provide direct benefit to the employer." *Mark v. Gawker Media LLC,* No. 13-cv-4347, 2016 WL 1271064, at * 8 (S.D.N.Y. Mar. 29, 2016). Where an internship benefits both the intern and the employer, courts should "focus on the benefits to the student while still considering whether the manner in which the employer implements the internship program takes unfair advantage of or is otherwise abusive towards the student." *Id.* at 12 (quoting *Schumann,* 803 F.3d at 1211). Based upon the factual allegations in the amended complaint, plaintiff's internship at South Point was a bona fide internship in which she received educational and vocational benefits in a real-world setting in exchange for her work, which outweighed any of the benefits defendants may have received from the internship.

7    Pursuant to the Field Instruction Manual, the following incentives are offered to field sites and instructors supervising LIU's students: (a) the field site receives tuition remission, awarded as one and a half (1.5) credits for each second-year student who interns for one (1) year that may be allocated to any of its employees for any course at LIU for up to one (1) year from the date of issuance; (b) "[a]ctive field instructors are given a courtesy card which allows them to use the University Library and to attend discounted tickets for selected events at the Tilles Center located on the LIU Post Campus[;]" and (c) field instructors "are invited to various symposia, networking events and workshops provided by the social work department on the ... [LIU] campuses." (Murphy Aff., Ex. E at 28-29).

In sum, any factors arguably supporting a finding that plaintiff was an employee under the FLSA and NYLL are outweighed by the clear economic reality of her relationship with defendants, particularly since the undisputed purpose of her internship at South Point was to fulfill an academic requirement for her MSW degree. (*See* Am. Compl., ¶ 25). *See, e.g. Vlad-Berindan,* 2016 WL 1317700, at * 8 (finding that the plaintiff "was clearly the primary beneficiary of the internship with the [d]efendants[ ]" because, *inter alia,* she initially sought the internship for an academic requirement).

The case cited by plaintiff, *Winfield v. Babylon Beauty Sch. of Smithtown Inc.,* 89 F. Supp. 3d 556 (E.D.N.Y. 2015), in support of her FLSA and NYLL claims against the LIU

defendants is inapposite because, *inter alia,* the plaintiffs in that case were students in vocational schools who received academic credit for the work they performed in the schools' clinics, which included "manual labor and administrative functions as well as services in other fields of cosmetology that were unrelated to the field for which they sought a license." *Id.* at 567. The plaintiffs alleged, *inter alia,* that "as a result of the revenue generated from [their] work in the clinic, the [schools] allegedly earned a substantial profit and had a competitive advantage over for-profit salons, which are required to pay their employees a minimum wage." *Id.* The Court found that "[u]nder the circumstances, ... it would be plausible to conclude that the primary benefit of the [p]laintiffs' work ran to the [schools], and therefore, they [were] employees subject to the minimum wage requirements of the FLSA." *Id.*

Unlike the plaintiffs in *Winfield,* the work plaintiff performed for her internship was performed at South Point, not an LIU clinic, and plaintiff does not allege that the LIU defendants received any direct profit, benefit or competitive advantage as a result of the work she performed at South Point. Rather, plaintiff alleges only that LIU's "internship program is a requirement for school accreditation," (Am. Compl., ¶ 26; *see also id.,* ¶ 30), and that the LIU defendants "benefited [sic] from [her] participation in the internship program ... by allowing such participation to be used to fulfill accreditation requirements." (*Id.,* ¶ 164). Since plaintiff does not allege that the LIU defendants received any direct benefit or competitive advantage from the work she performed at South Point, whereas she received educational and vocational training in a real-world setting and would have received academic credits required for her degree had she successfully completed the internship requirements, it is clear that plaintiff was the primary beneficiary of the internship at South Point.

**\*15** Upon consideration of all of the *Glatt* factors, the totality of the circumstances as alleged in the amended complaint and the economic reality of the relationship between plaintiff and defendants, it is clear that plaintiff was the primary beneficiary of her internship at South Point with respect to her relationship with both the Bayview defendants and the LIU defendants. [8] Accordingly, the branches of defendants' motions seeking judgment on the pleadings with respect to plaintiff's FLSA and NYLL claims pursuant to Rule 12(c) of the Federal Rules of Civil Procedure are granted and plaintiff's FLSA and NYLL claims (First, Second and Third Causes of Action) are dismissed in their entirety with prejudice for failure to state a plausible claim for relief.

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 36 of 87

Sandler v. Benden, Not Reported in Fed. Supp. (2016)

2016 WL 9944017

8 Since neither the Bayview defendants, nor the LIU defendants, were plaintiff's employer for purposes of her FLSA and NYLL claims, or, as set forth below, for purposes of her ADA and Rehabilitation Act claims, it is unnecessary to consider plaintiff's alternative contentions regarding an agency relationship between them.

## C. Federal Discrimination Claims

### 1. ADA and Rehabilitation Act Employment Discrimination Claims

An individual is not an "employee" within the meaning of Title I of the ADA and the Rehabilitation Act, and cannot state a plausible claim for employment discrimination under those statutes, in "the absence of either direct or indirect economic remuneration or the promise thereof." *O'Connor v. Davis*, 126 F.3d 112, 116 (2d Cir. 1997) [9] ; *see also Pastor v. Partnership for Children's Rights*, No. 10-cv-5167, 2012 WL 4503415, at * 1 (E.D.N.Y. Sept. 28, 2012), *aff'd*, 538 Fed.Appx. 119 (2d Cir. Nov. 5, 2013) ("[I]nterns constitute employees under ... the ADA only if they receive some kind of direct or indirect financial benefit or promise thereof from an employer.") "Th[e] remuneration need not be a salary, ... but must consist of substantial benefits not merely incidental to the activity performed[.]" *United States v. City of New York*, 359 F.3d 83, 92 (2d Cir. 2004) (quotations and citations omitted); *see also York v. Ass'n of Bar of City of New York*, 286 F.3d 122, 126 (2d Cir. 2002) (holding that the following facts are "indicative of 'financial benefit': salary or other wages; employee benefits, such as health insurance; vacation; sick pay; or the promise of any of the foregoing[,]" and that "benefits must meet a minimum level of 'significance,' or substantiality, in order to find an employment relationship in the absence of more traditional compensation.") "Financial benefits might be in the form of a salary or wages, or benefits such as medical insurance, retirement pensions, life or disability insurance, vacation time, sick pay, and/or a promise of any of the above." *Pastor*, 2012 WL 4503415, at *1; *see also York*, 286 F.3d at 126 (holding that financial benefits sufficient to satisfy the "remuneration test" are those "which primarily benefit the employee independently of the employer, such as "salary, vacation, sick pay, ... health insurance, disability insurance, life insurance, death benefits, and retirement pension[.]") Since plaintiff did not receive any such compensation or benefits from either the Bayview defendants or the LIU

defendants, (*see*, Am. Compl., ¶¶ 2, 18, 25), she cannot state a plausible claim for employment discrimination, or a hostile work environment, under either the ADA or the Rehabilitation Act against them. Accordingly, the branch of the Bayview defendants' motion seeking judgment on the pleadings with respect to plaintiff's claims under the ADA and Rehabilitation Act pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is granted to the extent that plaintiff's employment discrimination claims under Title I of the ADA and the Rehabilitation Act (Fourth and Fifth Causes of Action, respectively) are dismissed in their entirety with prejudice for failure to state a claim for relief. [10]

9 Although *O'Connor* involved claims under Title VII, "the definition of 'employee' under the ADA parallels that under Title VII and was intended to be given the 'same meaning.' " *Castellano v. City of New York*, 142 F.3d 58, 69 (2d Cir. 1998); *accord Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 114 n. 2 (2d Cir. 2000). Similarly, the same standards applied to ADA claims are applicable to employment discrimination claims brought under the Rehabilitation Act. *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 168 n. 2 (2d Cir. 2003) (finding that cases interpreting the ADA are relevant to employment discrimination claims under the Rehabilitation Act "because the Rehabilitation Act provides that '[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under ... the [ADA] ... as such sections relate to employment.' ") (quoting 29 U.S.C. § 794(d)).

10 In light of this determination, it is unnecessary to consider the LIU defendants' remaining contentions seeking dismissal of plaintiff's employment discrimination claims under the ADA and Rehabilitation Act.

### 2. Other Discrimination Claims under the ADA

**\*16** However, claims under the Rehabilitation Act and the ADA are not limited to employment discrimination claims. *See, e.g.* 29 U.S.C. § 794(a); 42 U.S.C. §§ 12132, 12182 and 12189.

### a. Title II of the ADA

Title II of the ADA provides:

"Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities *of a public entity*, or be subjected to discrimination *by any such entity.*"

42 U.S.C. § 12132 (emphasis added). To the extent the amended complaint can be read to assert a claim under Title II of the ADA, such claim cannot be asserted against any of the defendants, as none of them is a "public entity" within the meaning of the statute. *See* 42 U.S.C. § 12131(1) (defining the term "public entity" to mean "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) the National Railroad Passenger Corporation, an any commuter authority (as defined in section 24102(4) of Title 49).") Rather, South Point is alleged to be "a domestic limited liability company organized under the laws of the State of New York ... in the nursing home and rehabilitation facility business ... [and] a recipient of federal financial assistance[,]" (Am. Compl., ¶ 21); and LIU is alleged to be "a domestic not-for-profit corporation organized under the laws of the State of New York ... in the business of higher education ... [and] a recipient of federal financial assistance." (*Id.*, ¶ 24). *See, e.g. Green v. City of New York*, 465 F.3d 65, 78-80 (2d Cir. 2006) (holding that a private hospital is not a "public entity" within the meaning of Title II of the ADA); *Spychalsky v. Sullivan*, No. 01-cv-0958, 2003 WL 22071602, at * 5 (E.D.N.Y. Aug. 29, 2003), *aff'd*, 96 Fed.Appx. 790 (2d Cir. May 25, 2004) (dismissing the plaintiff's claims under Title II of the ADA against a division of a private catholic university on the basis that it is not a "public entity" within the meaning of the statute). Accordingly, to the extent that the fourth cause of action in the amended complaint can be read to assert a claim under Title II of the ADA, that claim is dismissed in its entirety with prejudice for failure to state a claim for relief.

### b. Title III of the ADA

To the extent the amended complaint can be read to assert a claim under Title III of the ADA, "[m]onetary relief ... is not available to private individuals under Title III of the ADA." *Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 86 (2d Cir. 2004), *as corrected by* 511 F.3d 238 (2d Cir. 2004). "A private individual may only obtain injunctive relief for violations of a right granted under Title III [of the ADA]; [s]he cannot recover damages." *Powell*, 364 F.3d at 86; *see also Krist v. Kolombos Rest. Inc.* 688 F.3d 89, 94 (2d Cir. 2012) (holding that Title III of the ADA "authorizes private actions only for injunctive relief, not monetary damages[.]")

Since plaintiff seeks only monetary relief with respect to her ADA claims, *i.e.*, reimbursement of her tuition, compensatory and punitive damages and attorney's fees, the amended complaint fails to state a plausible claim for relief under Title III of the ADA. Accordingly, the branch of the LIU defendants' motion seeking judgment on the pleadings with respect to plaintiff's ADA claims pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is granted to the extent that any claim under Title III of the ADA (Fourth Cause of Action) is dismissed in its entirety with prejudice for failure to state a plausible claim for relief.

### 3. Section 504 of the Rehabilitation Act Claim

**\*17** Section 504 of the Rehabilitation Act provides, in relevant part:

"No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her ... disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...."

29 U.S.C. § 794(a). Thus, "[i]n order to establish a violation of § 504 of the Rehabilitation Act, a plaintiff must show: (1) that he has a disability for purposes of the Rehabilitation Act; (2) that he was 'otherwise qualified' for the benefit that has been denied; (3) that he has been denied the benefits 'solely by reason' of his disability; and (4) that the benefit is part of a 'program or activity receiving Federal financial assistance.' " *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998); *see also Davis v. Shah*, 821 F.3d 231, 259 (2d Cir. 2016) ("To state a prima face claim under [Section 504 of the Rehabilitation Act], a plaintiff must establish (1) that she is a qualified individual with a disability; (2) that she was excluded from participation in [or denied the benefits of] ... programs or activities [of an entity receiving federal financial assistance] or was otherwise discriminated against by ... [such] entity;

Sandler v. Benden, Not Reported in Fed. Supp. (2016)

2016 WL 9944017

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 38 of 87

and (3) that such exclusion or discrimination was due to her disability."(quotations and citation omitted)).

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), specifically incorporates the definition of "individual with a disability" in 29 U.S.C. § 705(20), which provides, in relevant part, that for purposes of, *inter alia*, subchapter V of the Act, which includes Section 504, and subject to certain exclusions not relevant here, "individual with a disability" means "any person who has a disability as defined in section 12102 of Title 42." "Disability" is defined in 42 U.S.C. § 12102 as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." Contrary to defendants' contentions, plaintiff's allegations are sufficient, at the pleadings stage, to satisfy the first element of a claim under Section 504 of the Rehabilitation Act.

"A plaintiff may base her discrimination claim on one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Davis*, 821 F.3d at 260. Plaintiff bases her disability discrimination claim on the latter theory, *i.e.*, defendants' purported failure to provide her with reasonable accommodations. (*See* Am. Compl., ¶¶ 4, 36, 55, 57, 63). In considering such claims, courts "ask whether a plaintiff with disabilities as a practical matter was denied meaningful access to services, programs or activities to which he or she was legally entitled." *Wright v. New York State Dep't of Corr.*, ─── F.3d ────, 2016 WL 4056036, at * 4 (2d Cir. July 29, 2016) (quotations and citation omitted); *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 277 (2d Cir. 2003) ("Quite simply, the demonstration that a disability makes it difficult for a plaintiff to access benefits that are available to both those with and without disabilities is sufficient to sustain a claim for a reasonable accommodation.")

 **\*18**  Even liberally read, the amended complaint does not state a plausible claim under Section 504 of the Rehabilitation Act because, *inter alia*, it may not reasonably be inferred from the factual allegations therein that plaintiff was denied meaningful access to services, programs or activities of defendants to which he or she was legally entitled by defendants' refusal to make reasonable accommodations, or that she was otherwise excluded from participating in, or denied the benefits of, any program or activity of South Point or LIU "*solely* by reason of her ... disability." 29 U.S.C. § 794(a) (emphasis added); *see, e.g. Harris v. Mills*,

572 F.3d 66, 75 (2d Cir. 2009) (holding that the plaintiff's Rehabilitation Act claim was insufficient because, *inter alia*, there was "no allegation (beyond *ipse dixit*) that [he] was denied the opportunity to read from a written statement 'by reason' of his disability, let alone 'solely by reason' of his disability, as the Rehabilitation Act requires."); *Flight v. Gloeckler*, 68 F.3d 61, 64 (2d Cir. 1995) (affirming the dismissal of the plaintiff's Rehabilitation Act claim on the basis, *inter alia*, that he was not denied a benefit "solely by reason of [ ] his disability" within the meaning of Section 504).

"In order to show that the [denial of benefits] was 'solely by reason of her or his disability,' the plaintiff must show (a) that there was a 'causal connection' between [her] disability and the ... decision [to deny her benefits], ... and (b) that the disability was the only cause of the decision[.]" *Sedor v. Frank*, 42 F.3d 741, 746 (2d Cir. 1994) (citations omitted); *see also Sinisgallo v. Town of Islip Housing Auth.*, 865 F. Supp.2d 307, 340 (E.D.N.Y. 2012) (holding that in order to establish the requisite causal connection with respect to plaintiff's reasonable accommodation claim under, *inter alia*, the Rehabilitation Act, the plaintiff must show that but for his disability, he would not have needed a reasonable accommodation to an otherwise neutral policy and, thus, he would not have been denied the benefit at issue, and that "[f]ramed this way, the onus of the reasonable accommodation analysis is not the defendants' purpose in terminating [the benefit], but whether [the plaintiff] was unable to comply with the defendants' neutral policy and [was denied the benefit] because of his disability." (quotations, alteration and citation omitted)). "If the [defendant] can show that its decision was motivated at least in part by a factor other than the plaintiff's disability, the Rehabilitation Act claim must be rejected." *Sedor*, 42 F.3d at 746. "The causal relationship between disability and decision need not be direct, in that causation may be established if the disability caused conduct that, in turn, motivated the [defendant] to [act] ...; however, to satisfy the 'solely' part of the 'solely by reason of' element, the disability must have been the only cause of the ... [defendant's] conduct." *Sedor*, 42 F.3d at 746. "Thus, only if the only reason for the conduct was the disability could the [plaintiff] be said to have been [denied the benefits of a program or activity] '*solely*' by reason of his disability." *Id.* (emphasis in original; quotations, alterations and citation omitted).

Nothing in the amended complaint indicates that plaintiff was denied meaningful access to any program or service at

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 39 of 87

Sandler v. Benden, Not Reported in Fed. Supp. (2016)

2016 WL 9944017

South Point or LIU by defendants' failure to make reasonable accommodations for her disability. To the contrary, it is clear from the factual allegations in the amended complaint that plaintiff was "provide[d] the needed accommodations" no later than December 2013. (Am. Compl., ¶ 63).

Furthermore, it may not reasonably be inferred from the factual allegations in the amended complaint (1) that the Bayview defendants requested that plaintiff's internship at South Point be terminated, or otherwise denied her of any benefit of the internship program, or (2) that the LIU defendants (a) expelled plaintiff from the MSW Program; (b) gave her a failing grade, and two (2) grades of "C" or below; (c) put "special restrictions" on her subsequent internship, (Am. Compl., ¶ 87); (d) gave "her a series of very poor grades on all assignments which could be graded subjectively" during the Spring 2015 semester, (id., ¶ 88); or (e) otherwise denied her any benefit of the MSW Program solely because of her disability. Rather, plaintiff alleges, *inter alia*, (1) that "[w]ithin days, if not hours, of reading the process recording" she submitted to Benden and LIU that "disclosed improper quality of patient care at South Point[,]" (Am. Compl., ¶¶ 67-68), Benden "published" the allegedly defamatory letter requesting that she "be removed from her placement at South Point[,]" (id., ¶¶ 68-76; *see also id.*, ¶ 5 ["Immediately after [plaintiff] wrote a report to Benden and LIU which disclosed improper care at South Point, Benden retaliatorily [sic] and discriminatorily [sic] terminated [her] from the internship, wrote a defamatory letter regarding her to LIU and provided false records of [her] work to LIU"] ); (2) that LIU expelled plaintiff from the MSW Program "the very next day" after receiving Benden's letter, without conducting an investigation, (id., ¶ 77; *see also id.*, ¶ 5 ["LIU, ... then retaliatorily [sic] and discriminatorily [sic] expelled [her] from its [MSW] Program the very next day, ... performing little to no investigation of the matter and failing to inquire as to [her] version of events at all"] ); (3) that thereafter she received a failing grade and two (2) "bad" grades "[w]hile pursuing the appeal" of her dismissal from the MSW Program, (id., ¶ 80); (4) that after the decision to expel her was reversed on appeal and she was reinstated to the MSW Program, Nathanson "intimated [in an email] that she did not want [plaintiff] to 'continue in the program,' " (id., ¶ 84; *see also id.*, ¶ 5 ["Nathanson expressed her frustration with the reinstatement decision, and communicated to the social work department that she wished [plaintiff] gone from the school"] ); and (5) that LIU subsequently "put special restrictions on [her] next internship" and, "at the explicit or implicit request of Nathanson," gave plaintiff "a series of

very poor grades on all assignments which could be graded subjectively," resulting in plaintiff being expelled from LIU in May 2015. (Id., ¶¶ 87-89). Thus, based upon the allegations in the amended complaint, one of the causes, if not the primary cause, of the challenged conduct by defendants was plaintiff's submission of the process recording purportedly disclosing improper quality of patient care at South Point. Accordingly, none of the challenged conduct was caused solely by reason of plaintiff's disabilities.

**\*19** Similarly, to the extent that plaintiff bases her Rehabilitation Act claim on her claim that LIU provided her with only one (1) choice for an internship, *i.e.*, South Point, (Am. Compl., ¶ 27), she attributes that decision to discrimination based upon her criminal history, not her disabilities. (Id., ¶¶ 3, 35).

Since plaintiff's purported disabilities were clearly not the sole cause of the challenged decisions and conduct by defendants, plaintiff cannot state a plausible claim under Section 504 of the Rehabilitation Act against them as a matter of law. *See, e.g. Marino v. City Univ. of N.Y.*, 18 F. Supp. 3d 320, 342-343 (E.D.N.Y. 2014) (dismissing the plaintiff's claims under Section 504 of the Rehabilitation Act because "[n]othing in the Complaint raise[d] the plausible inference ... that she was given a failing grade solely because of her disability."); *Cain v. Mandl College of Allied Health*, No. 14-cv-1729, 2015 WL 3457143, at \* 5 (S.D.N.Y. May 29, 2015) (dismissing the plaintiff's disability discrimination claims on the basis, *inter alia*, that there was no indication that her alleged disability had any bearing on her dismissal from the school). Accordingly, the branches of defendants' motions seeking judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure with respect to plaintiff's disability discrimination claim under Section 504 of the Rehabilitation Act are granted and plaintiff's claim under Section 504 of the Rehabilitation Act (Fifth Cause of Action) is dismissed in its entirety with prejudice for failure to state a plausible claim for relief.

D. State Law Claims

Although the dismissal of state law claims is not required when the federal claims in an action are dismissed, *see Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 391-92, 118 S. Ct. 2047, 141 L.Ed. 2d 364 (1998), a federal court may decline to exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c). *See Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 129 S. Ct. 1862, 1866-1867, 173 L.Ed. 2d 843 (2009) (holding that a district

court's decision whether to exercise supplemental jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary); *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 117 (2d Cir. 2013) ("The exercise of supplemental jurisdiction is within the sound discretion of the district court.") The court must "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction" over any pendent state law claims. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350, n. 7, 108 S. Ct. 614, 98 L.Ed. 2d 720 (1988); *accord Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 102 (2d Cir. 2014). Generally, where all of the federal claims in an action are dismissed before trial, or where a claim raises a novel or complex issue of state law, the balance of factors will favor declining to exercise supplemental jurisdiction over the remaining state law claims. *See Cohill*, 484 U.S. at 350 n. 7; *Kroshnyi*, 771 F.3d at 102 ("A court may decline to exercise supplemental jurisdiction[ ] ... if, among other factors the claim raises a novel or complex issue of State law, or [it] has dismissed all claims over which it has original jurisdiction." (quotations and citations omitted)); *Delaney v. Bank of America Corp.*, 766 F.3d 163, 170 (2d Cir. 2014) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." (quotations and citation omitted)).

**\*20** In light of the dismissal of all federal claims in this action at the pleadings stage, and the fact that plaintiff's NYSHRL claim raises a novel and unresolved issue of state law, *i.e.*, whether the amendment to the NYSHRL to add Section 296-c, effective July 22, 2014, is entitled to retroactive effect, and upon consideration of all relevant factors, *i.e.*, judicial economy, convenience, fairness and comity, I decline to exercise supplemental jurisdiction over the remaining state law claims in this action. Accordingly, plaintiff's remaining state law claims (Sixth through Seventeenth Causes of Action) are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(1) and (3). Pursuant to 28 U.S.C. § 1367(d), the statute of limitations for any state law claims timely filed in this Court is tolled for a period of **thirty (30) days after the date of this order** unless a longer tolling period is otherwise provided under state law.

## IV. Conclusion

For the reasons set forth above, defendants' motions seeking judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure are granted to the extent that plaintiff's claims alleging violations of the FLSA, the NYLL, the ADA and the Rehabilitation Act (First through Fifth Causes of Action) are dismissed in their entirety with prejudice for failure to state a claim for relief, and plaintiff's remaining state law claims (Sixth through Seventeenth Causes of Action) are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c), and the motions are otherwise denied. The Clerk of the Court shall enter judgment in favor of defendants and close this case.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 9944017

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1406649
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

John J. BENYI, Plaintiff,

v.

NEW YORK; Binghamton Police Department;
Broome County Sheriff's Department; New
York Appellate Division Third Department;
United States District Court for the Northern
District of New York; Second Circuit Court of
Appeals; Detective Sergeant Barry Angel; and
Deputy Sheriff William Guyyey, Defendants.

3:20-CV-1463 (DNH/ML)
|
Signed 03/23/2021

**Attorneys and Law Firms**

JOHN J. BENYI, Plaintiff, Pro Se, Lea County Correctional
Facility, 6900 West Millen, Hobbs, New Mexico 88244.

## ORDER and REPORT-RECOMMENDATION

MIROSLAV LOVRIC, United States Magistrate Judge

**\*1** The Clerk has sent this *pro se* complaint (Dkt. No. 1)
together with an amended application to proceed *in forma
pauperis* (Dkt. No. 4) filed by John J. Benyi ("Plaintiff") to
the Court for review. For the reasons discussed below, I deny
Plaintiff's amended *in forma pauperis* application (Dkt. No. 4)
without prejudice, and I recommend that Plaintiff's Complaint
(Dkt. No. 1) be dismissed in its entirety, in part (1) without
prejudice and with leave to amend, and (2) with prejudice and
without leave to amend.

## I. BACKGROUND

On November 30, 2020, Plaintiff commenced this action
by filing a verified Complaint and a motion to proceed *in
forma pauperis*. (Dkt. Nos. 1, 2.) On December 1, 2020,
the Court denied Plaintiff's *in forma pauperis* application as
incomplete and administratively closed the case. (Dkt. No. 3.)
On December 22, 2020, Plaintiff filed an amended *in forma
pauperis* application. (Dkt. No. 4.) As a result, on January 4,
2021, the case was reopened and restored to the Court's active
docket. (Dkt. No. 5.)

Construed as liberally [1] as possible, the Complaint alleges
that Plaintiff's civil rights were violated by New York State,
the Binghamton Police Department, the Broome County
Sheriff's Department, [2] the New York Appellate Division
Third Department, the United States District Court for the
Northern District of New York, the Second Circuit Court
of Appeals, Detective Sergeant Barry Angel, [3] and Deputy
Sheriff William Guyyey [4] (collectively "Defendants"). (*See
generally* Dkt. No. 1.) More specifically, Plaintiff alleges that
on April 17, 1987, his rights were violated by Defendant
Angel—an employee of Binghamton Police Department—
who concocted a false confession to non-existent crimes.
(Dkt. No. 1, Attach. 1 at 1.) In addition, Plaintiff alleges that
Inspector Donald Conidin—an employee of the Binghamton
Police Department—removed evidence from his dresser
and that Patrolman William Grace—an employee of the
Binghamton Police Department—stole his swiss army knife,
and, on information and belief, stole his television, stereo, and
audio and video tape collection. (*Id.*)

[1]  The Court must interpret *pro se* complaints to
raise the strongest arguments they suggest. *Soto v.
Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting
*Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.
1994)).

[2]  The Complaint lists the Broome County Sheriff's
Department as a Defendant in this matter. (Dkt. No.
1 at 1.) As a result, the Clerk of the Court is directed
to amend the docket sheet accordingly.

[3]  The Complaint lists Detective Sergeant Barry
Angel as a Defendant in this matter. (Dkt. No. 1 at
1.) As a result, the Clerk of the Court is directed to
amend the docket sheet accordingly.

[4]  The Complaint lists Deputy Sheriff William
Guyyey as a Defendant in this matter. (Dkt. No. 1
at 2.) As a result, the Clerk of the Court is directed
to amend the docket sheet accordingly.

Plaintiff alleges that on May 30, 1987, Defendant Angel
and Defendant Guyyey—an employee of Broome County
Sheriff's Department—arranged to have him attacked by Scott
Haven, which resulted in Plaintiff suffering "serious brain
damage, ... numerous surgeries," and required Plaintiff to take
anti-seizure medications. (*Id.*)

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 42 of 87

**\*2** Plaintiff alleges that "[a]ll [three] of the cops probably perjured themselves at trial," though it is unclear which three police officers Plaintiff is referring to. (*Id.*) Plaintiff alleges that he was acquitted of all indicted charges at his criminal trial but convicted of an unindicted charge "on the say-so of a proven perjurer[,] [Defendant] Angel." (*Id.* at 2.)

Plaintiff alleges that he filed a motion pursuant to N.Y. Crim. Proc. Law § 440 but that Judge Monseratte "deliberately ignored the proven perjury and fraud." (*Id.*) In addition, Plaintiff alleges that Defendant New York Appellate Division Third Department "refused to review the case" three weeks before the chief justice was arrested by the Federal Bureau of Investigations. (*Id.*)

Plaintiff alleges that United States District Judge Hurd of Defendant United States District Court for the Northern District of New York, "accepted an unsigned, unnotarized 'affidavit' from ADA Lehman ... and used it to dismiss the case." [5] (*Id.*) In addition, Plaintiff alleges that Defendant Second Circuit Court of Appeals declared Plaintiff's case a threat to national security and took away Plaintiff's rights. (*Id.*)

[5]     Although not set forth by Plaintiff in the Complaint, the Court notes that on January 7, 1991, Plaintiff filed a *pro se* civil rights action in the Northern District of New York, No. 6:91-CV-0018 (NPM/GJD) ("*Benyi I*"). On February 28, 1997, United States Senior District Judge Neal P. McCurn, granted the defendants' motion for summary judgment. (*Benyi I*, Dkt. No. 163.) In addition, on February 22, 1991, Plaintiff filed a *pro se* habeas corpus claim in the Northern District of New York, No. 6:91-CV-0196 (LEK/DH) ("*Benyi II*"). On September 22, 1994, then-United States Magistrate Judge David N. Hurd issued a report and recommendation, which recommended that Plaintiff's petition for writ of habeas corpus be denied. (*Benyi II*, Dkt. No. 37.) On April 17, 1996, United States District Judge Con. G. Cholakis accepted and adopted Magistrate Judge Hurd's report and recommendation and denied Plaintiff's petition for writ of habeas corpus. (*Benyi II*, Dkt. No. 43.)

Plaintiff alleges that Defendants conspired with the New York Department of Corrections to lose his legal papers when he was transferred to Arthur Kill Correctional Facility ("Arthur CF"). (*Id.*) Plaintiff alleges that "they" [6] had me attacked a second time at Arthur CF. (*Id.*)

[6]     Plaintiff uses the term "they" frequently throughout the Complaint. (*See generally* Dkt. No. 1.) However, it is unclear to the Court who Plaintiff is referring to.

Plaintiff alleges that "they" provided false information to officials in New Mexico, which resulted in Plaintiff's arrest, his house being "invaded" three times, and threats to his wife unless Plaintiff pleaded guilty. (*Id.* 3.) Plaintiff alleges that he was arrested by his probation/parole officer for medical marijuana but that violation was dismissed. (*Id.*) Plaintiff alleges that "they" claimed that "they" found illegal porn on his computer but that Plaintiff merely searched a file sharing program for "Playboy" and none of the porn that he viewed was "labeled in any way that appeared illegal." (*Id.*)

Plaintiff alleges that "PPO Megan," "PPO Kevin," their supervisor Pollada, and Douglas and Gladys at La Posada halfway house conspired to cover up their culpability by forcing Plaintiff to plead guilty to—what appears to be a violation of the terms of Plaintiff's probation or parole —failure to program. (*Id.* at 4.) Plaintiff alleges that his failure to program was "their" fault, not his, and that these individuals threatened to arrest his "innocent caregiver," Margaret Malone. (*Id.*)

**\*3**  The Complaint does not appear to assert any causes of action. However, attached to the Complaint are excerpts from a document with information and instructions for filing a complaint pursuant to 42 U.S.C. § 1983. In addition, Plaintiff states that he filed an action against the New Mexico Probation/Parole and La Posada Halfway House alleging causes of action pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1997, and the Americans with Disabilities Act ("ADA"). [7] (Dkt. No. 1 at 7.)

[7]     On November 30, 2020, Plaintiff commenced a *pro se* civil rights action in the District of New Mexico, No. 2:20-CV-1244 (KG/KBM) ("*Benyi III*"). On January 8, 2021, United States District Judge Kenneth J. Gonzales dismissed Plaintiff's Complaint. (*Benyi III*, Dkt. No. 4.)

For relief, Plaintiff seeks his immediate release to the care of his United States Department of Veterans Affairs ("V.A.")

caregiver, Margaret Malone, and his V.A. fiduciary, Dorota Montour, in California. (*Id.* at 5.)

Plaintiff also filed an amended application for leave to proceed *in forma pauperis*. (Dkt. No. 4.)

## II. PLAINTIFF'S AMENDED APPLICATION TO PROCEED *IN FORMA PAUPERIS*

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010). [8] "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Cash*, 2010 WL 5185047, at *1 (citing 28 U.S.C. § 1915(b); *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

[8]   Section § 1915(g) prohibits a prisoner from proceeding *in forma pauperis* where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(g). The Court has reviewed Plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service. *See* http://pacer.uspci.uscourts.gov. It does not appear from that review that Plaintiff had accumulated three strikes for purposes of 28 U.S.C. § 1915(g) as of the date this action was commenced.

Upon review, the Court finds that Plaintiff has submitted a completed IFP application which has been certified by an appropriate official at his facility (Dkt. No. 4), and which demonstrates economic need. *See* 28 U.S.C. § 1915(a)(2). However, Plaintiff has not filed the inmate authorization required in the Northern District pursuant to Local Rule 5.1.4(b)(1)(B). (*See generally* docket sheet; *see also* Dkt. No. 3.) [9]

[9]   The Clerk of the Court is directed to provide Plaintiff with a blank inmate authorization form.

Accordingly, Plaintiff's amended application to proceed with this action IFP is denied without prejudice.

## III. LEGAL STANDARD FOR INITIAL REVIEW OF COMPLAINT

Ordinarily, the finding that Plaintiff does not qualify for IFP status would end the Court's discussion, and Plaintiff, in light of his *pro se* status, would likely be afforded an opportunity to either prepay the full filing fee, or submit a new, completed, and certified application for IFP. Because, however, as is discussed more completely below, I find that Plaintiff's Complaint fails to state a claim upon which relief may be granted, 28 U.S.C. § 1915 requires that the court dismiss the action "[n]otwithstanding any filing fee, or any portion thereof, that may have been paid[.]" 28 U.S.C. § 1915(e); *see also* 28 U.S.C. 1915A(a) ("The court shall review ... as soon as practicable ... a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.").

**\*4** Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that — ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [10] Similarly, under 28 U.S.C. § 1915A, a court must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curium) (noting that Section 1915A applies to all actions brought by prisoners against governmental officials even when plaintiff paid the filing fee).

[10]   To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis in either law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

Additionally, when reviewing a complaint, a court may also look to the Federal Rules of Civil Procedure. Rule 8 of the Federal Rules of Civil Procedure provides that a pleading which sets forth a claim for relief shall contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether

the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, C.J.) (quoting *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977)).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), *rev'd on other grounds*, 682 F. App'x 30. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Rule 8 "demands more than an unadorned the-defendant-unlawfully-harmed-me accusation." *Id.* Thus, a pleading that contains only allegations which "are so vague as to fail to give the defendants adequate notice of the claims against them" is subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009).

**IV. ANALYSIS**

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that all causes of action be dismissed.

**A. Claims Pursuant to 42 U.S.C. § 1983**

**1. Claims Against Defendants New York and New York Appellate Division Third Department**

After carefully considering the matter, I recommend that Plaintiff's claims against Defendant New York and New York Appellate Division Third Department pursuant to 42 U.S.C. § 1983, be dismissed with prejudice because they are immune from suit.

**\*5** Defendant New York is immune from suits pursuant to 42 U.S.C. § 1983 seeking either legal or equitable relief, under the Eleventh Amendment. *Papasan v. Allain*, 478 U.S. 265, 276 (1986); *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 98-100 (1984).

Moreover, Defendant New York State Appellate Division Third Department is merely an agency or arm of New York State. *See Ognibene v. Niagara Cnty. Sheriff's Dep't*, 03-CV-0678E, 2003 WL 2443989, at \*3 (W.D.N.Y. Dec. 1, 2003) ("To the extent the plaintiff names various state courts as defendants and seeks either legal or equitable relief against them under § 1983, they are immune from such suit under the Eleventh Amendment."). As an agency or arm of the State of New York, the court is immune from suit under the Eleventh Amendment. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see also Mercado v. Town of Goshen*, 20-CV-5399, 2020 WL 5210949, at \*3 (S.D.N.Y. Aug. 28, 2020) ("Plaintiff sues the 'Orange County Court,' which is part of the New York State Unified Court System. The Court therefore dismisses Plaintiff's § 1983 claims against this Defendant under the doctrine of Eleventh Amendment immunity and because these claims are frivolous."); *Curto v. Palisades Collection, LLC*, 07-CV-529S, 2008 WL 11357852, at \*4 (W.D.N.Y. Mar. 10, 2008) (dismissing the plaintiff's claims against the "New York State Unified Court System, 8[th] Judicial District Buffalo City Court" as barred by the Eleventh Amendment); *Saint-Fleur v. City of New York*, 99-CV-10433, 2000 WL 280328, \*2 (S.D.N.Y., Mar. 14, 2000) (collecting cases) ("State courts, as arms of the State, are entitled to Eleventh Amendment immunity from suit in federal court."); *Fields v. Walthers*, 94-CV-1659, 1997 WL 204308 at \*2 (N.D.N.Y. April 5, 1997) (Pooler, J.) ("For Eleventh Amendment purposes, governmental entities of the state that are considered 'arms of the state' receive Eleventh Amendment immunity.").

As a result, I recommend that Plaintiff's claims against Defendants New York and New York Appellate Division Third Department[11] be dismissed with prejudice and without leave to amend. *Johnson v. Fischer*, 19-CV-1384, 2020 WL 758964, at \*2 (N.D.N.Y. Feb. 14, 2020) (Stewart, M.J.) (recommending dismissal, without leave to amend, claims against the Appellate Division Third Department); *Dinsio v. Appellate Division, Third Dep't*, 16-CV-0324, 2017 WL 3016832, at \*12 (N.D.N.Y. July 14, 2017) (Suddaby, C.J.) (citing *Zuckerman v. Appellate Division, Second Dep't, Supreme Court of the State of N.Y.*, 421 F.2d 625, 626 (2d Cir. 1970); *Bernstein v. New York*, 591 F. Supp. 2d 448, 465 (S.D.N.Y. 2008)) ("Defendant correctly argues that, as the sole named Defendant in this case, the Eleventh Amendment

bars Plaintiff's claims because the Third Department is considered 'an arm of the state of New York.' ").

11   The Court also notes that Defendant New York Appellate Division "Third Department is also not considered a 'person' for purposes of 42 U.S.C. § 1983." *Dinsio*, 2017 WL 3016832, at *12, n.13 (citing *Zuckerman*, 421 F.2d at 626; *Ajamian v. New York*, 13-CV-1316, 2014 WL 3928448, at *6 (N.D.N.Y. Aug. 11, 2014) (D'Agostino, J.) (holding that the Third Department is not a "person" within the meaning of Section 1983)).

## 2. Claims Against Defendants Binghamton Police Department and Broome County Sheriff's Department

**\*6**  After careful consideration, I recommend dismissal of Plaintiff's claims pursuant to 42 U.S.C. § 1983 against Defendants Binghamton Police Department and Broome County Sheriff's Department because they are not entities susceptible to suit.

A municipal police department is not susceptible to suit pursuant to 42 U.S.C. § 1983. *La Grande v. Town of Bethlehem Police Dep't*, 08-CV-0738, 2009 WL 2868231, at *2 (N.D.N.Y. Sept. 1, 2009) (Kahn, J.); *Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463, 477 (E.D.N.Y. 2002) (internal citations omitted). "Under New York law, departments which are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and cannot sue or be sued." *Walker v. U.S. Marshalls*, 08-CV-0959, 2009 WL 261527, at *2 (E.D.N.Y. Feb. 4, 2009) (quoting *Hall v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002)); *see also Nicholson v. Lenczewski*, 356 F. Supp. 2d 157, 164 (D. Conn. 2005) (collecting cases).

Here, Plaintiff's claims against Defendants Binghamton Police Department and Broome County Sheriff's Department, which have no legal, separate identity apart from the City of Binghamton and Broome County, respectively, are not plausible. Therefore, I recommend dismissal of the claims against Defendants Binghamton Police Department and Broome County Sheriff's Department, with prejudice and without leave to amend. *See Jackson v. Gunsalus*, 16-CV-0647, 2016 WL 4004612, at *5 (N.D.N.Y. June 24, 2016) (Dancks, M.J.), *report and recommendation adopted*, 2016 WL 3983635 (July 25, 2016) (Sharpe, J.) (dismissing

claims against the Syracuse Police Department with prejudice and without leave to amend because the Syracuse Police Department "is not susceptible to suit under § 1983."); *Makas v. Benjamin*, 09-CV-0129, 2009 WL 3871441, at *3 (N.D.N.Y. Nov. 18, 2009) (Kahn, J.) (dismissing claims against Ulster County Sheriff's Department as it is "an administrative arm of the county," which cannot be sued under § 1983).

## 3. Claims Against Defendants United States District Court for the Northern District of New York [12] and Second Circuit Court of Appeals

12   The Court notes that it has authority to decide this matter despite the fact that it is named as a defendant. *Hansel v. U.S. Supreme Court, Second Circuit Court of Appeals*, 141 F.3d 1151 (2d Cir. 1998). Federal judges are required to disqualify themselves in any proceeding in which their impartiality might reasonably be questioned. 28 U.S.C. § 455(a). The ultimate inquiry under Section 455(a) is whether a reasonable person would conclude that the judge's impartiality could reasonably be questioned, and disqualification is not required on the basis of remote, contingent or speculative interests. *United States v. Thompson*, 76 F.3d 442, 450 (2d Cir. 1996); *United States v. Lovaglia*, 954 F.2d 811, 815 (2d Cir. 1992). Plaintiff did not sue any member of this Court in an individual capacity. Here the danger of partiality, if any, is based on remote and speculative concerns because Plaintiff seeks nothing more than a series of vague declarations and has alleged no specific wrongdoing by members of this Court. Accordingly, disqualification is not required. In any event, disqualification is not possible here because it would leave Plaintiff with no judges of this Court to hear his Complaint. Thus, the rule of necessity applies and this Court may proceed to hear the case. *United States v. Will*, 449 U.S. 200 (1980); *Atkins v. United States*, 214 Ct.Cl. 186 (Ct. Cl. 1977).

**\*7**  After carefully considering the matter, I recommend that Plaintiff's claims against Defendants United States District Court for the Northern District of New York and Second Circuit Court of Appeals be dismissed based on the doctrine of sovereign immunity.

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475 (1994); *see also Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994) ("Because an action against a federal agency or federal officers in their official capacities is essentially a suit against the United States, such suits are also barred under the doctrine of sovereign immunity, unless such immunity is waived."). "[T]he United States is immune from constitutional tort claims against the United States, its agencies, or federal employees sued in their official capacities." *Perez v. Hawk*, 302 F. Supp. 2d 9, 18 (E.D.N.Y. 2004).

As a result, I recommend that Plaintiff's § 1983 claims against the Federal defendants be dismissed for lack of subject matter jurisdiction. *See, e.g.*, *Johnson v. Wolfe*, 19-CV-7337, 2019 WL 5784704, at *3-4 (S.D.N.Y. Nov. 5, 2019) (dismissing claims against, *inter alia*, the Second Circuit Court of Appeals based on the doctrine of sovereign immunity; *Forjone v. Dep't of Motor Vehicles*, 414 F. Supp. 3d 292, 301 (N.D.N.Y. 2019) (Hurd, J.) (dismissing the plaintiff's claims against the federal defendants pursuant to, *inter alia*, 42 U.S.C. § 1983, based on the doctrine of sovereign immunity; *Olmeda v. Babbits*, 07-CV-2140, 2008 WL 282122, at *5 (S.D.N.Y. Jan. 25, 2008) (dismissing plaintiff's §§ 1983, 1985, 1986 claims against federal agencies as barred by sovereign immunity).

The Court has also considered whether the Federal Tort Claims Act ("FTCA") might provide Plaintiff a means of relief. The FTCA grants a limited waiver of sovereign immunity that applies to "claims against the United States for money damages ... for injury ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

"Thus, for liability to arise under the FTCA, a plaintiff's cause of action must be comparable to a cause of action against a private citizen recognized in the jurisdiction where the tort occurred, and his allegations, taken as true, must satisfy the necessary elements of that comparable state cause of action." *Chen v. United States*, 854 F.2d 622, 626 (2d Cir. 1988).

However, there is no indication that Plaintiff properly exhausted any possible claim under the FTCA, which requires a claimant to "first present[ ] the claim to the appropriate Federal agency" and have it "denied by the agency in writing." 28 U.S.C. § 2675(a). This failure provides independent justification to dismiss any such claim against the Federal defendants, too. *See, e.g.*, *Celestine v. Mt. Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005) ("The FTCA requires that a claimant exhaust all administrative remedies before filing a complaint in federal district court.").

**\*8** Moreover, Plaintiff has improperly named the federal agencies as defendants in this action. *See, e.g.*, *Langella v. Bush*, 306 F. Supp. 2d 459, 463 (S.D.N.Y. 2004) ("Under the FTCA, suit must be brought directly against the United States, and federal agencies are immune from suit.").

As a result, I recommend that Plaintiff's claims against Defendants United States District Court for the Northern District of New York and Second Circuit Court of Appeals, be dismissed.

### 4. Claims Against Defendants Angel and Guyyey in Their Official Capacities

To the extent that Plaintiff intended to sue Defendants Angel and Guyyey in their official capacities, the Supreme Court has explained that this kind of claim is "to be treated as a suit against the entity"; i.e., the City of Binghamton and Broome County. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).

In *Monell v. Dep't of Soc. Servs.*, the Supreme Court held that a municipality may be held liable under § 1983 if a plaintiff can demonstrate that the constitutional violation was caused by a municipal "policy or custom." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). However, the Supreme Court has intentionally made these so-called "*Monell*" claims "hard to plead and hard to prove." *Crawley v. City of Syracuse*, 17-CV-1389, 2020 WL 6153610, at *9 (N.D.N.Y. Oct. 21, 2020) (Hurd, J.). "Unlike state tort law, a municipality cannot be held liable under § 1983 merely because it happened to employ the alleged tortfeasor." *Crawley*, 2020 WL 6153610, at *9.

Instead, "under § 1983[ ] local governments are responsible only for 'their *own* illegal acts.' " *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis in original) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). Thus, "to establish municipal liability under 42 U.S.C. § 1983, a plaintiff must

2021 WL 1406649

demonstrate that the deprivation of his constitutional right was 'caused by a governmental custom, policy or usage of the municipality.' " *Deferio v. City of Syracuse*, 770 F. App'x 587, 589 (2d Cir. 2019) (summary order) (quoting *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012)).

Through a series of decisions, the Supreme Court has recognized that *Monell* liability may be established through: (1) a policy formally adopted and endorsed by the municipality; (2) actions taken by policymaking officials that caused the particular deprivation alleged; (3) practices by subordinate officials that are not expressly authorized but are so widespread and consistent that policymakers must have been aware of them; or (4) a failure by policymakers to train or supervise that amounts to "deliberate indifference" to the rights of those who come into contact with the inadequately trained or supervised municipal employees. *Deferio*, 770 F. App'x at 590 (collecting cases); *see also Benacquista v. Spratt*, 217 F. Supp. 3d 588, 599-600 (N.D.N.Y. 2016) (Hurd, J.) (recognizing same theories of liability).

The Complaint does not allege facts plausibly suggesting that the City of Binghamton or County of Broome violated Plaintiff's rights based on a custom, policy, or practice. (*See generally* Dkt. No. 1.) In fact, the Complaint is devoid of any factual assertions related to wrongdoing by these municipal entities.

**\*9** As a result, I recommend that, to the extent Plaintiff intended to assert claims against Defendants Angel and Guyyey in their official capacities, those claims be dismissed for failure to state a claim upon which relief may be granted.

### 5. Statute of Limitations

The statute of limitations for a § 1983 action accruing in New York is three years. *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009). The statute of limitations begins to run on the date that the plaintiff's claims accrues. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). Federal law governs the accrual date. *Morse v. Univ. of Vt.*, 973 F.2d 122, 125 (2d Cir. 1992). Generally, under federal law, a cause of action accrues when "the plaintiff knows or has reason to know the injury which is the basis of his action." *Covington v. New York*, 171 F.3d 117, 121 (2d Cir. 1999) (quoting *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980)); *see Fahs Constr. Grp., Inc. v. Gray*, 725 F.3d 289, 292 (2d Cir. 2013) (per curiam) (citing *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002))

(a claim for equal protection accrues "when the plaintiff knew or should have known of the disparate treatment."). That is so even if "the full extent of the injury is not then known or predictable." *Fahs Const. Group, Inc.*, 725 F.3d at 292. "[S]tate tolling rules determine whether the limitations period has been tolled, unless state tolling rules would 'defeat the goals' of section 1983." *Abbas v. Dixon*, 480 F.3d 636, 641 (2d Cir. 1997) (citing *Pearl*, 296 F.3d at 80).

Although the statute of limitations is an affirmative defense, where it is clear from the face of the complaint that a claim is barred by the applicable statute of limitations, the claim is subject to dismissal for failure to state a claim on 28 U.S.C. § 1915(e)(2)(B) review. *See Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) (holding that a complaint can be dismissed on initial review based on a defense that appears on the face of the complaint); *Syfert v. City of Rome*, 17-CV-0578, 2018 WL 3121611, at *3-5 (N.D.N.Y. Feb. 12, 2018) (Dancks, M.J.) (dismissing all claims barred by the statute of limitations on initial review pursuant to 28 U.S.C. § 1915(e)(2)(B)), *report and recommendation adopted by*, 2018 WL 2316681 (N.D.N.Y. May 22, 2018) (Suddaby, C.J.); *Syfert v. City of Rome*, 17-CV-0578, 2017 WL 3405521, at *8-10 (N.D.N.Y. Aug. 7, 2017) (Dancks, M.J.) (same), *report and recommendation adopted by*, 2017 WL 5195230 (N.D.N.Y. Nov. 9, 2017) (Suddaby, C.J.); *Syfert v. City of Rome*, 15-CV-1149, 2015 WL 6819168, at *7-8 (N.D.N.Y. 2015) (Kahn, J.) (same).

Here, drawing all reasonable inferences and construing the Complaint liberally, Plaintiff commenced this action on November 20, 2020. (Dkt. No. 1.) [13] As a result, any causes of action in Plaintiff's Complaint that accrued before November 20, 2017, are barred by the statute of limitations.

[13]     The Court notes that Plaintiff's Complaint was filed on November 30, 2020. (Dkt. No. 1.) However, pursuant to the prison mailbox rule, the Court deems Plaintiff's Complaint filed on November 20, 2020, when he gave it to prison officials. *Douglas v. Bughrara*, 11-CV-1535, 2013 WL 5347285, at *3 (N.D.N.Y. Sept. 23, 2013) (Kahn, J.).

The only dates set forth in the Complaint are (1) an incident that occurred on April 17, 1987, (2) an incident that occurred on May 30, 1987, and (3) Plaintiff's criminal trial that took place February 1988. (Dkt. No. 1 at 2; Dkt. No. 1, Attach. 1 at 1.) The Court also notes that Defendant New York Appellate Division Third Department denied Plaintiff's appeal on July

20, 1989. *People v. Benyi*, 152 A.D.2d 864 (N.Y. App. Div. 3d Dep't 1989). Moreover, on October 19, 1989, the New York Court of Appeals denied Plaintiff leave to appeal. *People v. Benyi*, 74 N.Y.2d 894 (N.Y. 1989). As set forth in note 5 *supra*, on February 22, 1991, Plaintiff filed a writ of habeas corpus claim in Defendant United States District Court for the Northern District of New York, which was dismissed on April 17, 1996. (*Benyi II*, Dkt. No. 43.) Any causes of action related to incidents that occurred on these dates, which occurred approximately twenty years before November 20, 2017, are barred by the statute of limitations.

**\*10** Moreover, I find that Plaintiff's allegations do not amount to a "continuing violation." The continuing violation doctrine, where applicable, is an "exception to the normal knew-or-should-have-known accrual date" if there is evidence of an ongoing discriminatory policy or practice. *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (quoting *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999)). The continuing violation doctrine does not apply to "discrete acts," even where those discrete acts are a part of a "serial violation," but applies solely to claims that "by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Gonzalez*, 802 F.3d at 220 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 111 (2002)). When the doctrine applies, the limitations period begins to run when the defendant has engaged in "enough activity to make out an actionable ... claim," as long as the plaintiff has alleged some non-time-barred acts which contributed to the alleged violation. *Id.* (quoting *Morgan*, 536 U.S. at 117; *Harris*, 186 F.3d at 250). A continuing violation cannot "be established merely because the claimant continues to feel the effects of a time-barred discriminatory act." *Harris*, 186 F.3d at 250 (citing *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997)).

The continuing violation doctrine is generally disfavored in this Circuit. *See Town of Ramopo v. Town of Clarkstown*, 16-CV-2004, *2017 WL 782500*, at *5 (S.D.N.Y. Feb. 27, 2017); *Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 292 (S.D.N.Y. 2011) (quoting *Trinidad v. N.Y.C. Dep't of Corr.*, 423 F. Supp. 2d 151, 165 n.11 (S.D.N.Y. 2006)) ("[C]ourts in the Second Circuit 'have been loath to apply [the continuing violation doctrine] absent a showing of compelling circumstances.' ").

According to Plaintiff, "[o]n April 17, 1987, Detective Sgt. Barry Angel did concoct a proven false 'confession' to proven non-existent crimes." (Dkt. No. 1, Attach. 1 at 1.) Thus, to the extent that Plaintiff asserts causes of action related to this alleged wrong, the claims, if any, would have accrued in 1987, or, at the very latest, February 1988, when the "crime lab examiner and pathologist testified for the DEFENSE" and Plaintiff was acquitted of all indicted charges. (Dkt. No. 1 at 3; Dkt. No. 1, Attach. 1 at 1.)

In addition, Plaintiff alleges that "[o]n May 30, 1987, 3 days after the crime lab report was issued proving the confession was a fraud, Det. Angel and Deputy Sheriff William Guyyey arranged to have [Plaintiff] attacked." (Dkt. 1, Attach. 1 at 1.) Plaintiff does not assert any allegations plausibly suggesting that he lacked a complete and present cause of action after the alleged attack on May 30, 1987. (*See generally* Dkt. No. 1.)

The other allegations in Plaintiff's Complaint appear to have occurred several years, possibly decades, apart. (Dkt. 1, Attach. 1.) As a result, I find no compelling circumstances present to warrant applying the continuing violation doctrine.

Under New York law, "the doctrine of fraudulent concealment prevents a party from fraudulently concealing wrongdoing until after the tolling of the statute of limitations." *Aiken v. Nixon*, 236 F. Supp. 2d 211, 240 (N.D.N.Y. 2002) (McAvoy, J.) "To invoke the doctrine of fraudulent concealment properly [for purposes of seeking an equitable tolling of the statute of limitations], a plaintiff must establish three elements, including: (1) wrongful concealment by defendants [of their actions], (2) which prevented plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing the discovery of the claim." *New York Dist. Council of Carpenters Pension Fund v. Forde*, 939 F. Supp. 2d 268, 278 (S.D.N.Y. 2013) (citing *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998); *Butala v. Agashiwala*, 916 F. Supp. 314, 319 (S.D.N.Y. 1996)). "The relevant question is not the intention underlying defendants' conduct, but rather whether a reasonable plaintiff in the circumstances would have been aware of the existence of a cause of action." *Veltri v. Bldg. Serv. 32b-J Pension Fund*, 393 F.3d 318, 323 (2d Cir. 2004) (citing *Pearl*, 296 F.3d at 82; *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990)).

**\*11** Here, the Court finds Plaintiff has not plausibly alleged any of the three elements to invoke this doctrine.

Further, although not raised by Plaintiff, having carefully reviewed the Complaint, the Court discerns no basis to invoke equitable tolling or equitable estoppel in order to salvage

what are otherwise patently untimely claims. Under New York law, equitable tolling applies "where a plaintiff has been prevented in some extraordinary way from exercising rights," such that "it would have been impossible for a reasonably prudent person to learn about his or her cause of action." *Pearl*, 296 F.3d at 85. In a related but slightly different vein, equitable estoppel is available "where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay bringing the lawsuit." *Dillman v. Combustion Eng'g, Inc.*, 784 F.3d 76, 85 (2d Cir. 1986); *see also Abbas*, 480 F.3d at 642 (stating that equitable estoppel applies when a "plaintiff was induced by fraud, misrepresentation or deception to refrain from filing a timely action"). Under either doctrine, "[d]ue diligence on the part of the plaintiff in bringing an action ... is an essential element of equitable relief." *Abbas*, 480 F.3d at 642 (quoting *Doe v. Holy See (State of Vatican City)*, 17 A.D. 3d 793, 796 (N.Y. App. Div. 3d Dep't 2005)).

As a result, the Court finds Plaintiff is not entitled to tolling and, thus, his claims, which are based on events that occurred before November 20, 2017, are time barred.

Therefore, I recommend dismissing Plaintiff's claims pursuant to 42 U.S.C. § 1983, as untimely.

### B. Claims Pursuant to 28 U.S.C. § 1997

Plaintiff refers to 28 U.S.C. § 1997 [14] as a basis for claims that he asserted in another lawsuit against the New Mexico Probation/Parole and LaPosada Halfway House. (Dkt. No. 1 at 7.)

[14]    Although Plaintiff cites to 28 U.S.C. § 1997, there is no such section of the United States Code.

To the extent that Plaintiff intended to assert claims here pursuant to 42 U.S.C. § 1997, which deals with suits by prisoners regarding prison conditions, I recommend that those claims be dismissed.

The statute provides in 42 U.S.C. § 1997j, "[t]he provisions of this subchapter shall in no way expand or restrict the authority of parties other than the United States to enforce the legal rights which they may have pursuant to existing law with regard to institutionalized persons." 42 U.S.C. § 1997j (2006). "This clause precludes recognition of a private cause of action under 42 U.S.C. § 1997." *Kerchee v. Smith*, 11-CV-0459, 2011 WL 5143135, at *2, n.9 (W.D. Okla. Sept. 30, 2011); *accord Chichakli v. Samuels*, 15-CV-0687,

2016 WL 11447755, at *5, n.12 (W.D. Okla. Mar. 10, 2016) ("The PLRA does not provide any private right of action."); *Woodstock v. Shaffer*, 15-CV-0041, 2015 WL 13614123, at *5 (D. Colo. Sept. 24, 2015) (citing 42 U.S.C. § 1997(a)(c)) (holding that the Civil Rights of Institutionalized Persons Act "does not provide for an individual right of action."); *see McRorie v. Shimoda,* 795 F.2d 780, 782 n. 3 (9th Cir. 1986) (stating that 42 U.S.C. § 1997j "precludes a private cause of action" under 42 U.S.C. §§ 1997-1997j); *Callahan v. Southwestern Medical Ctr.*, 03-CV-1434, 2005 WL 1238770, at *6 (W.D. Okla. Apr. 29, 2005) (stating that "[c]ourts have consistently found" that the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997a "does not provide for a[n] individual right of action" (citations omitted)), *report and recommendation adopted by*, 2005 WL 1656917 (W.D. Okla. July 7, 2005), *aff'd,* 178 F. App'x 837, 840 (10th Cir. May 8, 2006).

### C. Claims Pursuant to the ADA

**\*12** Plaintiff refers to the ADA as a basis for claims that he asserted in another lawsuit against the New Mexico Probation/Parole and LaPosada Halfway House. (Dkt. No. 1 at 7.)

To the extent that Plaintiff intended to assert claims here pursuant to the ADA, I recommend that those claims be dismissed.

#### 1. Statute of Limitations

"[T]he ADA's statute of limitations is three years." *De La Rosa v. Lewis Foods of 42nd Street, LLC*, 124 F. Supp. 3d 290, 299, n.14 (S.D.N.Y. 2015). For the reasons set forth *supra*, in Part III.A.5. of this Order and Report Recommendation, I recommend that Plaintiff's claims pursuant to the ADA be dismissed as time barred.

#### 2. Failure to State A Claim

In the alternative, I recommend that Plaintiff's ADA claims be dismissed for failure to state a claim upon which relief may be granted.

Although the Compliant is sparse, and largely incomprehensible, it states that Plaintiff is a "71-year old, 100% disabled veteran of the United States Navy." (Dkt. No.

1, Attach. 1 at 1.) The Complaint provides no allegations of discrimination based on his disability. (*See generally* Dkt. 1.) However, construing the Complaint liberally, as the Court must, Plaintiff failed to allege facts plausibly suggesting claims pursuant to Title II or Title III of the ADA. [15]

[15]    Based on the facts alleged, Plaintiff could not proceed with a claim under Title I of the ADA, which addresses employment discrimination, because he has neither alleged that he was employed by Defendants, nor alleged that he exhausted administrative remedies by filing a charge with the Equal Employment Opportunity Commission before pursuing litigation in federal court. 42 U.S.C. § 12117; *see Mary Jo C. v. New York State Local Retirement Sys.*, 707 F.3d 144, 169 (2d Cir. 2013) (quoting *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 360, n.1 (2001)) (" 'Title I of the ADA expressly deals with th[e] subject' of employment discrimination."). Moreover, Title IV of the ADA does not appear to be applicable to Plaintiff's claims because Title IV prohibits disability discrimination in telecommunications. *Genco v. Sargent & Collins LLP*, 18-CV-0107, 2018 WL 3827742, at *3, n.5 (W.D.N.Y. June 4, 2018). Finally, Title V of the ADA, sometimes referred to as the "retaliation provision," also does not appear applicable because Plaintiff does not allege that he engaged in activity protected by the ADA, that Defendants were aware of that activity, or any causal connection between the allegedly adverse actions that Defendant took against him and the protected activity. *Chiesa v. New York State Dep't of Labor*, 638 F. Supp. 2d 316, 323 (N.D.N.Y. 2009) (Hurd, J.); *see also Constantine v. Merola*, 2020 WL 8450544, at *5 (N.D.N.Y. Nov. 6, 2020) (Lovric, M.J.) (recommending dismissal of the plaintiff's ADA Title V claims where the complaint failed to allege that the plaintiff "engaged in any protected activity, that any [d]efendant knew that [p]laintiff was involved in the protected activity, or that any adverse decision or course of action taken by [d]efendants was causally connected to that protected activity."), *report and recommendation adopted by* 2021 WL 392487 (N.D.N.Y. Feb. 4, 2021) (Hurd, J.).

### i. Title II of the ADA

**\*13**  Title II of the ADA "proscribes discrimination against the disabled in access to public services." *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009) (citing *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84-85 (2d Cir. 2004), *corrected,* 511 F.3d 238 (2d Cir. 2004)). The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA is applicable to inmates in state correctional facilities. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998); *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016).

Here, the Compliant is devoid of any factual allegations plausibly suggesting that Plaintiff was unable to access programs due to his disability, how his disability prevented him from accessing those programs, or what accommodations he sought and was denied by Defendants. (*See generally* Dkt. 1.) Courts "routinely dismiss ADA suits by disabled inmates that ... do not allege that the inmate was treated differently because of his or her disability." *Elbert v. New York State Dep't of Corr. Servs.*, 751 F. Supp. 2d 590, 595 (S.D.N.Y. 2010).

In addition, other than a conclusory assertion that he is disabled, Plaintiff does not assert facts plausibly alleging that he is a qualified individual under the ADA. *See Schlosser v. Walker*, 20-CV-0433, 2020 WL 7324679, at *3 (D. Conn. Dec. 11, 2020) (holding that the plaintiff's allegation that he suffers from "a serious mental illness" was insufficient to allege that he was a qualified individual pursuant to the ADA); *Burdick v. Town of Schroeppel*, 16-CV-1393, 2017 WL 5509355, at *13 (N.D.N.Y. Jan. 31, 2017) (Dancks, M.J.) ("A plaintiff's complaint must plead facts suggesting that his alleged disability can meet all of the elements contained in the ADA's definition of disability."); *see also Hale v. King,* 642 F.3d 492, 500 (5th Cir. 2011) (holding that, "[t]o establish a claim under [42 U.S.C. § 12102(1)(A)], a plaintiff must allege that he (1) has a[n] ... impairment that (2) substantially limits (3) a major life activity," and dismissing plaintiff's complaint where it failed to allege, *inter alia,* "that his conditions substantially limited him in his performance of a life activity"); *Cox v. Civista Med. Ctr.,* 16 F. App'x 185, 186 (4th Cir. 2001) (affirming district court's dismissal of the plaintiff's complaint because it failed to "demonstrate a disability" under 42 U.S.C. § 12102(1)

(A) or (B)); *Ajuluchuku v. Macy's,* 12-CV-1855, 2012 WL 5464467, at *3 (E.D. Cal. Nov. 7, 2012) (dismissing the plaintiff's amended complaint because it did "not allege facts establishing any of [the] elements [of 42 U.S.C. § 12102(1)]); *Thompson v. New York City Dep't of Probation,* 03-CV-4182, 2003 WL 22953165, at *3 n.5 (S.D.N.Y. Dec. 12, 2003) ("Under the ADA definition of 'disability,' merely pleading a physical impairment without specifying that it 'substantially limits' a 'major life activity' may be insufficient to state a claim for relief.").

As a result, in the alternative, I recommend that Plaintiff's ADA claims under Title II be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. *See Hill v. LaClair,* 20-CV-0441, 2020 WL 2404771, at *8 (N.D.N.Y. May 11, 2020) (Hurd, J.) (dismissing ADA Title II claims "pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted."). [16]

[16]  In the alternative, to the extent that Plaintiff attempts to assert ADA Title II claims against Defendants Angel and Guyyey in their individual capacities, I recommend that those claims be dismissed because "individuals cannot be held liable under the ADA." *Netti v. Ayers,* 17-CV-0976, 2017 WL 7542494, at *18 (N.D.N.Y. Oct. 5, 2017) (Baxter, M.J.) (citing *Baross v. Greenlawn,* 16-CV-4805, 2017 WL 2124424, at *4 (E.D.N.Y. May 15, 2017)), *report and recommendation adopted by* 2018 WL 813509 (N.D.N.Y. Feb. 9, 2018) (Suddaby, C.J.); *accord Rosenfield v. New York State Div. of Veterans' Affairs,* 18-CV-1299, 2019 WL 4621962, at *10 (N.D.N.Y. Sept. 24, 2019) (Suddaby, C.J.); *see Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir. 2001) (holding that Title II of the ADA does not provide for suits against individuals); *Fox v. State Univ. of N.Y.,* 497 F. Supp. 2d 446, 449 (E.D.N.Y. 2007) ("[T]here is no individual liability under Title I or Title II of the ADA, or the ADEA."); *Sutherland v. New York State Dep't of Law,* 96-CV-6935, 1999 WL 314186, at *7 (S.D.N.Y. May 19, 1999) ("Individual defendants may not be held personally liable for alleged violations of the ADA.").

### ii. Title III of the ADA

**\*14**  Title III of the ADA prevents discrimination based on a disability in places of public accommodation. 42 U.S.C. § 12182. However, Title III "expressly does not apply to public entities, including local governments." *Bloom v. Bexar Cnty.,* 130 F.3d 722, 726 (5th Cir. 1997); *see Morales v. New York,* 22 F. Supp. 3d 256, 266-67 (S.D.N.Y. 2014) ("Title III is not applicable to public entities."). Instead, "[a] claim under Title III of the [ADA] can only be asserted against a private entity engaged in the provision of public accommodations, such as an inn, hotel or private school." *Morales,* 22 F. Supp. 3d at 266 (citing 42 U.S.C. §§ 12181(7); 12182); *see also Booker v. City of New York,* 17-CV-7035, 2018 WL 4616048, at *5, n.3 (S.D.N.Y. Sept. 26, 2018) (holding that a claim pursuant to Title III of the ADA cannot be asserted against the City of New York or its employees in their official capacities because they are not private entities engaged in the provision of public accommodations).

Here, Defendants are public entities, which are thus, not amenable to a Title III ADA claim. *See Maioriello v. New York State Office for People with Dev. Disabilities*, 14-CV-0214, 2015 WL 5749879, at *16 (N.D.N.Y. Sept. 30, 2015) (Suddaby, C.J.) (dismissing the plaintiff's claims to the extent that they were based on a violation of Title III because the New York State Office for People with Developmental Disabilities is a public entity). [17]

[17]  To the extent that Plaintiff intended to assert a Title III claim against Defendants Angel and Guyyey in their individual capacities, Title III provides a private right of action for injunctive relief but no right of action for monetary relief. 42 U.S.C. § 12188; *see Krist v. Kolombos Rest. Inc.,* 688 F.3d 89, 94 (2d Cir. 2012) (holding that Title III of the ADA "authorizes private actions only for injunctive relief, not monetary damages."); *Powell,* 364 F.3d at 86 ("Monetary relief ... is not available to private individuals under Title III of the ADA."); *see also Ervine v. Deser View Reg'l Med. Ctr. Holdings, LLC,* 753 F.3d 862, 867 (9th Cir. 2014) ("Damages are not an available remedy to individuals under Title III of the ADA; individuals may receive only injunctive relief."). As a result, those claims should also be dismissed.

Moreover, for the reasons set forth *supra,* in Part III.C.2.i. of this Order and Report-Recommendation, Plaintiff failed to allege that he was a qualified individual pursuant to the ADA.

2021 WL 1406649

In addition, "Title[ ] ... III of the ADA prohibit[s] discrimination against qualified disabled individuals by requiring that they receive 'reasonable accommodations' that permit them to have access to and take a meaningful part in public services and public accommodations." *Powell*, 364 F.3d at 85, opinion corrected, 511 F.3d 238 (2d Cir. 2004) (citations omitted). To adequately plead a claim pursuant to Title III of the ADA for failure to provide reasonable accommodations, a plaintiff must allege facts establishing that the defendant's "failure to make 'reasonable modifications' to their policies, practices, and procedures deprived plaintiff of the ability to access the 'goods, services, facilities, privileges, advantages, or accommodations' available to those lacking [the] plaintiff's disabilities." *Andersen v. N. Shore Long Island Jewish Healthcare Sys. Zucker Hillside Hosp.*, 12-CV-1049, 2013 WL 784391, at *9 (E.D.N.Y. Jan. 23, 2013) (quoting 42 U.S.C. 12182(b)(2)(A)(i)-(ii) (additional citation omitted)), *report and recommendation adopted* as modified, 2013 WL 784344 (E.D.N.Y. Mar. 1, 2013).

Here, the Complaint is devoid of factual allegations concerning "policies, practices, [or] procedures" by Defendants that deprived Plaintiff of ability to access goods, services, or privileges available to those without Plaintiff's disabilities. *Doe v. NYSARC Tr. Serv., Inc.*, 20-CV-801, 2020 WL 5757478, at *8 (N.D.N.Y. Sept. 28, 2020) (Hummel, M.J.), *report and recommendation adopted by*, 2020 WL 7040982 (N.D.N.Y. Dec. 1, 2020) (Sannes, J.).

**\*15** As a result, I recommend that, in the alternative, to the extent that Plaintiff intended to assert claims pursuant to Title III of the ADA, those claims be dismissed for failure to state a claim.

### D. Relief Sought by Plaintiff is Inappropriate

The only relief that Plaintiff appears to seek is his immediate release to his V.A. caregiver and fiduciary in California. (Dkt. No. 1 at 5.) However, the Supreme Court has held that a challenge by a prisoner to the fact or duration of his confinement and seeking an immediate or earlier release from that confinement must be pursued through a habeas corpus proceeding rather than in an ordinary civil rights action. *Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973); *see Garcia v. Westchester Cnty. District Attorney Office*, 21-CV-0348, 2021 WL 411546, at *3 (S.D.N.Y. Feb. 4, 2021) ("A plaintiff may not challenge the validity of his confinement or seek release from custody in a civil action under § 1983, but must instead bring a petition for a writ of habeas corpus to seek such

relief."); *Martinez v. Hynes*, 20-CV-4325, 2021 WL 242232, at *2 (E.D.N.Y. Jan. 22, 2021) ("Prisoners have other ways of challenging convictions they believe to be unconstitutional, first through direct appeal and then through a writ of habeas corpus pursuant to 28 U.S.C. § 2254); *London v. Nassau Cnty. District Attorney's Office*, 20-CV-3988, 20-CV-3989, 20-CV-3990, 2020 WL 7699644, at *9, n.6 (E.D.N.Y. Dec. 28, 2020) (abstaining from adjudicating the plaintiff's remaining claims seeking injunctive relief because habeas corpus relief is the exclusive remedy in federal court for a state prisoner seeking release from custody).

In this case, the Complaint and attached exhibits do not reflect that Plaintiff has complied with the exhaustion requirements for filing a habeas petition pursuant to 28 U.S.C. § 2254. As a result, in the alternative, to the extent that Plaintiff's Complaint could be construed as a habeas petition, I recommend that it be dismissed for failure to exhaust the available state court remedies. *Patterson v. New York*, 2020 WL 7646739, at *3 (N.D.N.Y. Dec. 23, 2020) (D'Agostino, J.) (dismissing the plaintiff's complaint to the extent that it could be construed as a habeas petition where the plaintiff failed to allege that he complied with the exhaustion requirements for filing a habeas corpus petition and holding that a plaintiff may not challenge the legality of his conviction through a section 1983 action and may only obtain that relief by bringing a petition for a writ of habeas corpus).

### V. OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-

CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.). [18]

[18]     See also *Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp.*, 550 U.S. at 544.

**\*16** With respect to Plaintiff's claims pursuant to 42 U.S.C. § 1983, I recommend that the claims against Defendants New York, Binghamton Police Department, Broome County Sheriff's Department, New York Appellate Division Third Department, United States District Court for the Northern District of New York, and Second Circuit Court of Appeals, be dismissed with prejudice and without leave to amend. *See Forjone*, 414 F. Supp. 3d at 303-04 (dismissing with prejudice the plaintiff's claims against the state and federal defendants based on the doctrine of sovereign immunity because "[p]ermitting amendment would be unproductive in this instance."); *Johnson*, 2020 WL 758964, at *2 (recommending dismissal, without leave to amend, the plaintiff's claims against the Appellate Division Third Department); *Jackson*, 2016 WL 4004612, at *5 (dismissing claims against the Syracuse Police Department with prejudice and without leave to amend because the Syracuse Police Department "is not susceptible to suit under § 1983."). However, to the extent that Plaintiff attempted to assert claims against Defendants Angel and Guyyey—in their individual or official capacities —I am unable to conclude with complete certainty that if permitted leave to amend the complaint, Plaintiff could not assert a plausible claim pursuant to 42 U.S.C. § 1983.

Moreover, generally, a district court should not dismiss claims as time barred without providing a *pro se* plaintiff with "notice and opportunity to be heard" as to whether there might be a meritorious tolling argument or other reason why the complaint might be considered. *Abbas*, 480 F.3d at 640. Therefore, I recommend that Plaintiff's time barred claims pursuant to 42 U.S.C. § 1983 and the ADA be dismissed with leave to amend. [19]

[19]     To the extent that Plaintiff seeks monetary damages against Defendants Angel and Guyyey in their

individual capacities pursuant to the ADA I recommend that those claims be dismissed with prejudice and without leave to amend.

In addition, I recommend that to the extent that Plaintiff intended to assert claims pursuant to 42 U.S.C. § 1997, those claims be dismissed with prejudice and without leave to amend because permitting amendment would be unproductive.

If Plaintiff chooses to file an amended complaint, he should note that the law in this circuit clearly provides that " 'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.' " *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *accord Pourzancvakil v. Humphry*, 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.). Therefore, in any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such amended complaint will replace the existing Complaint and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

**ACCORDINGLY**, it is

**ORDERED** that the amended application to proceed *in forma pauperis* (Dkt. No. 4) is **DENIED WITHOUT PREJUDICE**; and it is further [20]

[20]     If Plaintiff wishes to proceed with this action, he must either (i) pay the $402.00 filing fee, or (ii) submit a renewed IFP application detailing his current financial condition complete with the required inmate authorization form, within thirty

(30) days from the date of the filing of Court's Decision and Order. Failure to comply with this directive will result in the issuance of a report and recommendation to the assigned district judge that the action be dismissed.

**\*17  ORDERED** that the Clerk of the Court shall provide Plaintiff with a blank inmate authorization form; and it is further

**ORDERED** that the Clerk of the Court shall amend the docket so as to **ADD** as Defendants the additional entities and individuals identified in the Complaint (i.e. the Broome County Sheriff's Department, Detective Sergeant Barry Angel, and Deputy Sheriff William Guyyey); and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITHOUT LEAVE TO REPLEAD** Plaintiff's (1) claims pursuant to 42 U.S.C. § 1983 against Defendants New York, Binghamton Police Department, Broome County Sheriff's Department, New York State Appellate Division Third Department, United States District Court for the Northern District of New York, and Second Circuit Court of Appeals; and (2) claims pursuant to 42 U.S.C. § 1997, for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b); and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITH LEAVE TO REPLEAD** Plaintiff's (1) claims pursuant to 42 U.S.C. § 1983 against Defendants Angel and Guyyey; and (2) claims pursuant to the ADA, for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b); and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this order, report, and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules. [21]

[21]  The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [22] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

[22]  If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**All Citations**

Slip Copy, 2021 WL 1406649

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 55 of 87

Heendeniya v. St. Joseph's Hosp. Health Ctr. (SJHHC), Not Reported in Fed. Supp. (2017)

2017 WL 1013081

2017 WL 1013081
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Umesh HEENDENIYA, Plaintiff,

v.

ST. JOSEPH'S HOSP. HEALTH CTR. (SJHHC);
Roger Gary Levine, MD; Lisa Marie O'Connor, MD;
George O. Tremiti, MD; Horatius Roman, MD;
Joanne Mary French, RN; Wendy Briscoe, RN;
Susan Lynn Cate, Lmft; Rosaline Spinella [1], RN;
Robert Michael Constantine, MD; Mitchell Bruce
Feldman, MD; Cynthia A. Rybak, NP; Kathryn
Howe Ruscitto, President and CEO of SJHHC;
Lowell A. Seifter, JD, Senior VP and Gen. Counsel
of SJHHC; Meredith Price, VP of Fin. Servs. and
CFO of SJHHC; Deborah Welch, VP; Gael Gilbert,
RN and Dir. of SJHHC's Psychiatric Ward; SJHHC
Does 1-5, Inclusive; Corporations A-F, Inclusive;
Eric T. Schneiderman, Esq., New York State Atty.
Gen.; New York State Office of Mental Health
(OMH); Ann Marie T. Sullivan, M.D., Comm'r of
OMH; Joshua Pepper, Esq. Deputy Comm'r of
OMH; Michael C. Green, Exec. Deputy Comm'r of
DCJS; Nics Appeals Office—OMH; and New York
State Div. of Criminal Justice Servs., Defendants.

[1] The Clerk of the Court is directed to amend
the docket to correct the spelling of this
Defendant's last name from "Spunelka" to
"Spinella."

5:15-CV-1238 (GTS/TWD)
|
Signed 03/14/2017

**Attorneys and Law Firms**

UMESH HEENDENIYA, P.O. Box 5104, Spring Hill, FL
34611, Pro Se.

COSTELLO, COONEY & FEARON, PPLC, ROBERT J.
SMITH, ESQ., 500 Plum Street, Suite 300, Syracuse, NY
13204, Counsel for Defendants SJHHC, French, Briscoe,
Cate, Spinella, Rybak, Ruscitto, Seifter, Price, Welch, and
Gilbert.

SMITH, SOVIK, KENDRICK & SUGNET, P.C., KEVIN
E. HULSLANDER, ESQ., JOHN P. COGHLAN, ESQ.,
250 South Clinton Street, Suite 600, Syracuse, NY 13202,
Counsel for Defendant Levine.

MARTIN, GANOTIS, BROWN, MOULD & CURRIE, P.C.,
BRIAN M. GARGANO, ESQ., 5790 Widewaters Parkway,
Syracuse, NY 13214, Counsel for Defendants O'Connor,
Tremiti, Roman, Constantine, and Feldman.

## DECISION and ORDER

Hon. Glenn T. Suddaby, Chief U.S. District Judge

**\*1** Currently before the Court, in this *pro se* action filed by
Umesh Heendeniya ("Plaintiff") against the thirty-five above-
captioned entities and individuals ("Defendants") pursuant
to, *inter alia*, 42 U.S.C. § 1983 arising out of 18 U.S.C. §
922(g)(4)'s alleged prohibition on Plaintiff's ability to receive
a firearm shipped in interstate or foreign commerce as a
result of his involuntary commitment to a psychiatric ward,
are three motions to dismiss Plaintiff's Second Amended
Complaint for failure to state a claim upon which relief can
be granted pursuant to Fed. R. Civ. P. 12(b)(6), filed by
(1) Defendants St. Joseph's Hospital Health Center, Susan
Lynn Cate, Wendy Briscoe, Joanne French, Cynthia Rybak,
Kathryn Howe Ruscitto, Lowell Seifter, Meredith Price,
Deborah Welch, and Gael Gilbert (Dkt. Nos. 46, 62), (2)
Defendant Roger Gary Levine, M.D. (Dkt. No. 59), and (3)
Rosaline Spinella (Dkt. No. 87). For the reasons set forth
below, Defendants' motions are granted in part and denied in
part.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Second Amended Complaint

Generally, in his Second Amended Complaint, Plaintiff
alleges (among other things) as follows. (Dkt. No. 55 [Plf.'s
Second Am. Compl.].) Plaintiff, a Massachusetts resident,
suffers from "Type-2 Bipolar Disorder (Manic Depression)"
and post-traumatic stress disorder ("PTSD"). (*Id.* at ¶¶ 96,
140.) However, Plaintiff "has never been diagnosed with any
form of psychotic or delusional disorder[.]" (*Id.* at ¶ 99.)

On or about April 5, 2013, Plaintiff was brought to St. Joseph's
Hospital Health Center ("SJHHC") by "EMS" and, between
that date and April 12, 2013, was treated for a "prescription

medication overdose" and pneumonia. [2] (*Id.* at ¶ 141.) He was first treated in the emergency room, then in the intensive care unit ("ICU"), and, finally, in the "general medical wing" of SJHHC. (*Id.*) While Plaintiff was being treated in the ICU, he was visited by Dr. Lisa O'Connor, M.D., a psychiatrist with SJHHC's psychiatric unit, on two separate occasions. (*Id.* at ¶¶ 155-56.) Dr. O'Connor "questioned [Plaintiff] at length," and Plaintiff provided "his complete biographic[al], physical, and mental health, social, and educational histor[ies]." (*Id.* at ¶ 163.) Dr. O'Connor asked Plaintiff "about any past arrests," and Plaintiff disclosed that, in 1995, he had shot and killed an assailant in Oklahoma, was tried for "first degree murder," and was acquitted in June 1996. (*Id.* at ¶¶ 108, 164.) Moreover, Plaintiff explained to Dr. O'Connor that "he had been arrested twice in the past for carrying firearms while not having the correct concealed carry permit (due to the lack of reciprocity agreements between the respective [s]tates) in his possession." (*Id.* at ¶ 165.) Specifically, Plaintiff was arrested for "possessing firearms" in Iowa in 2002 (although he possessed a "concealed carry" permit issued by Virginia at the time), and was arrested again for "possessing a firearm" in Massachusetts in 2007 (although he possessed a "concealed carry" permit issued by Utah at the time). (*Id.* at ¶¶ 166, 168.) He explained to Dr. O'Connor that he was not convicted of any firearm-related offense on either occasion, and that he wanted to continue to "possess guns" to "protect himself" and because "he was a firm believer in the Second Amendment and firearm rights." (*Id.* at ¶¶ 167, 169, 171.) Plaintiff also disclosed that he had been treated by his psychiatrist in Massachusetts for his bipolar disorder and PTSD for the previous five years. (*Id.* at ¶¶ 179-180.)

[2]   According to an SJHHC admission note signed by Defendant Wendy Briscoe, RN, and attached to Plaintiff's Complaint, Plaintiff's mother "found him unresponsive at a local motel" after Plaintiff ingested Xanax and Risperdal. (Dkt. No. 1, Attach. 6, at 6 [attaching page "1" of SJHHC 3-6 Progress Note, dated 4/12/13].)

**\*2**  On April 12, 2013, after his discussions with Dr. O'Connor, Plaintiff was involuntarily admitted to SJHHC's psychiatric department pursuant to New York Mental Hygiene Law ("MHL") § 9.27, despite the fact that he did not "exhibit any suicidal, homicidal, delusional, paranoid, or psychotic symptoms whatsoever," and did not "behave in a manner that could cause harm to himself or others." [3] (*Id.* at ¶¶ 143-44.) Rather, as a basis for Plaintiff's involuntary admission, several of the individual Defendants [4] (including

Dr. O'Connor) "falsely or negligently wrote in hospital records" that Plaintiff had a "history of schizoaffective disorder," despite Plaintiff's own account of his medical history (which did not include this diagnosis) and the opportunity to contact his treating psychiatrist to verify this diagnosis. (*Id.* at ¶¶ 151-53, 185, 187, 210.) In so doing, Dr. O'Connor "exaggerated and/or increased the (artificial) justification under which [Plaintiff] could be involuntarily admitted" to SJHHC's psychiatric ward. (*Id.* at ¶ 191.) At no point did any of the Defendants properly assess whether Plaintiff posed a danger to himself or others. [5] (*Id.* at ¶¶ 247-260.)

[3]   According to Briscoe's admission note, Plaintiff (who was under the care of Defendant Dr. Roger Levine, M.D.) relayed his psychiatric history and arrest history, and "declined ... treatments and procedures[,] stating his [S]econd [A]mendment rights and that he is not an American citizen." (Dkt. No. 1, Attach. 6, at 6.)

[4]   In his Second Amended Complaint, Plaintiff refers to the Defendants in the following groupings: (1) Defendants SJHHC, French, Briscoe, Cate, Spinella, Rybak, Ruscitto, Seifter, Price, Welch, Gilbert, and SJHHC Does 1-5 are referred to collectively as "the SJHHC Defendants"; (2) Defendants Levine, O'Connor, Tremiti, Roman, Constantine, and Feldman are referred to collectively as the "Physician Defendants," and (3) Defendants New York State Office of Mental Health ("OMH"), Sullivan, Pepper, NICS Appeals Office—OMH Central Files, the New York State Division of Criminal Justice Services ("DCJS"), Green, and Schneiderman are referred to as the "State Defendants." (Dkt. No. 55 at ¶¶ 1-2.) For the sake of consistency, the Court will use the same designations where practicable, but refers to the SJHHC Defendants as "the St. Joseph's Defendants."

[5]   Plaintiff also alleges that Defendants Dr. George Tremiti, M.D., and Dr. Horatius Roman, M.D., did not personally examine him prior to his involuntary admission, in contradiction to the Certificate of Examining Physician forms that each of these Defendants completed, which certified that they believed that Plaintiff was in need of "involuntary care" based on their personal examinations of

Heendeniya v. St. Joseph's Hosp. Health Ctr. (SJHHC), Not Reported in Fed. Supp. (2017)

2017 WL 1013081

Plaintiff. (Dkt. No. 55 at ¶¶ 225-228 [Plf.'s Second Am. Compl.]; *see also* Dkt. No. 1, Attach. 7, at 2 [Certificate of Examining Physician, signed by Dr. Tremiti on 4/8/2013, noting, at bottom of page, "suicide attempt, history of schizo affective disorder...."]; *id.* at 4 [Certificate of Examining Physician, signed by Dr. Roman on 4/8/2013, noting, at bottom of page, "suicide attempt, h/o schizo affective disorder...."].)

Defendants had at least two motives for improperly involuntarily admitting Plaintiff to the psychiatric ward. First, the SJHHC Defendants and the Physician Defendants had "an unfair bias against" Plaintiff's right to possess firearms under the Second Amendment of the U.S. Constitution, and wanted to "make sure that [Plaintiff] would lose his firearm rights" pursuant to 18 U.S.C. § 922(g)(4). (*Id.* at ¶¶ 215, 326, 343, 376, 426.) This "strong moral bias" is evident because SJHHC is "managed, controlled, and/or heavily influenced by the Catholic Church." (*Id.* at ¶ 326.) Second, the SJHHC Defendants and/or the Physician Defendants "had a financial motive" to involuntarily admit Plaintiff to the psychiatric unit and provide treatment. (*Id.* at ¶¶ 194, 242, 263, 267, 278, 315, 343.)

Although Defendants "had good legal cover to ... involuntarily admit" Plaintiff under the MHL and relevant case law, the St. Joseph's Defendants and Physician Defendants exploited a "loophole" in the MHL by involuntarily admitting him to the psychiatric ward (thereby eliminating his right to possess firearms under 18 U.S.C. § 922[g][4] ) and then discharging him on April 17, 2013, before the time at which they were obligated to notify his family members of his right to a hearing to challenge his involuntary admission and free legal representation. (*Id.* at ¶¶ 311, 328-344.) Moreover, Defendants "never [gave Plaintiff] any paperwork nor notified [him] verbally of his legal rights, including the availability of free [legal representation] to challenge his retention as an involuntarily admitted patient." (*Id.* at ¶ 365.) [6]

[6]   Plaintiff alleges that Briscoe "falsely stated in SJHHC ... forms that [Plaintiff] had been provided with documents informing him of his legal rights...." (*Id.* at ¶ 308.) Briscoe's admission note states that Plaintiff "received a copy of his legal rights, unit handbook and pt rights book with understanding," was "given a unit tour," and that "[t]reatment plans [were] initiated for"

depression and "self injury acute." (Dkt. No. 1, Attach. 6, at 7.) Another document attached to Plaintiff's Complaint, captioned "NOTIFICATION OF STATUS AND RIGHTS, INVOLUNTARY ADMISSION ON MEDICAL CERTIFICATION," bears Plaintiff's name, Dr. Levine's name, a notice regarding Plaintiff's right to legal services, and contact information for the Syracuse, New York, office of Mental Hygiene Legal Services. (Dkt. No. 1, Attach. 7, at 6 [attaching Notification of Status and Rights, Involuntary Admission on Medical Certification, signed by a staff physician on 4/12/13, and bearing the statement, "THE ABOVE PATIENT HAS BEEN GIVE [*sic*] A COPY OF THIS NOTICE"].)

**\*3** In "early 2015," Plaintiff became aware that he may be prohibited from owning or purchasing firearms pursuant to 18 U.S.C. § 922(g)(4). [7] (*Id.* at ¶ 348.) Plaintiff wrote a letter to the St. Joseph's Defendants and the Physician Defendants to inform them that his involuntary admission to the psychiatric ward "has now led to him being unable to purchase or possess firearms and ammunition," but they "wrote back ... refusing to rectify the ... impediment that they unjustly and unlawfully imposed on him [with] regard[ ] to his gun rights...." [8] (*Id.* at ¶¶ 353-54.)

[7]   It appears that Plaintiff was aware of this possibility in April 2013, given that, as noted above, contemporaneous medical records attached to his Complaint reflect that he declined treatment, citing his "[S]econd [A]mendment rights," and expressing concern that he may be prohibited from owning firearms if he was involuntarily admitted. (Dkt. No. 1, Attach. 6, at 6-7.)

[8]   In a letter dated January 27, 2015, and attached to Plaintiff's Complaint, Mary Clare Ehde, Manager of SJHHC's Office of Patient Experience, stated that Plaintiff's "concerns" had been reviewed and that treating staff had been interviewed. (Dkt. No. 1, Attach. 9, at 3 [Letter, dated 1/27/2015].) SJHHC's review confirmed that, prior to Plaintiff's admission, he had been "evaluated by 2 medical Physicians and a Psychiatrist," and that, as a result, medical staff "concluded that, for your safety, the involuntary admission was an appropriate course of treatment for you." (*Id.*) Based upon these conclusions, SJHHC declined to

Case 5:22-cv-00199-DNH-TWD Document 7 Filed 04/05/22 Page 58 of 87

Heendeniya v. St. Joseph's Hosp. Health Ctr. (SJHHC), Not Reported in Fed. Supp. (2017)

2017 WL 1013081

"amend[ Plaintiff's] medical records to change [his] admission status." (*Id.*)

Because this Decision and Order is intended primarily for the review of the parties, the Court will not further recite the factual allegations contained in Plaintiff's Second Amended Complaint, with which the parties are familiar.

Based upon the foregoing allegations, Plaintiff appears to assert the following claims: (1) a claim for medical malpractice against the SJHHC Defendants and the Physician Defendants ("Count I") (*id.* at ¶¶ 392-406); (2) a claim for "[i]ntentional and/or [r]eckless [i]nfliction of [e]motional [d]istress" against the SJHHC Defendants and the Physician Defendants ("Count II") (*id.* at ¶¶ 407-12); (3) a claim for negligent infliction of emotional distress against the SJHHC Defendants and the Physician Defendants ("Count III") (*id.* at ¶¶ 413-19); (4) a claim for violation of Title III and Title V of the Americans with Disability Act, 42 U.S.C. § 12121 *et seq.* ("ADA") and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*, against the SJHHC Defendants, the Physician Defendants and Corporations A-F ("Count IV") (*id.* at ¶¶ 420-34);[9] (5) a claim for civil conspiracy under New York State law against the SJHHC Defendants and Physician Defendants ("Count V") (*id.* at ¶¶ 435-41); (6) a claim for "[v]iolation of the Second Amendment" against the State Defendants, and for a declaratory judgment and injunctive relief in relation thereto ("Count VI") (*id.* at ¶¶ 442-48); (7) a claim against the State Defendants that MHL § 9.27, as applied, violated his rights under the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution ("Count VII") (*id.* at ¶¶ 449-53); (8) a claim against the State Defendants that MHL § 9.27, as applied, violated his rights under the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution ("Count VIII") (*id.* at ¶¶ 454-58); (9) a claim against the State Defendants that MHL § 9.27, on its face, violated his rights under the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution ("Count IX") (*id.* at ¶¶ 459-63); (10) a claim against the State Defendants that MHL § 9.27, on its face, violated his rights under the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution ("Count X") (*id.* at ¶¶ 464-68); (11) claims for violation of Title II and Title V of the ADA and section 504 of the Rehabilitation Act against the State Defendants ("Count XI") (*id.* at ¶¶ 469-76); and (12) a claim for violation of N.Y. Civil Rights Law § 79-n and MHL § 33.01 against the SJHHC Defendants, Physician Defendants, and State Defendants ("Count XII") (*id.* at ¶¶ 477-481).

[9] Corporations A-F represent the unknown "direct employers (i.e., a physician group, partnership, limited liability corporation, etc.)" of the six named Physician Defendants. (Dkt. No. 55 at ¶ 1.)

**B. Parties' Briefing on Defendants' Motion to Dismiss**

**1. St. Joseph's Defendants' Memoranda of Law and Spinella's Memorandum of Law**

**\*4** Generally, in their respective memoranda of law, the St. Joseph's Defendants and Spinella argue as follows: (1) Plaintiff's Second Amended Complaint contains no allegations with respect to Ruscitto, Seifter, Price, Welch, Gilbert, or SJHHC Does 1-5, and any claims purportedly asserted against them must therefore be dismissed; (2) to the extent that Plaintiff may be understood to have alleged a negligent training and/or negligent supervision claim against Ruscitto, Gilbert, Price, Seifter, Welch, Spinella, and/or SJHHC, these claims must be dismissed because (a) he has failed to allege facts plausibly suggesting that these Defendants provided negligent training or negligent supervision, and (b) as Plaintiff alleges, these Defendants were acting within the scope of their employment and, as a result, the employer cannot be held liable under New York law for a claim of negligent hiring, retention, or training; (3) Plaintiff's Title III ADA and Rehabilitation Act claims must be dismissed because (a) individuals may not be held liable under these statutes, and (b) he has failed to allege facts plausibly suggesting that SJHHC constitutes a public accommodation for purposes of his claims or that SJHHC denied him access to its facility or services; (4) Plaintiff's Title V ADA claim must be dismissed because (a) individuals may not be held liable under this statute, (b) he has failed to allege facts plausibly suggesting that he was engaged in a protected activity, that SJHHC knew of the protected activity, or the existence of a causal connection between a protected activity and any retaliatory action, and (c) he should not be permitted to "resurrect" his previously dismissed claims pursuant to 42 U.S.C. § 1983, which were predicated on the same factual allegations (*id.* at 8-9); (5) Plaintiff's § 1983 claims must be dismissed pursuant to the law-of-the-case doctrine because these claims, first asserted in his Amended Complaint, were previously dismissed with prejudice; (6) Plaintiff's conspiracy claim pursuant to 42 U.S.C. § 1985 (to the extent Plaintiff can be understood to allege such a claim) must be dismissed because (a) he has failed to allege facts plausibly suggesting that Defendants conspired to violate his rights or that any such conspiracy was motivated by class-based discriminatory

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 59 of 87

Heendeniya v. St. Joseph's Hosp. Health Ctr. (SJHHC), Not Reported in Fed. Supp. (2017)

2017 WL 1013081

animus, and (b) to the extent that Plaintiff alleges that the conspirators were all St. Joseph's employees, his claim is barred by the intracorporate conspiracy doctrine; (7) Plaintiff's claim pursuant to 42 U.S.C. § 1986 (to the extent Plaintiff can be understood to allege such a claim) must be dismissed because liability under § 1985 is a necessary predicate to liability under § 1986, and, for the reasons set forth above, Plaintiff has failed to properly plead a § 1985 claim; (8) Plaintiff's intentional-infliction-of-emotional-distress claim must be dismissed because (a) it is time-barred and (b) he has failed to allege facts plausibly suggesting that Defendants engaged in sufficiently extreme and outrageous conduct to support this claim (or even a negligent-infliction-of-emotional-distress claim) (id. at 14-17); (9) Plaintiff's medical malpractice claim must be dismissed because it is time-barred; (10) to the extent that Plaintiff may be understood to have asserted a claim for "perjury," this claim must be dismissed because such a civil claim does not exist (id. at 17-18); (11) Plaintiff's claim pursuant to New York Civil Rights Law § 79-n must be dismissed because he has failed to allege facts plausibly suggesting that he was subjected to violence or intimidation; (12) Plaintiff's claim pursuant to MHL § 33.01 must be dismissed because, in support of this claim, he merely re-asserts that his rights under § 1983, the ADA, and the Rehabilitation Act have been violated, and, for the reasons enumerated above, those claims must be dismissed; (13) Plaintiff's civil conspiracy claim under New York State law must be dismissed because Plaintiff has failed to allege facts plausibly suggesting that he was subjected to a separate underlying tort; and (14) alternatively, in the event that the Court concludes that only Plaintiff's state law claims survive the St. Joseph's Defendants' and Spinella's motions to dismiss, the Court should decline to exercise supplemental jurisdiction over those state law claims. (Dkt. No. 46, Attach. 2, at 2-18 [St. Joseph's Defs.' Memo. of Law]; Dkt. No. 62, Attach. 2, at 1-5 [St. Joseph's Defs.' Supp. Memo. of Law]; [10] Dkt. No. 87, Attach. 2, at 1-19 [Spinella's Memo. of Law].)

[10]    By letter dated July 25, 2016, the St. Joseph's Defendants advised the Court that their motion to dismiss (which was filed with respect to Plaintiff's Amended Complaint) applied with equal force to Plaintiff's later-filed Second Amended Complaint. (Dkt. No. 57.) Thereafter, the St. Joseph's Defendants filed a second memorandum of law in support of their motion to dismiss, intended to "address[ ] any newly asserted causes of action in Plaintiff's Second Amended

Complaint." (Dkt. No. 62, Attach. 2, at 1 [St. Joseph's Def.'s Supp. Memo. of Law].) The Court will consider the arguments set forth in both of the St. Joseph's Defendants' memoranda of law because, combined, they do not exceed the page limitations contained in Local Rule 7.1(a)(1) of the Court's Local Rules of Practice.

### 2. Dr. Levine's Memorandum of Law

Generally, in his memorandum of law, Dr. Levine argues as follows: (1) Plaintiff's medical malpractice claim must be dismissed because it is time-barred; (2) Plaintiff's intentional-infliction-of-emotional-distress claim must be dismissed because (a) it is time-barred and (b) Plaintiff has failed to allege facts plausibly suggesting that Dr. Levine had the requisite intent to inflict emotional distress, given Plaintiff's allegations that multiple medical professionals independently determined that Plaintiff's commitment was warranted; (3) Plaintiff's negligent-infliction-of-emotional distress claim must be dismissed because he has failed to allege facts plausibly suggesting that Defendants' actions involved a threat or danger of physical harm to him; (4) Plaintiff's ADA Title III claim must be dismissed because Plaintiff has not alleged facts plausibly suggesting that Dr. Levine– a psychiatrist who was "director of" the psychiatry unit at SJHHC–was an owner, lessee, or operator of SJHHC for purposes of that provision; (5) Plaintiff's ADA Title V claim must be dismissed because (a) Plaintiff has failed to allege facts plausibly suggesting any basis for such a claim and (b) Title V does not provide for individual liability; (6) Plaintiff's Rehabilitation Act claim must be dismissed because he has failed to allege facts plausibly suggesting that he was denied participation in, or the benefits of, any federally funded program; (7) Plaintiff's civil conspiracy claim under New York State law must be dismissed because he has failed to allege facts plausibly suggesting that he was subjected to a separate underlying tort; and (8) Plaintiff's claim pursuant to New York Civil Rights Law § 79-n must be dismissed because he has failed to allege facts plausibly suggesting that he was subjected to violence or intimidation. (Dkt. No. 59, Attach. 1, at 4-14 [Dr. Levine's Memo. of Law].)

### 3. Plaintiff's Memorandum of Law in Opposition to the Motions to Dismiss Filed by the St. Joseph's Defendants and Dr. Levine

Case 5:22-cv-00199-DNH-TWD Document 7 Filed 04/05/22 Page 60 of 87

Heendeniya v. St. Joseph's Hosp. Health Ctr. (SJHHC), Not Reported in Fed. Supp. (2017)

2017 WL 1013081

Generally, in opposition to the motions to dismiss filed by the St. Joseph's Defendants and Dr. Levine, Plaintiff argues as follows: (1) his medical malpractice claim is not time-barred because the last day on which he could have interposed this claim under the statute of limitations (October 17, 2015) was a Saturday, and he therefore had until Monday, October 19, 2015, to interpose it; (2) with respect to the St. Joseph's Defendants first argument, he has alleged facts plausibly suggesting that the five "executive" individual Defendants failed to exercise sufficient oversight with respect to "lower level" SJHHC employees; (3) the five "executive" individual Defendants, as well as SJHHC, are also liable for any harm caused to him by the Physician Defendants under principles of agency; (4) his ADA and Rehabilitation claims should not be dismissed because (a) SJHHC is liable for violations of these provisions perpetrated by the St. Joseph's individual Defendants, and, through principles of agency, by the Physician Defendants, (b) he has alleged facts plausibly suggesting that Defendants failed to make a "reasonable modification" to the medical services that he was provided to ensure that his Second Amendment rights were not implicated under 18 U.S.C. § 922(g)(4); (5) none of his claims should be dismissed pursuant to the law-of-the-case doctrine because (a) his claims do not merely rehash his previously dismissed § 1983 claims and (b) application of the law-of-the-case doctrine is discretionary; and (6) his claim pursuant to MHL § 33.01 should not be dismissed because he has alleged facts plausibly suggesting that he lost a property right (i.e., "his firearm licensing rights and firearm permit rights") under 18 U.S.C. § 922(g)(4) as a result of being "forcefully and unlawfully" involuntarily admitted. (Dkt. No. 90 at 3-9 [Plf.'s Opp'n Memo. of Law to the St. Joseph's Defs. and Dr. Levine].)

## 4. Plaintiff's Memorandum of Law in Opposition to Spinella's Motion to Dismiss

**\*5** Generally, in opposition to Spinella's motion to dismiss, Plaintiff asserts the same arguments summarized above in Part I.B.3. of this Decision and Order and, moreover, argues as follows: (1) he has alleged facts plausibly suggesting that Spinella failed to "exercise sufficient ... oversight" of the Physician Defendants, who (a) wrote "false medical information" in his medical records and (b) falsely noted on his involuntary admission forms that Drs. Tremiti and Roman personally examined him; (2) his civil conspiracy claim should not be dismissed because (a) he has alleged facts plausibly suggesting that Spinella and the other

individual Defendants conspired to deprive him of his right to possess firearms and ammunition by (i) recording "false and exaggerated medical information (from a psychiatric illness standpoint)," (ii) failing to contact his treating psychiatrist, and (iii) refusing his request to be admitted on a voluntary basis so that his Second Amendment rights would not be lost by operation of 18 U.S.C. § 922(g)(4), and (b) his timely medical malpractice claim constitutes an underlying tort for purposes of his civil conspiracy claim; and (3) if his federal claims are dismissed, the Court should exercise supplemental jurisdiction over any surviving state law claims. (Dkt. No. 105, Attach. 1, at 3-17 [Plf.'s Opp'n Memo. of Law to Spinella].)

## 5. St. Joseph's Defendants' and Spinella's Reply Memorandum of Law

Generally, in their reply, the St. Joseph's Defendants and Spinella argue as follows: (1) Plaintiff has failed to oppose their motion to the extent that it seeks dismissal of (a) his § 1985 claim, (b) his § 1986 claim, (c) his intentional tort claims, (d) his negligent-infliction-of-emotional distress claim, (e) his "perjury" claim, (f) his New York Civil Rights Law § 79-n claim, and (g) his New York State civil conspiracy claim; (2) Plaintiff's § 1983 claims must be dismissed pursuant to the Court's Decision and Order filed February 25, 2016, which dismissed Plaintiff's § 1983 claims with prejudice and directed that Plaintiff's Amended Complaint "shall not attempt to reassert any claims that have been dismissed with prejudice in this Decision and Order"; and (3) Plaintiff's claims that are mere attempts to reassert his previously dismissed § 1983 claims under different causes of action–including his medical malpractice claim, ADA claims, Rehabilitation Act claims, and claim pursuant to MHL § 33.01–must also be dismissed. (Dkt. Nos. 92, 107 at 1-4 [St. Joseph's Defs.' Reply Memo. of Law]; Dkt. No. 107 at 2-5 [Spinella's Reply Memo. of Law].) [11]

[11]     The St. Joseph's Defendants' reply and Spinella's reply are in the form of affidavits, sworn to by defense counsel. (Dkt. Nos. 92, 107.) Defense counsel is respectfully reminded that affidavits must not contain legal arguments and that legal arguments must be set forth in a reply memorandum of law. N.D.N.Y. L.R. 7.1(a)(1), (2).

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 61 of 87

Heendeniya v. St. Joseph's Hosp. Health Ctr. (SJHHC), Not Reported in Fed. Supp. (2017)
2017 WL 1013081

#### 6. Dr. Levine's Reply Memorandum of Law

Generally, in his reply, Dr. Levine reiterates the arguments set forth in his memorandum of law and, moreover, argues as follows: (1) Plaintiff has conceded that Dr. Levine cannot be held liable under Title III and Title V of the ADA; (2) because a civil conspiracy under New York State law requires a showing of intentional conduct, Plaintiff's medical malpractice claim cannot serve as the tort underlying his civil conspiracy claim; and (3) because Plaintiff's intentional-infliction-of-emotional-distress claim is time-barred, this claim cannot serve as the tort underlying his civil conspiracy claim. (Dkt. No. 96 at 2-8 [Dr. Levine's Reply Memo. of Law].)

## II. GOVERNING LEGAL STANDARD

### A. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cty.*, 549 F. Supp. 2d 204, 211, nn. 15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

**\*6** On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp. 2d at 212, n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests."

*Jackson*, 549 F. Supp. 2d at 212, n.17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson*, 549 F. Supp. 2d at 212, n.18 (citing Supreme Court cases); *Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak*, 629 F. Supp. 2d at 213, n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atl. Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968-69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not

2017 WL 1013081

permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 (internal quotation marks and citations omitted). However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

**\*7** Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id.* (internal citation and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

A few words are also appropriate regarding what documents are considered when a dismissal for failure to state a claim is contemplated. Generally, when contemplating a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case. [12]

[12]    *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *L-7 Designs, Inc. v. Old Navy, LLC*, No. 10-573, 2011 WL 2135734, at \*1 (2d Cir. June 1, 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary judgment is not necessary under Fed. R. Civ. P. 12[d] if the "matters outside the pleadings" in consist of [1] documents attached to the complaint or answer, [2] documents incorporated by reference in the complaint (and provided by the parties), [3] documents that, although not incorporated by reference, are "integral" to the complaint, or [4] any

matter of which the court can take judicial notice for the factual background of the case); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that a district court considering a dismissal pursuant to Fed. R. Civ. 12(b)(6) "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.... Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint.... However, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document.") [internal quotation marks and citations omitted]; *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding [a] defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks and citation omitted).

**\*8** Finally, the Court notes that Dr. Levine filed an answer before he filed his present motion to dismiss. As a result, the Court construes his motion as one seeking judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001) (collecting cases).

### B. Legal Standards Governing Plaintiff's Claims
Because the parties have (in their memoranda of law) demonstrated an adequate familiarity with the legal standards governing Plaintiff's claims, the Court will not recite in detail

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 63 of 87

Heendeniya v. St. Joseph's Hosp. Health Ctr. (SJHHC), Not Reported in Fed. Supp. (2017)

2017 WL 1013081

those legal standards in this Decision and Order, which is intended primarily for the review of the parties. Rather, the Court will discuss those legal standards only where necessary below, in Part III of this Decision and Order.

## III. ANALYSIS

### A. Claims Previously Dismissed with Prejudice

As an initial matter, Plaintiff's original Complaint was liberally construed to have asserted several claims pursuant to 42 U.S.C. § 1983, and these claims were dismissed with prejudice for failure to state a claim upon which relief can be granted. Specifically, although Plaintiff's Second Amended Complaint contains numerous additional factual allegations, the following claims previously construed to have been asserted in Plaintiff's Complaint and dismissed with prejudice based on the same course of events underlying his Second Amended Complaint: (1) Count VI (asserting a "[v]iolation of the Second Amendment" against the State Defendants); (2) Counts VII and IX (asserting that MHL § 9.27 violated his due process rights); and (3) Counts VIII and X (asserting that MHL § 9.27 violated his equal protection rights). (Dkt. No. 6 at Parts III.D, IV [Order and Report-Recommendation of Dancks, M.J., filed 11/30/2015]; Dkt. No. 20 [Decision and Order, adopting Order and Report-Recommendation].) In its Decision and Order regarding Plaintiff's original Complaint, the Court expressly directed that Plaintiff "shall not attempt to reassert any claims that have been dismissed with prejudice" therein. (Dkt. No. 20 at 12.) The earlier dismissal of these claims thus constitutes law of the case, and Plaintiff has not identified any grounds justifying reconsideration of the Court's prior holdings regarding these claims. See *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) ("The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.") (internal quotation marks omitted).

The Court notes that Plaintiff expressly asserts his § 1983 claims (i.e., Counts VI-X) "[a]gainst solely the ... State Defendants[.]" (Dkt. No. 55, captions to Counts VI-X.) However, as in his Complaint, Plaintiff's Second Amended Complaint is devoid of any factual allegations related to any involvement of the State Defendants' in his involuntary admission at SJHHC. Moreover, even if (1) Plaintiff's new factual allegations that the St. Joseph's Defendants and the Physician Defendants circumvented his right to a hearing by discharging him before the deadline by which a hearing was required could serve as the basis for a § 1983 claim that

was properly before the Court and (2) the Court construed Plaintiff's Second Amended Complaint as asserting his due process and equal protection claims against the St. Joseph's Defendants and the Physician Defendants (rather than the State Defendants), his claims still would not entitle him to relief because, (among other things) "[t]here can be no claim under the Equal Protection or Due Process Clauses of the Fourteenth Amendment where mere private action abridges the rights of an individual." *McIntosh v. Covenant House*, 05-CV-9973, 2007 WL 1946540, at *3 (S.D.N.Y. June 28, 2007); *accord*, Dkt. No. 6 at 20 [Report-Recommendation, noting that "private conduct, no matter how discriminatory or wrongful, is not controlled by § 1983"] [internal quotation marks omitted] ). Although Plaintiff alleges that SJHHC had financial incentives to involuntarily admit patients, this conclusory and speculative allegation does not plausibly suggest "a sufficiently close nexus between the State and the challenged action" such that the challenged action "may be fairly treated as that of the State itself." *Andersen v. N. Shore Long Is. Jewish Healthcare Sys.'s Zucker Hillside Hosp.*, 12-CV-1049, 2015 WL 1443254, at *10 (E.D.N.Y. Mar. 26, 2015); *see also Antwi v. Montefiore Med. Ctr.*, 14-CV-0840, 2014 WL 6481996, at *5 (S.D.N.Y. Nov. 18, 2014) ("[I]t is well-settled in the Second Circuit that a private hospital confining a patient under the New York MHL is not acting under color of state law."). Accordingly, even if it could reasonably be said that Plaintiff has asserted in his Second Amended Complaint any new § 1983 claim not barred by the Court's directive that he not attempt to reassert any previously dismissed claims, the Court concludes that Plaintiff has not alleged facts plausibly suggesting an entitlement to relief pursuant to § 1983. [13]

[13]  Because Plaintiff is litigating this matter *pro se* and has been granted *in forma pauperis* status, the Court has a continuing duty to review his Second Amended Complaint and must "dismiss the case at any time if the court determines that ... the action (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(i)-(iii); *accord, e.g., Kyung Ja Lee v. HSBC Mortg. Corp. USA*, 14-CV-0584, 2014 WL 795766, at *1 (E.D.N.Y. Feb. 27, 2014) (noting a district court's "independent duty to assess whether a complaint meets the pleading standard under" Fed. R. Civ. P. 8, "and to dismiss it if it does not").

Heendeniya v. St. Joseph's Hosp. Health Ctr. (SJHHC), Not Reported in Fed. Supp. (2017)

2017 WL 1013081

**\*9**  For each of the foregoing reasons, Counts VI-X of Plaintiff's Second Amended Complaint are dismissed.

### B. Whether Plaintiff's ADA Title II, III and Title V Claims and Rehabilitation Act Claims Must Be Dismissed (Counts IV and XI)

After carefully considering the matter, the Court answers this question in the affirmative for the reasons set forth in the St. Joseph's Defendants' memoranda of law and Dr. Levine's memoranda of law. (Dkt. No. 46, Attach. 2, at 4-8 [St. Joseph's Defs.' Memo. of Law]; Dkt. No. 87, Attach. 2, at 2-5 [Spinella's Memo. of Law]; Dkt. No. 59, Attach. 1, at 11-13 [Dr. Levine's Memo. of Law]; Dkt. No. 92 at 3-4 [St. Joseph's Defs.' Reply Memo. of Law]; Dkt. No. 96 at 5-6 [Dr. Levine's Memo. of Law].) To those reasons, the Court adds the following analysis.

First, as the St. Joseph's Defendants and Dr. Levine correctly note, "individual defendants may not be sued for money damages under either" the ADA or the Rehabilitation Act. *Morales v. City of New York*, No. 13-CV-7667, 2016 WL 4718189, at \*6 (S.D.N.Y. Sept. 7, 2016) (citing *Askins v. N.Y.C. Transit*, 11-CV-6371, 2013 WL 142007, at \* 4 [S.D.N.Y. Jan. 8, 2013] and *Fate v. Goord*, 11-CV-7493, 2012 WL 3104884, at \*4 [S.D.N.Y. July 31, 2012]); *accord, Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012). Here, Plaintiff is seeking "compensat[ion] for the maximum pecuniary amount allowed" for his ADA and Rehabilitation Act claims. (Dkt. No. 55 at ¶ 434 [Plf.'s Second Am. Compl.].)

Second, Plaintiff has failed to allege facts plausibly suggesting an entitlement to relief under Title III or the Rehabilitation Act. "In order to state a claim for violation of Title III, ... a plaintiff must establish that (1) he or she is disabled within the meaning of the ADA; (2) that the defendants own, lease, or operate a place of public accommodation; and (3) that the defendants discriminated against the plaintiff within the meaning of the ADA[.]" *Krist*, 688 F.3d at 94-95. "To establish a prima facie case under the Rehabilitation Act, a plaintiff must allege: [1] that he or she is a person with disabilities under the Rehabilitation Act, [2] who has been denied benefits of or excluded from participating in a federally funded program or special service, [3] solely because of his or her disability." *Bryant v. New York State Educ. Dep't*, 692 F.3d 202, 216 (2d Cir. 2012). Although "[s]ection 504 of the Rehabilitation Act, enacted prior to the ADA, is narrower than the ADA in that its provisions apply only to programs receiving federal financial assistance ... Title III and § 504 provide similar protections to individuals with disabilities and the merits of such claims are generally considered together." *McInerney v. Rensselaer Polytechnic Inst.*, 977 F. Supp. 2d 119, 125 (N.D.N.Y. 2013) (Hurd, J.); *accord, Hargrave v. Vermont*, 340 F.3d 27, 35 (2d Cir. 2003) (noting that, "[b]ecause Section 504 of the Rehabilitation Act and the ADA impose identical requirements," disability discrimination claims under both statutes may be considered "in tandem") (internal quotation marks omitted).

With respect to the second element of his Title III and Rehabilitation Act claims, Plaintiff has not alleged facts plausibly suggesting that SJHHC constitutes a public accommodation, or that he has been denied benefits of, or excluded from participating in, a federally funded program or service. [14] (*See generally* Dkt. No. 55 [Plf.'s Second Am. Compl.].) Equally important, however, is the fact that Plaintiff has not alleged facts plausibly suggesting that any of the Defendants discriminated against him "*based on [his] disability*." *Andersen*, 2015 WL 1443254, at \*17 (citing *McGugan v. Aldana-Bernier*, 752 F.3d 224, 232 [2d Cir. 2014]). Indeed, the thrust of Plaintiff's factual allegations is that Defendants involuntarily admitted him to SJHHC's psychiatric ward because (1) they were interested in financial gain and (2) they disapproved of his exercise of his Second Amendment rights. (*See, e.g.,* Dkt. No. 55 at ¶¶ 194, 326.) These factual allegations do not plausibly suggest that Plaintiff is entitled to relief within the meaning of Title III or the Rehabilitation Act. *See Andersen*, 2015 WL 1443254, at \*17 ("Here, Plaintiff's purported claim that the Hospital committed her for financial reasons does not plausibly allege discrimination based upon disability.").

14      Even if the Court were to liberally construe Plaintiff's Second Amended Complaint as asserting a claim pursuant to Title II of the ADA against the non-State Defendants (a construction which would run counter to Plaintiff's otherwise numerous and specific statutory citations), dismissal of such a claim would also be required because Plaintiff has failed to allege facts plausibly suggesting that SJHHC (or, for that matter, Corporations A-F) are public entities subject to suit under Title II. *See Green v. City of New York*, 465 F.3d 65, 79 (2d Cir. 2006) ("A private hospital performing services pursuant to a contract with a municipality[,] even if it does so according to the municipality's rules and under its direction, is not a creature of any governmental entity.").

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 65 of 87

Heendeniya v. St. Joseph's Hosp. Health Ctr. (SJHHC), Not Reported in Fed. Supp. (2017)

2017 WL 1013081

**\*10** With respect to Plaintiff's Title V retaliation claim, he has failed to allege facts plausibly suggesting that he was subjected to retaliation within the meaning of Title V of the ADA. To state a retaliation claim under Title V, a plaintiff must allege facts plausibly suggesting that "(i) [he] was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Weixel v. Bd. of Educ.*, 287 F.3d 138, 148 (2d Cir. 2002) (internal quotation marks omitted). Plaintiff alleges in a conclusory manner that one or more of the St. Joseph's Defendants and/or Physician Defendants "retaliated against [him] for voicing his constitutional rights in regards to firearms...." (Dkt. No. 55 at ¶ 427.) However, Plaintiff has not alleged facts plausibly suggesting that his statement(s) constituted engagement in a protected activity. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)* ("The term 'protected activity' refers to action taken *to protest or oppose statutorily prohibited discrimination*."), *superseded by regulation as stated in Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102 (2d Cir. 2013) (emphasis added).

With respect to Plaintiff's Title II and Rehabilitation Act claims [15] against the State Defendants (Count XI), [16] Plaintiff has not alleged facts plausibly suggesting that any State Defendant was in any way involved with his care during his time at SJHHC, that any State Defendant (either before or after his discharge from SJHHC) denied him "the opportunity to either participate in, or to benefit from the[se D]efendants' services, programs, or activities[,] or [that he was] otherwise discriminated against because of [his] ... disabilities." *McIntosh v. City of New York*, 14-CV-0051, 2017 WL 473840, at \*6 (E.D.N.Y. Feb. 3, 2017). Simply stated, Plaintiff has identified no authority supporting the proposition that the right to possess firearms constitutes a service, program, or activity of the State, to which he must be provided access by accommodation under Title II and/or the Rehabilitation Act.

[15]   Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The standards adopted by Title II and the Rehabilitation Act "are nearly identical

[and courts] consider the merits of these claims together." *Disabled in Action v. Bd. of Elec. in City of New York*, 752 F.3d 189, 196 (2d Cir. 2014) (internal quotation marks omitted).

[16]   The Court reviews the sufficiency of Plaintiff's factual allegations with respect to these claims against the State Defendants (in conjunction with Plaintiff's other ADA and Rehabilitation Act claims) pursuant to 28 U.S.C. § 1915(e), because Plaintiff is proceeding *in forma pauperis*. In the alternative, the Court does so because Plaintiff is proceeding *pro se* and the Court finds the claims in question to be frivolous.

Finally, for the reasons enumerated above (as well as those set forth in the moving Defendants' memoranda of law), the Court concludes that dismissal of Plaintiff's Title III and Rehabilitation Act claims is also appropriate with respect to all of the individual Physician Defendants (and not only Dr. Levine), as well as the State Defendants, unidentified John Does 1-5, and Corporations A-F, pursuant to 28 U.S.C. § 1915(e). In short, the moving Defendants' arguments (which are substantive and not fact-specific to them) apply with equal force to the non-moving individual and entity Defendants.

## C. Whether Plaintiff's Claims Pursuant to 42 U.S.C. §§ 1985 and 1986 Must Be Dismissed

As discussed above, the St. Joseph's Defendants and Spinella argue that, to the extent that Plaintiff's Second Amended Complaint may be construed to assert claims pursuant to 42 U.S.C. §§ 1985 and 1986, these claims must be dismissed for failure to state a claim upon which relief can be granted. (Dkt. No. 46, Attach. 2, at 10-14 [St. Joseph's Defs.' Memo. of Law]; Dkt. No. 87, Attach. 2, at 7-10 [Spinella's Memo. of Law].) After carefully considering the matter, the Court answers this question in the affirmative for the reasons set forth in the St. Joseph's Defendants' memorandum of law and Spinella's memorandum of law. To those reasons, the Court adds three points.

**\*11** First, "a claim under § 1985(3) for conspiracy to deny equal protection in violation of the Fourteenth Amendment is not actionable in the absence of state action." *Edmond v. Hartford Ins. Co.*, 27 Fed.Appx. 51, 53 (2d Cir. 2001) (summary order) (citing *United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 831-32 [1983]); *see also Khan v. City of New York*, 14-CV-4665, 2016 WL 1128298, at \*8 (E.D.N.Y. Feb. 1, 2016) (noting that, "[i]n the context

Case 5:22-cv-00199-DNH-TWD   Document 7   Filed 04/05/22   Page 66 of 87

Heendeniya v. St. Joseph's Hosp. Health Ctr. (SJHHC), Not Reported in Fed. Supp. (2017)

2017 WL 1013081

of actions brought against private conspirators, the Supreme Court has thus far recognized only two rights protected under § 1985(3): the right to be free from involuntary servitude and the right to interstate travel") (quoting *Brown v. Philip Morris Inc.*, 250 F.3d 789, 805 [3d Cir. 2001]). As noted above, Plaintiff has failed to allege facts plausibly suggesting that the State Defendants had any involvement in his involuntary admission at SJHHC.

Second, Plaintiff failed to oppose these Defendants' arguments in his opposition memorandum of law. In this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3) of this Court's Local Rules of Practice.[17] Stated otherwise, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden.[18] Defendant has met that burden here.

[17]   *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31, 1999 WL 325378 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

[18]   *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

Third, as with Plaintiff's § 1983, ADA, and Rehabilitation Act claims, the Court concludes that dismissal of Plaintiff's

§§ 1985(3) and 1986 claims (to the extent that even an extraordinarily liberal construction of his Second Amended Complaint suggests an intention to assert such claims) is also appropriate with respect to all of the non-moving individual and entity Defendants pursuant to 28 U.S.C. § 1915(e).

**D. Whether Plaintiff's Medical Malpractice Claim Must Be Dismissed as Time-Barred (Count I)** [19]

[19]   As noted above, each of the moving Defendants argue that the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims. Although Plaintiff has not alleged a specific state of residence as to each individual Defendant, it appears that jurisdiction based upon diversity of citizenship pursuant to 28 U.S.C. § 1332 may exist in this case, given that Plaintiff's Second Amended Complaint alleges that (1) he is a resident of Florida and (2) the amount in controversy exceeds $75,000. (Dkt. No. 55 at ¶¶ 4, 83, 140 [Plf.'s Second Am. Compl.].) The moving Defendants do not argue that diversity of citizenship is lacking. Under the circumstances, the Court declines the moving Defendants' invitation to dismiss Plaintiff's state law claims on this basis at this time.

**\*12**   After carefully considering the matter, the Court answers this question in the negative for the reasons set forth in Plaintiff's opposition memoranda of law. (Dkt. No. 90 at 3-5 [Plf.'s Opp'n Memo. of Law to the St. Joseph's Defs. and Dr. Levine]; Dkt. No. 105, Attach. 1, at 3-5 [Plf.'s Opp'n Memo. of Law to Spinella].) The Court would add only that it takes judicial notice of the fact that October 17, 2015 (i.e., the apparent last day of the two-and-a-half-year statute of limitations period applicable to Plaintiff's medical malpractice claim), was a Saturday. As a result, it appears (at least from the face of the Second Amended Complaint) that Plaintiff's medical malpractice claim is not time-barred. *See* Fed. R. Civ. P. 6(a)(1)(C) ("When the period [to be computed] is stated in days or a longer unit of time ... include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday."). Accordingly, the Court denies the moving Defendants' motion to dismiss this claim on statute-of-limitations grounds.

**E. Whether Plaintiff's Intentional-Infliction-of-Emotional-Distress Claim Must Be Dismissed (Count II)**

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 67 of 87

Heendeniya v. St. Joseph's Hosp. Health Ctr. (SJHHC), Not Reported in Fed. Supp. (2017)

2017 WL 1013081

After carefully considering the matter, the Court answers this question in the affirmative for the reasons set forth in the memoranda of law filed by the St. Joseph's Defendants, Spinella, and Dr. Levine. (Dkt. No. 46, Attach. 2, at 14-17 [St. Joseph's Defs.' Memo. of Law]; Dkt. No. 87, Attach. 2, at 10-13 [Spinella's Memo. of Law]; Dkt. No. 59, Attach. 1, at 6-9 [Dr. Levine's Memo. of Law].) To those reasons, the Court adds three points.

First, to the extent that Count II asserts, in the alternative, a claim of reckless infliction of emotional distress, this claim is also subject to a one-year statute of limitations and is therefore time-barred. *See, e.g., James v. Flynn,* 132 A.D.3d 1214, 1216 (N.Y. App. Div. 3d Dep't 2015) ("[T]he proposed cause of action for reckless infliction of emotional distress is also subject to a one-year statute of limitations....").

Second, Plaintiff failed to oppose these Defendants' arguments in his opposition memoranda of law. Because these Defendants' arguments have (at the very least) clear facial merit, these Defendants have met their "modest" burden applicable to unopposed arguments. *See, supra,* Part III.C. of this Decision and Order. In the alternative, the Court concludes that these Defendants have met the burden ordinarily applicable to a properly opposed motion.

Third, the Court concludes that dismissal of Plaintiff's intentional-infliction-of-emotional-distress claim as asserted against the non-moving Physician Defendants and John Does 1-5 is appropriate pursuant to 28 U.S.C. § 1915(e). Simply stated, Plaintiff does not allege facts plausibly suggesting that he had any further contact with the Physician Defendants after the date of his discharge from SJHHC (April 17, 2013), and there is therefore no basis to conclude that such a claim would have accrued at any later date with respect to any of the other Physician Defendants.

As a result, Plaintiff's intentional-infliction-of-emotional distress claim is dismissed.

### F. Whether Plaintiff's Negligent-Infliction-of-Emotional-Distress Claim Must Be Dismissed (Count III)

After carefully considering the matter, the Court answers this question in the affirmative for the reasons set forth in the memoranda of law filed by the St. Joseph's Defendants, Spinella, and Dr. Levine. (Dkt. No. 46, Attach. 2, at 16-17 [St. Joseph's Defs.' Memo. of Law]; Dkt. No. 87, Attach. 2, at 12-13 [Spinella's Memo. of Law]; Dkt. No. 59, Attach. 1,

at 9-11 [Dr. Levine's Memo. of Law].) To those reasons, the Court adds two points.

First, Plaintiff failed to oppose these Defendants' arguments in his opposition memoranda of law. Because these Defendants' arguments have (at the very least) clear facial merit, these Defendants have met their "modest" burden applicable to unopposed arguments. *See, supra,* Part III.C. of this Decision and Order. In the alternative, the Court concludes that these Defendants have met the burden ordinarily applicable to a properly opposed motion.

**\*13** Second, the Court concludes that dismissal of Plaintiff's negligent-infliction-of-emotional-distress claim as asserted against the non-moving Physician Defendants and John Does 1-5 is appropriate pursuant to 28 U.S.C. § 1915(e) for the same reasons as those stated by the moving Defendants. Simply stated, Plaintiff has failed to allege facts plausibly suggesting that any Defendant subjected him (or a close family member) to physical injury or a threat of danger at any point during the time relevant to his claims. *See, e.g., Dava v. City of New York,* 15-CV-0875, 2016 WL 4532203, at *11 (S.D.N.Y. Aug. 29, 2016) ("Both [the bystander theory and the direct duty theory of a negligent-infliction-of-emotional-distress claim] require physical injury or the threat of danger, either to the plaintiff herself or to a close family member.") (internal quotation marks omitted). [20]

20    To the extent that New York State recognizes an exception to this requirement "where there is 'an especial likelihood of genuine and serious mental distress, arising from ... special circumstances, which serves as a guarantee that the claim is not spurious,' " the Court concludes that Plaintiff has not alleged facts plausibly suggesting such circumstances in this case. *Baker v. Dorfman,* 239 F.3d 415, 421 (2d Cir. 2000) (quoting *Johnson v. State,* 37 N.Y.2d 378 [1975]). *Johnson* recognized two such circumstances: (1) "recovery for emotional harm resulting from negligent transmission by a telegraph company of a message announcing death"; and (2) "recovery for emotional harm to a close relative resulting from negligent mishandling of a corpse[.]" *Johnson,* 37 N.Y.2d at 382; *accord, Quinn v. United States,* 946 F. Supp. 2d 267, 278-79 [N.D.N.Y. May 20, 2013] [Suddaby, J.] ). In this case, the thrust of Plaintiff's allegations is that the St. Joseph's Defendants and Physician Defendants *intentionally* exaggerated the

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 68 of 87

Heendeniya v. St. Joseph's Hosp. Health Ctr. (SJHHC), Not Reported in Fed. Supp. (2017)

2017 WL 1013081

severity of his psychiatric condition and history in the course of involuntarily admitting him in order to (1) secure financial incentives for SJHHC and (2) advance the Catholic Church's position as an opponent of Second Amendment rights. (*See, e.g.,* Dkt. No. 55 at ¶¶ 215, 326 [Plf.'s Second Am. Compl.].) *See also Bermudez v. City of New York,* 11-CV-0750, 2014 WL 11274759, at *11 (S.D.N.Y. Mar. 25, 2014) ("Negligent infliction of emotional distress may not be based on intentional conduct."); *Regeda v. City of New York,* 09-CV-5427, 2012 WL 7157703, at *13 (E.D.N.Y. Sept. 7, 2012) ("[T]he defendants also correctly argue that the negligent infliction of emotional distress claim should be dismissed because it is based on intentional conduct–the arrest of the plaintiff."). Accordingly, Plaintiff has failed to allege facts plausibly suggesting the existence of "special circumstances" supporting such a claim.

### G. Whether Plaintiff's Claim Pursuant to N.Y. Civil Rights Law § 79-n and MHL § 33.01 Must Be Dismissed (Count XII)

After carefully considering the matter, the Court answers this question in the affirmative for the reasons set forth in the memoranda of law filed by the St. Joseph's Defendants, Spinella, and Dr. Levine. (Dkt. No. 62, Attach. 2, at 2-4 [St. Joseph's Defs.' Supp. Memo. of Law]; Dkt. No. 87, Attach. 2, at 14-16 [Spinella's Memo. of Law]; Dkt. No. 59, Attach. 1, at 14 [Dr. Levine's Memo. of Law].) To those reasons, the Court adds three points.

First, Plaintiff failed to oppose these Defendants' arguments related to N.Y. Civil Rights Law § 79-n in his opposition memoranda of law. Because these Defendants' arguments have (at the very least) clear facial merit, these Defendants have met their "modest" burden applicable to unopposed arguments. *See, supra,* Part III.C. of this Decision and Order. In the alternative, the Court concludes that these Defendants have met the burden ordinarily applicable to a properly opposed motion.

**\*14** Second, MHL § 33.01 provides in pertinent part that, "[n]otwithstanding any other provision of law, no person shall be deprived of any civil right, if in all other respects qualified and eligible, solely by reason of receipt of services for a mental disability nor shall the receipt of such services modify or vary any civil right of any such person, including but not limited to ... rights relating to the granting, forfeiture, or

denial of a license, permit, privilege, or benefit pursuant to any law." N.Y. Mental Hygiene Law § 33.01. Plaintiff appears to have invoked this statute with respect to his "firearm licensing rights" because "licenses and permits are noted" in its text. (Dkt. No. 90 at 9 [Plf.'s Opp'n Memo. of Law to St. Joseph's Defs. and Dr. Levine].) However, in the portion of his Second Amended Complaint asserting his claim, Plaintiff merely alleges that Defendants "violated his" rights under the Second Amendment, Fourteenth Amendment, ADA, and Rehabilitation Act "because he is mentally disabled," received treatment at SJHHC, and has a history of receiving "psychiatric treatment[.]" (Dkt. No. 55 at ¶¶ 478-81.) Moreover, Plaintiff has failed to identify any case law applying MHL § 33.01 to gun licenses, or any authority supporting the proposition that gun licenses are included within the statute's ambit, and there does not appear to be any. In any event, requiring compliance with MHL § 33.01 does not *preclude* enforcement of 18 U.S.C. § 922(g)(4) (i.e, the federal statute prohibiting, *inter alia,* the possession or receipt of firearms or ammunition shipped or transported in interstate or foreign commerce by any person "who has ... been committed to a mental institution"). *See generally Palmer v. New York State Dep't of Mental Hygiene,* 44 N.Y.2d 958, 960 (1978) (acknowledging that, although "*in this State* deprivation of rights by reason of receipt of services for a mental disability is ... forbidden by statute," there nonetheless "may be incidental disabilities created under Federal law.... Nothing the courts can do will change the fact that plaintiff was indeed treated for mental illness, whether the ground for such treatment was present or not.") (emphasis added). In short, Plaintiff has failed to allege facts plausibly suggesting that these Defendants deprived him of any right or privilege within the meaning of MHL § 33.01, and has identified no basis for finding that this statute makes available any substantive relief from 18 U.S.C. § 922(g)(4).

Third, the Court concludes that dismissal of Plaintiff's claims against the non-moving Physician Defendants, John Does 1-5, and State Defendants is appropriate pursuant to 28 U.S.C. § 1915(e) for the same reasons as those stated by the moving Defendants. In the alternative, the Court dismisses those claims as frivolous.

Accordingly, Count XII of Plaintiff's Second Amended Complaint is dismissed.

### H. Whether Plaintiff's Civil Conspiracy Claim Must Be Dismissed (Count V)

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 69 of 87

Heendeniya v. St. Joseph's Hosp. Health Ctr. (SJHHC), Not Reported in Fed. Supp. (2017)

2017 WL 1013081

After carefully considering the matter, the Court answers this question in the affirmative for the reasons set forth in the memoranda of law filed by the St. Joseph's Defendants, Spinella, and Dr. Levine. (Dkt. No. 62, Attach. 2, at 4-5 [St. Joseph's Defs.' Supp. Memo. of Law]; Dkt. No. 87, Attach. 2, at 16-17 [Spinella's Memo. of Law]; Dkt. No. 59, Attach. 1, at 13-14 [Dr. Levine's Memo. of Law]; Dkt. No. 96 at 7 [Dr. Levine's Reply Memo. of Law].) To those reasons, the Court adds two points.

First, "[t]he statute of limitations for civil conspiracy [under New York law] is the same as that for the underlying tort." *Jean-Laurent v. Hennessy*, 840 F. Supp. 2d 529, 560 (E.D.N.Y. 2011) (quoting *Brady v. Lynes*, 05-CV-6540, 2008 WL 2276518, at *9 [S.D.N.Y. June 2, 2008]); *accord, Schlotthauer v. Sanders*, 153 A.D.2d 731, 732 (N.Y. App. Div. 2d Dep't 1989), *lv. denied*, 75 N.Y.2d 709 (1990) ("The plaintiff's seventh and eight causes of action, which allege civil conspiracy, must similarly be dismissed, with prejudice, as time-barred because conspiracy is not an independent tort, and is time-barred when the substantive tort underlying it is time-barred[.]"). As discussed above, Plaintiff's intentional-infliction-of-emotional-distress claim is time-barred, and his civil conspiracy claim, to the extent predicated on this claim, is therefore also time-barred.

Second, the Court concludes that dismissal of Plaintiff's civil conspiracy claim against the non-moving Physician Defendants and John Does 1-5 is appropriate pursuant to 28 U.S.C. § 1915(e) for the same reasons as those stated by the moving Defendants.

### I. Amendment to Cure Pleading Deficiencies

Ordinarily, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of

discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

**\*15** In this instance, Plaintiff has already been afforded the opportunity to amend his Complaint after initial review, and Plaintiff amended his Amended Complaint (i.e., by filing his Second Amended Complaint) after the St. Joseph's Defendants moved to dismiss the claims asserted therein. Plaintiff has failed to cure the deficiencies identified with numerous of the claims in his original Complaint, and, for the reasons discussed above, the Court concludes that further attempts to amend any of his claims would be futile.

**ACCORDINGLY**, it is

**ORDERED** that the St. Joseph's Defendants motion to dismiss Plaintiff's Second Amended Complaint for failure to state a claim upon which relief can be granted (Dkt. Nos. 46, 62) is **GRANTED** **in part and** **DENIED** **in part**; and it is further

**ORDERED** that the Defendant Levine's motion for judgment on the pleadings with respect to Plaintiff's Second Amended Complaint (Dkt. No. 59) is **GRANTED** **in part and** **DENIED in part**; and it is further

**ORDERED** that the Clerk of the Court is directed to amend the docket to reflect the correct spelling of Defendant Spinella's name (rather than "Spunelka"); and it is further

**ORDERED** that the Defendant Spinella's motion to dismiss Plaintiff's Second Amended Complaint for failure to state a claim upon which relief can be granted (Dkt. No. 87) is **GRANTED** **in part and** **DENIED in part**; and it is further

**ORDERED** that **SURVIVING** moving Defendants' respective motions is Plaintiff's medical malpractice claim (Count I), asserted against the St. Joseph's Defendants and the Physician Defendants (i.e., Defendants French, Briscoe, Cate, Spinella, Rybak, Ruscitto, Seifter, Price, Welch, Gilbert, Levine, O'Connor, Tremiti, Roman, Constantine, Feldman, and John Does 1-5); and it is further

**ORDERED** that all other claims asserted in Plaintiff's Second Amended Complaint (i.e., Counts II-XII) are **DISMISSED** with prejudice; and it is further

2017 WL 1013081

**ORDERED** that Defendants OMH, Sullivan, Pepper, NICS Appeals Office—OMH Central Files, DCJS, Green, Schneiderman, and Corporations A-F are terminated from this action; and it is further

**ORDERED** that the St. Joseph's Defendants file an answer to Plaintiff's Second Amended Complaint within **FOURTEEN (14) DAYS** of the date of this Decision and Order pursuant to Fed. R. Civ. P. 12(a)(4)(A). This case is referred back to Magistrate Judge Dancks for a Rule 16 conference and the scheduling of pretrial deadlines.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1013081

---

**End of Document**  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by  Bernstein v. City of New York,  S.D.N.Y.,  February 18, 2015

2013 WL 395484
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Ronald M. GREEN, Plaintiff,

v.

DGG PROPERTIES CO., INC., Water's Edge
Realty, LLC, Claudio Marasco, Michael
Dattilo, and Tina Dattilo, Defendants.

Civil Action No. 3:11–CV–01989 (VLB).
|
Jan. 31, 2013.

**Attorneys and Law Firms**

Ronald M. Green, New York, NY, pro se.

Catherine Moreton Gray, Pamela J. Moore, Tiffany R. Hubbard, McCarter & English, LLP, Hartford, CT, for Defendants.

*MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' REQUEST FOR ATTORNEYS' FEES [Dkt. 16]*

VANESSA L. BRYANT, District Judge.

### I. *Introduction*

**\*1** The Plaintiff, Ronald Green ("Green"), brings this action against Defendants Dgg Properties Co., Inc. ("Dgg"), doing business as Water's Edge Resort & Spa ("Water's Edge" or the "Resort"), Water's Edge Realty, LLC ("Water's Edge Realty"), Claudio Marasco ("Marasco") (Executive Vice President of Water's Edge), Michael Dattilo (President of Water's Edge), and Tina Dattilo (General Manager of Water's Edge) alleging violations of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. (the "ADA") and Connecticut General Statutes §§ 46a–64(a)(1) and (2). Defendants have moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted, and pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. For the reasons that follow, Defendants' Motion

to Dismiss is GRANTED. The Court DENIES, however, Defendants' request for attorneys' fees.

### II. *Factual Background*

The following facts and allegations are taken from Plaintiff's complaint. [Dkt. 1, Compl.]. Plaintiff and his wife visited Water's Edge Resort, which boasts guest, conference and banquet rooms, a spa, salon, and several restaurants, for an overnight stay from July 17 to 18, 2010. [Dkt. 1, Compl. at ¶¶ 11, 12]. The hotel portion of the Resort was originally constructed around 1940 and was renovated in the mid 1980s, and the Resort opened a new wing in 1999. [Dkt. 1, Compl. at ¶¶ 13, 14]. Prior to their arrival, Plaintiff and his wife made reservations for dinner and brunch at the Resort's restaurant, inviting a business colleague and his spouse to join them, and appointments at the spa and salon facilities. [Dkt. 1, Compl. at ¶¶ 17, 18]. While making these reservations, Plaintiff notified Water's Edge that he "was disabled, not ambulatory and substantially limited in mobility," that he used a walker and/or a wheelchair, and was "not otherwise able to move without assistance." [Dkt. 1, Compl. at ¶ 19]. Plaintiff contends that, shortly after arriving at the Resort, it became apparent that parts of the Resort including Plaintiff's guest room, the restaurant, and the spa were not handicapped accessible. [Dkt. 1, Compl. at ¶ 20]. Plaintiff further contends that Water's Edge falsely and deceptively "advertises on numerous websites and, in these and other advertisements, claims its facilities are wheelchair accessible." [Dkt. 1, Compl. at ¶¶ 15, 16]. Plaintiff confronted the manager on duty regarding the limited accessibility and the allegedly false advertisements, and the manager "shrugged and speciously exclaimed, 'this is an old hotel.' " [Dkt. 1, Compl. at ¶ 21].

As a result of the lack of ramp or wheelchair access to the dining facilities, Plaintiff and his wife were unable to dine in the main dining room on Saturday evening and were instead escorted "to a dilapidated and odiferous freight elevator (laden with food stuffs) that deposited them to the basement and back of the kitchen." From there they were escorted to and ate in "an area where no other guests were seated." [Dkt. 1, Compl. at ¶ 23]. Thereafter, Plaintiff and his wife "were forced to subsequently order dinner to their room but encountered difficulty because there was inadequate area for in-room dining, i.e. no dining table or chairs." [Dkt. 1, Compl. at ¶ 24]. On Sunday, Plaintiff and his wife—along with Plaintiff's colleague and the colleague's spouse—elected to dine in the bar area, "despite ample—but inaccessible— seating in the dining room," in order to "avoid the further embarrassment, inconvenience and unhealthy experience of

the freight elevator." [Dkt. 1, Compl. at ¶ 26]. Because of his mobility restrictions, Plaintiff was likewise unable to access the spa and salon areas, which lacked ramp access and could only be reached via stairs. [Dkt. 1, Compl. at ¶ 25].

**\*2** Plaintiff asserts that "[a]t the time of Plaintiff's visit to Water's Edge, he used a walker and a wheelchair for mobility and qualified as an individual with a disability as defined by the ADA and the Connecticut General Statutes." [Dkt. 1, Compl. at ¶ 3]. Plaintiff contends that the dining room, spa, and salon areas at Water's Edge violate § 12182(a) of the Americans with Disabilities Act and Conn. Gen.Stat. § 46a–64, regarding equal access in public accommodation to individuals with disabilities, that the defendants "have been on notice for years" regarding these violations, [1] and that defendants have willfully failed to remedy the situation and modify the facilities to make them accessible to individuals with disabilities. [Dkt. 1, Compl. at ¶¶ 27–29].

[1]      As an example of such notice, Plaintiff cites to a 2001 Connecticut district court complaint alleging that Water's Edge violated the ADA "because it did not provide adequate access to individuals with a disability," the Resort's answer to the complaint, and the Court's Order approving a settlement agreement reached by the parties in that case. [Dkt. 1, Compl. at ¶ 28 and Exhibit B].

Plaintiff filed five complaints of discrimination (one each against the five defendants named in his complaint) with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). [Dkt. 21, P's Memo in Opposition to Ds' MTD, at Exhs. A–E; Compl. at ¶ 2]. The CHRO issued a Release of Jurisdiction letter on November 23, 2011. [Compl. at ¶ 2]. Plaintiff initiated this action on December 22, 2011.

III. *Standard of Review*

" 'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' " *Sarmiento v. U.S.,* 678 F.3d 147 (2d Cir.2012) (*quoting Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Iqbal,* 556 U.S. at 678 (citations and internal quotations omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short

of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007)). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal citations omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson,* 594 F.3d 150, 161 (2d Cir.2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.' " *Id.* (*quoting Iqbal,* 556 U.S. at 679). "At the second step, a court should determine whether the 'wellpleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.' " *Id* . (*quoting Iqbal,* 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (internal quotations omitted).

**\*3** In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007). The Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *Patrowicz v. Transamerica HomeFirst, Inc.,* 359 F.Supp.2d 140, 144 (D.Conn.2005)(MRK). Here, Plaintiff references in his complaint and relies on the five charges of discrimination he filed with the CHRO, which he has attached as exhibits to his Opposition to Defendants' Motion to Dismiss. [Dkt. 21, P's Memo in Opposition to Ds' MTD, at Exhs. A–E; Compl. at ¶ 2]. Therefore, the Court may consider these charges to analyze the pending motion to dismiss.

Lastly, in deciding a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) the Court "may resolve disputed factual issues by reference to evidence outside the pleadings, including affidavits." *State Emps. Bargaining Agent Coal. v. Rowland,* 494 F.3d 71, 77 n. 4 (2d Cir.2007). *See also Morrison v. Nat'l Australia Bank Ltd.,* 547 F.3d 167, 170 (2d Cir.2008) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) a

district court may consider evidence outside the pleadings");
*Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir.2000) (holding same).

### IV. *Discussion*

a. *Private Right of Action Under Connecticut Law*

Defendants contend that Plaintiff's claim of disability discrimination in public accommodations under Connecticut law must be dismissed because Conn. Gen.Stat. § 46a–64 does not contain a private right of action. In an analysis of whether a private right of action exists under a statute, courts in Connecticut must begin with the "well settled fundamental premise that there exists a presumption in Connecticut that private enforcement does not exist unless expressly provided in a statute. In order to overcome that presumption, the plaintiff bears the burden of demonstrating that such an action is created implicitly in the statute." *Provencher v. Town of Enfield,* 284 Conn. 772, 777–78 (Conn.2007). "In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff one of the class for whose ... benefit the statute was enacted ... ? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?" *Id.* at 778 (quoting *Napoletano v. CIGNA Healthcare of Connecticut, Inc.,* 238 Conn. 216, 249 (Conn.1996), cert. denied, 520 U.S. 1103 (1997)).

> **\*4** Consistent with the dictates of General Statutes § 1–2z, however, we do not go beyond the text of the statute and its relationship to other statutes unless there is some textual evidence that the legislature intended, but failed to provide expressly, a private right of action. Textual evidence that would give rise to such a question could include, for example, language granting rights to a discrete class without providing an express remedy or language providing a specific remedy to a class without expressly delineating the contours of the right.

*Id.* The stringency of the test for an implied right of action is such that, "since the [Connecticut Supreme Court] decided *Napoletano* [in 1996], we have not recognized an implied cause of action despite numerous requests." *Id.* at 779 (citing cases in which an implied private right of action was not found). "[I]t is a rare occasion that we will be persuaded that the legislature intended to create something as significant as a private right of action but chose not to express such an intent in the statute." *Id.* at 780.

Conn. Gen.Stat. § 46a–64(a) provides that

> It shall be a discriminatory practice in violation of this section: (1) To deny any person within the jurisdiction of this state full and equal accommodations in any place of public accommodation, resort or amusement because of race, creed, color, national origin, ancestry, sex, marital status, age, lawful source of income, mental retardation, mental disability or *physical disability,* including, but not limited to, blindness or deafness of the applicant, subject only to the conditions and limitations established by law and applicable alike to all persons; (2) to discriminate, segregate or separate on account of race, creed, color, national origin, ancestry, sex, marital status, age, lawful source of income, mental retardation, mental disability, learning disability or *physical disability,* including, but not limited to, blindness or deafness. (emphasis added)

Defendants are correct that the plain language of § 46a–64 does not prescribe a private right of action. Rather, Conn. Gen.Stat. § 46a–64(c) provides an enforcement mechanism for violations of § 46a–64: "Any person who violates any provision of this section shall be fined not less than twenty-five dollars or more than one hundred dollars or imprisoned not more than thirty days, or both." [2]

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 74 of 87

2    The Court notes that, pursuant to changes adopted by the Connecticut legislature in 2012, the current text of Conn. Gen.Stat. § 46a–64(c) reads "Any person who violates any provision of this section shall be guilty of a class D misdemeanor." This change in the penalty provided under the statute does not affect this action, as Plaintiff's claims arise from his visit to Water's Edge in 2010.

However, Defendants ignore the corresponding administrative scheme enumerated in Connecticut's civil rights law—under which Conn. Gen.Stat. § 46a–64 is codified—which explicitly provides a cause of action to those individuals *who appropriately follow the prescribed administrative procedures.* Conn. Gen.Stat. § 46a–82(a) provides that:

> Any person claiming to be aggrieved by an alleged discriminatory practice ... may, by himself or herself or by such person's attorney, make, sign and file with the [CHRO] a complaint in writing under oath ... which shall set forth the particulars thereof and contain such other information as may be required by the commission.

**\*5** In turn, Conn. Gen.Stat. § 46a–100 authorizes a private cause of action after resort to and pursuant to a release of jurisdiction from the CHRO:

> Any person who has timely filed a complaint with the Commission on Human Rights and Opportunities in accordance with section 46a–82 and who has obtained a release from the commission in accordance with section 46a–83a or 46a–101, may also bring an action in the superior court for the judicial district in which the discriminatory practice is alleged to have occurred or in which the respondent transacts business, except any action involving a state agency or official may be brought in the

superior court for the judicial district of Hartford.

Conn. Gen.Stat. § 101(d) states that "Upon granting a release, the commission shall dismiss or otherwise administratively dispose of the discriminatory practice complaint pending with the commission without cost of penalty addressed to any party." A plaintiff is required to procure a release from the CHRO prior to initiating a private cause of action; if a plaintiff fails to procure a release or adhere to these administrative procedures, a court lacks jurisdiction to hear his or her claims. *Ayantola v. Bd. of Trustees of Tech. Colleges,* 116 Conn.App. 531, 535 (Conn.App.Ct.2009) (recognizing that § 46a–100 explicitly allows a plaintiff who has received a release of jurisdiction from the CHRO to file suit); *Okun v. Misiewicz,* No. CV9867084S, 2001 WL 985060 (Conn.Super.Ct. July 31, 2001) (dismissing count because "[t]he plaintiff's failure to file a timely complaint with the CHRO and to obtain a release from the CHRO deprives the court of subject matter jurisdiction over count three of the complaint"); *Lunardini v. Mass. Mut. Life Ins. Co.,* 696 F.Supp.2d 149, 166–67 (D.Conn.2010) ("Under the plain text of the Connecticut statute, release of jurisdiction from the CCHRO is a prerequisite to the personal right of action provided by the statute. See Conn. Gen.Stat. § 46a–100"); *Pleau v. Centrix, Inc.,* 501 F.Supp.2d 321, 328 (D.Conn.2007) (holding that employee who filed only age and marital status claims with CHRO, and accordingly did not receive a release of jurisdiction with respect to gender discrimination claim, failed to exhaust administrative remedies, as required to give court jurisdiction over gender discrimination claim).

Here, Plaintiff filed complaints of discrimination with the CHRO (one each against the five defendants named in his complaint) under the ADA and Conn. Gen.Stat. § 46a–64(a). Plaintiff has alleged in his complaint that he received a release of jurisdiction from the CHRO on November 23, 2011. Thus, under the plain language of § 46a–100, if Plaintiff has exhausted the administrative remedies required under the statute, he is authorized to bring this court action for alleged violations of § 46a–64. *See Desardouin v. United Parcel Serv., Inc.,* 285 F.Supp.2d 153, 158–59 (D.Conn.2003) (JCH) (recognizing that § 46a–100 authorizes "private causes of action after resort to the CHRO based on allegations of discriminatory practices," including violations of § 46a–64(a)); *McNamara v. Tournament Players Club of Connecticut, Inc.,* No. CV000093091, 2001 WL 1187091, at \*3 (Conn.Super.Ct. Sept. 10, 2001) (holding

2013 WL 395484

that, where "plaintiffs brought a claim [for violations of Conn. Gen.Stat. §§ 46a–64 and 46a–58(a) ] before CHRO which was administratively dismissed [pursuant to a release of jurisdiction] then brought a separate cause of action" the court had jurisdiction to hear the claims); *Corcoran v. German Social Society Frohsinn, Inc.,* No. CV020562775S, 2008 WL 642659, at *6–7 (Conn.Super.Ct. Feb. 21, 2008) (rendering judgment against defendant under § 46a–64, and granting injunctive relief and damages to plaintiff).

**\*6** The Court notes that Defendants' reliance on certain case law is misplaced. Defendants claim that "Connecticut courts have consistently held that Section 46a–64 is penal in nature and does not afford a private right of action." [Dkt. 16–1, Ds' MTD at p. 14]. Defendants go on to cite case law that does, in fact, support this proposition. However, the referenced case law is either outdated and fails to take into account relevant changes to Conn. Gen.Stat. § 46a–100, which currently authorizes a private cause of action as explained above, or features plaintiffs who failed to follow the administrative procedures outlined in the Connecticut civil rights law, thereby forfeiting their right to bring a private action.

In *Wright v. City of Hartford,* plaintiff brought suit after receiving a release to sue letter from the CHRO for alleged violations of § 46a–60 (prohibiting discrimination in employment). No. CV 970570863S, 1998 WL 83670 (Conn.Super.Ct. Feb. 13, 1998). However, in his complaint with the court, plaintiff instead alleged only that the defendant engaged in discriminatory practices under Conn. Gen. Stats. § 46a–58 and §§ 46a–64(a)(1) and (2). The Connecticut superior court held that

> Private actions brought pursuant to such authorizations are governed by §§ 46a–100, et seq. While such actions may seek wide ranging legal and equitable relief, such relief is only applicable to claims of discriminatory employment practices. In this case, the discrimination count does not claim discriminatory employment practices, nor does it rely on § 46a–60. To the contrary, the count is based on § 46a–58 (deprivation of rights), § 46a–64(a)(1) (denial of public accommodation) and § 46a–64(a)(2) (discrimination).

> All of these statutes are penal in nature. There is no statutory authorization to bring private actions based on a violation of the above statutes, nor does the Release to Sue letter authorize such an action.

*Id.* at *3. At the time that *Wright* was decided, Conn. Gen.Stat. § 46a–100 provided a private cause of action only for violations of Conn. Gen.Stat. § 46a–60:

> Any person who has timely filed a complaint with the commission on human rights and opportunities ... *alleging a violation of section 46a– 60 of the general statutes* and who has obtained a release from the commission in accordance with section 2 of this act, may also bring an action in the superior court for the judicial district in which the discriminatory practice is alleged to have occurred or in which the respondent transacts business ... (emphasis added)

1991 Conn. Legis. Serv. P.A. 91–331 (S.S.B.292) (WEST). The statute was later amended effective October 1, 1998, after the decision in *Wright,* to delete the reference to § 46a–60, thereby creating a private right of action for individuals who had received a release of jurisdiction letter from the CHRO for other violations of the civil rights law, as above. 1998 Conn. Legis. Serv. P.A. 98–245 (S.H.B.5673) (WEST). Thus, the decision in *Wright* is necessarily limited in scope by time and may now be read to support the proposition that, without a release of jurisdiction from the CHRO, a plaintiff may not bring a private action, nor may he bring a private action for allegations not specifically released by the CHRO.

**\*7** In support of their proposition that Plaintiff here does not have a private cause of action, Defendants cite, for example, to *Smith v. New Horizon Computer,* No. CV084026134S, 2009 WL 862749 (Conn.Super.Ct. Mar. 10, 2009), which relied heavily on the decision in *Wright.* The *Smith* court upheld a motion to strike the complaint enumerating a claim under § 46a–64(a), concluding that "given the persuasiveness

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 76 of 87

of [prior] Superior Court opinions [including *Wright* ] and because the plain language of § 46a–64(a)(1) and (2) indicates that the statute was meant only to be enforced through fines or imprisonment, the defendant's motion to strike the entire complaint is granted, as Connecticut's public accommodation statute does not provide for either an express, or implied, private cause of action under § 46a–64(a)(1) and (2)." *Smith,* 2009 WL 862749, at *2 n. 4. *Smith,* however, is inapplicable to the analysis in the present action, as there is no indication in *Smith* that the pro se plaintiff submitted his claim first to the CHRO, obtained a release of jurisdiction from the CHRO in accordance with either § 46a–83a or § 46a–101, or subsequently filed an action in court pursuant to § 46a–100. Instead, plaintiff appears to have filed his claims of discrimination directly with the court, in which case he failed to correctly utilize the administrative procedures enumerated in Connecticut's civil rights law. In light of his failure to follow these administrative procedures, plaintiff had no private right of action to sue under Conn. Gen.Stat. § 46a–64(a).

Similarly, in *Batiste v. Soundview Med. Assocs.,* on which Defendants also rely, the superior court struck plaintiff's § 46a–64 claim from his complaint, holding that this statute is penal in nature and does not afford a private right of action, and citing to *Wright* for this proposition. No. CV065001278, 2008 WL 1105247 (Conn.Super.Ct. Mar. 25, 2008). "The court in *Wright* noted that on many occasions the legislature had provided express language creating a private right of action and in the case of this particular statute [§ 46a–64(a) ] the legislature did not provide any language indicating its desire for a private right of action and, therefore, it should not be implied by the court." *Id.* at *3. Nowhere does the court state, though, that the CHRO released jurisdiction over plaintiff's claim under § 46a–64(a). In fact, in its analysis of plaintiff's claim under § 46a–58, the court noted that

> Section 46a–100 does allow the plaintiff to bring a private cause of action once he has obtained a release from the Connecticut Commission on Human Rights and Opportunities, but nowhere in that section does it specifically allow the plaintiff to bring a private cause of action under § 46a–58. The court interprets the statute to mean that, *after obtaining his release, the plaintiff may bring a private cause of action but should base it on the underlying claims that the plaintiff has already alleged in this complaint.* (emphasis added)

**\*8** *Id.* at *3. Therefore, under *Batiste,* § 46a–100 creates a right of action for allegations of discrimination *that were the subject of a CHRO complaint and have subsequently been released by the CHRO.* A plaintiff may not maintain a private action for any allegation not brought before or released by the CHRO. Defendants' reliance is therefore misplaced.

Lastly, Plaintiff and Defendants alike assert that the private right of action issue has not been addressed by the Connecticut Appellate Court, placing their reliance on the decision in *Corcoran v. German Social Society Frohsinn, Inc.,* 99 Conn.App. 839 (Conn.App.Ct.2007). In *Corcoran,* the court heard an appeal of the trial court's conclusion that the defendant was not a public accommodation within the meaning of § 46a–64(a). Two issues were presented upon appeal: (1) whether "the court failed to apply the proper legal standard in evaluating whether the defendant was a public accommodation" and (2) whether "the court's finding as to the defendant's selectivity of membership was clearly erroneous" *Id.* at 840. The Appellate Court reversed the superior court's judgment, holding that the lower court had committed legal error by applying the incorrect test for whether the defendant was a public accommodation. *Id.* at 844–45. The Appellate Court neither mentioned nor opined as to whether § 46a–64 creates a private right of action; rather, it considered only the two discrete issues presented on appeal, reversing and remanding to the trial court for further proceedings.

Defendants here rely on the Appellate Court's silence in *Corcoran* to bolster their proposition that their erroneously cited superior court cases are dispositive. Plaintiff relies on *Corcoran* for the proposition that, because the Appellate Court did not address the issue, a private right of action may be inferred under § 46a–64. The Court finds both propositions to be in error and at odds with *Corcoran's* prior and subsequent history. A quick reading of the trial court opinion in *Corcoran* reveals that the plaintiff filed a complaint of gender discrimination by a public accommodation in violation of § 46a–64 with the CHRO, which granted plaintiff a release of jurisdiction for this claim. *Corcoran v. German Social Soc. Frohsinn, Inc.,* No. 562775, 2005 WL 1524881, at *1 (Conn.Super.Ct. Jun. 1, 2005). Plaintiff then commenced litigation based on this claim in Connecticut superior court.

The Appellate Court, then, did not *need* to determine whether plaintiff had the right to bring a private right of action, as that right had already been conferred pursuant to § 46a–100 and the CHRO's release of jurisdiction. Furthermore, on remand the trial court rendered judgment against the defendant, holding that it was a place of public accommodation subject to liability under § 46a–64, and granted injunctive relief as well as damages for emotional distress to the plaintiff. *Corcoran v. German Social Soc. Frohsinn, Inc.,* No. CV020562775S, 2008 WL 642659, at *6–7 (Conn.Super.Ct. Feb. 21, 2008). Thus, the trial court recognized a private right of action under § 46a–64 for a plaintiff who follows the appropriate administrative channels and obtains a release of jurisdiction from the CHRO for its § 46a–64 claims. Connecticut courts have frequently upheld a private right of action under § 46a–100 for violations of § 46a–64. *See infra.*

**\*9** In sum, Plaintiff is expressly authorized by § 46a–100 to bring this action. However, plaintiff has not attached a copy of the release of jurisdiction letter to any of his pleadings, nor has he alleged to which of his complaints with the CHRO the release of jurisdiction pertains. Thus, the Court cannot discern against which of the Defendants Plaintiff is authorized to bring this action. Accordingly, the Court GRANTS dismissal of Plaintiff's discrimination claim brought pursuant to Conn. Gen.Stat. § 46a–64(a). *See, e.g., Desardouin,* 285 F.Supp. at 159 (dismissing § 46a–64(a) claim where plaintiff failed to allege in his complaint receipt of CHRO release letter and only alleged receipt of such in opposition to defendant's motion to dismiss).

b. *Disability under the ADA and Connecticut General Statutes*

Defendants argue that Plaintiff has failed to state a claim under either the ADA or Connecticut law because he has alleged only that he was temporarily impaired. Under the ADA, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). "In order to state a claim for violation of Title III ... a plaintiff must 'establish that (1) he or she is disabled within the meaning of the ADA; (2) that the defendants own, lease, or operate a place of public accommodation; and (3) that the defendants discriminated against the plaintiff within the

meaning of the ADA.' " *Krist v. Kolombos Rest. Inc.,* 688 F.3d 89, 94–95 (2d Cir.2012) (*citing Roberts v. Royal Atlantic Corp.,* 542 F.3d 363, 368 (2d Cir.2008), *cert. denied,* ––– U.S. ––––, 129 S.Ct. 1581, (2009)). "To establish a disability, plaintiff must (1) show that [he] suffers from a physical or mental impairment, (2) identify the activity claimed to be impaired and establish that it constitutes a 'major life activity, and (3) show that [his] impairment substantially limits the major life activity previously identified." *Kravtsov v. Town of Greenburgh,* No.10–cv–3142 (CS), 2012 WL 2719663, at *10 (S.D.N.Y. July 9, 2012) (internal quotation marks and citations omitted).

Because Plaintiff's claim arises after January 1, 2009, the ADA Amendment Act of 2008 ("ADAAA") governs the analysis. The ADAAA "substantially broadened the definition of a disability under the law, in explicit response to *Sutton v. United Air Lines,* 527 U.S. 471 (1999) and *Toyota Motor Mfg. v. Williams,* 534 U.S. 184 (2002), in which the ADA's terms defining disability had been strictly defined." *Hutchinson v. Ecolab, Inc.,* No.3:09cv1848 (JBA), 2011 WL 4542957, at *7 (D.Conn. Sept. 28, 2011). Under the ADAAA, the definition of "disability" is construed in "favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). "Disability" is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individuals; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). "The ADAAA expanded the interpretation of the ADA's three-category definition of 'disability.' For example, 'major life activity' includes 'caring for oneself, performing manual tasks ... walking, standing, lifting, bending, speaking, breathing.., and working,' as well as 'the operation of a major bodily function,' including 'neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.' " *Hutchison,* 2011 WL 4542957, at *8 (*quoting* Pub.L. No. 110–325, 122 Stat. 3553, 3555 (2008)).

**\*10** Equal Employment Opportunity Commission ("EEOC") regulations implementing the ADAAA, although having no binding effect, are "useful to understanding the intended meaning of the Amendments." *Hutchinson,* 2011 WL 4542957, at *8 n. 6. The EEOC regulations provide that under the ADAAA an impairment is a disability within the meaning of the statute where "it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment

need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). The regulations further provide that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 29 C.F.R. § 1630.2(j)(1)(vii).

Moreover, "temporary, non-chronic impairments of short-duration, with little or no long term or permanent impact, are usually not disabilities." *Kennebrew v. N.Y. City Housing Auth.,* No. 01 CIV 1654, 2002 WL 265120, at *18 n. 32 (S.D.N.Y. Feb. 26, 2002); *Leahy v. Gap. Inc.,* No. 07–CV–2008, 2008 WL 2946007, at *4 (E.D.N.Y. July 29, 2008) ("For purposes of the ADA, short term, temporary restrictions are not 'substantially limiting' and do not render a person 'disabled.' "); *Green v. N.Y. City Health & Hosp. Corp.,* No. 04–CV–5144, 2008 WL 144848, at *4 (S.D.N.Y. Jan. 15, 2008) ("To establish a disability under the ADA, there must be some proof of permanency."); *Adams v. Citizens Advice Bureau,* 187 F.3d 315, 316–17 (2d Cir.1999); *Williams v. Salvation Army,* 108 F.Supp.2d 303, 312–13 (S.D.N.Y.2000) ("temporary, non-chronic impairments of short duration, with little or no long-term or permanent impact, are usually not disabilities.").

It appears that even under the ADAAA's broadened definition of disability, short term impairments would still not render a person disabled within the meaning of the statute. EEOC interpretative guidance explains that the "effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section," however "[t]he duration of an impairment is one factor that is relevant in determining whether the impairment substantially limits a major life activity. Impairments that last only for a short period of time are typically not covered, although they may be covered if sufficiently severe." 29 C.F.R. pt. 1630, Appx. (internal quotation marks and citations omitted).

Conn. Gen.Stat. § 46a–51(15) states that " '[p]hysically disabled' refers to any individual who has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness, including, but not limited to, epilepsy, deafness or hearing impairment or reliance on a wheelchair or other remedial appliance or device." Connecticut courts have interpreted Connecticut's definition of "disability" to be "broader than the ADA or the

ADAAA, because it covers 'chronic' impairments even if not permanent ." *Hutchinson,* 2011 WL 4542957, at *9. In addition, § 46a51(15) does not require that the chronic impairment "substantially limit" a major life activity. *Buotote v. Illinois Tool Works, Inc.,* 815 F.Supp.2d 549, 556 (D.Conn.2011); *Grunberg v. Quest Diagnostics, Inc.,* No. 3:05–cv–1201, 2008 WL 323940, at *4 n. 2 (D.Conn. Feb. 5, 2008). "CFEPA ... provides that '[p]hysically disabled' refers to any individual who has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness.... The statute does not define 'chronic,' but courts have defined it as 'marked by long duration or frequent recurrence' or 'always present or encountered.' ... With reference to diseases, the term 'chronic' has been defined to mean 'of long duration, or characterized by slowly progressive symptoms; deep-seated or obstinate, or threatening a long continuance; distinguished from acute.' " *Logan v. SecTek, Inc.,* 632 F.Supp.2d 179, 184 (D.Conn.2009) (*quoting* Conn. Gen.Stat. § 46a–51(15)).

**\*11** Here, Plaintiff states that "[a]t the time of [his] visit to Water's Edge, he used a walker and a wheelchair for mobility and qualified as an individual with a disability as defined by the ADA and the Connecticut General Statutes." [Dkt. 1, Compl. at ¶ 3]. In support, Plaintiff offers that he "notified Water's Edge, while making these reservations, that he was disabled, not ambulatory and substantially limited in mobility," that he "used a walker and/or wheelchair and was not otherwise able to move about without assistance," and that he "could not climb stairs due to his mobility restrictions." [Dkt. 1, Compl. at ¶¶ 19, 25]. Nowhere in the complaint does Plaintiff allege the nature of his disability, claim that his use of a walker or wheelchair was permanent or chronic, or indicate the duration or long-term impact of his impairment such that the Court may reasonably infer that his condition was anything but temporary. Indeed, Plaintiff's use of the qualifier "at the time" in describing his impairment while staying at Water's Edge implies that his need for a wheelchair or walker *was* temporary. While Plaintiff has pled facts showing that he was limited in a major life activity—walking—he has failed to demonstrate that he suffers from a nontemporary physical disability that is the cause of the limitation on this major life activity. [3] Thus, Plaintiff has failed to state a plausible claim for relief under the ADA. Accordingly, the Court dismisses Plaintiff's ADA claim.

3    Defendants allege that the reason Plaintiff was restricted to a walker and/or wheelchair during his

visit to Water's Edge was that he was recovering from hip surgery. [Dkt. 16–1, Ds' MTD at p. 12 n. 4]. In his affidavit attached to his Opposition to Defendants' Motion to Dismiss, Plaintiff states that "[w]ith respect to my impairment, I permanently lack complete mobility and, to date, I have undergone three separate surgeries to address the condition." [Dkt. 21–1, Green Affidavit at ¶ 9]. However, because the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference," the Court may not credit Green's affidavit for this proposition. *McCarthy,* 482 F.3d at 191.

Likewise, Plaintiff's Conn. Gen.Stat. claim fails for similar reasons as his ADA claim. Plaintiff alleges only that, at the time of his visit to Water's Edge, he was not ambulatory and was dependent upon a wheelchair and/ or walker. He has pled no other facts indicating that this condition is "chronic" within the meaning of Conn. Gen.Stat. § 46a–51(15). [4] Such allegations devoid of further factual enhancement fail to state a plausible claim for a violation of Connecticut human rights law and the definition of "physical disabled" as stated in Conn. Gen.Stat. § 46a–51(15). *See Setkoski v. Bauer,* No. HHDCV116023082, 2012 WL 2044805, at *3 (Conn.Super.Ct. May 10, 2012) (holding that plaintiff's allegations that she had a serious medical condition that required surgery and a blood transfusion and three months of medical leave was insufficient to state a claim under Connecticut statute as plaintiff failed to allege "that her condition is continuing or will require medication or additional procedures" or is subject to recurrences). Accordingly, Plaintiff's claim under the Connecticut General Statutes is dismissed.

[4]      *See* note 3.

### c. *Standing*

Defendants argue that Plaintiff lacks standing to bring a claim under Title III of the ADA or under Conn. Gen.Stat. § 46a–64 because he has not alleged an intent to return to Water's Edge and thus cannot establish a likelihood of future harm, and has not and cannot allege facts to show that he is disabled under either federal or state law. "To establish standing, a plaintiff must demonstrate: (1) an 'injury in fact' that is 'concrete and particularized' and 'actual or imminent,

not conjectural or hypothetical'; (2) 'a causal connection between the injury and the conduct complained of'; and (3) redressability of the injury by a favorable decision." *Harty v. Simon Property Group, L.P.,* 428 F. App'x 69, 71 (2d Cir. June 29, 2011) (*quoting Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted)). Thus, "to establish standing in an ADA suit seeking injunctive relief based upon lack of access to a public accommodation, [the Second Circuit] ha[s] held that a plaintiff must (1) 'allege[ ] past injury under the ADA'; (2) show that 'it is reasonable to infer from [his or] her complaint that this discriminatory treatment will continue'; and (3) show that 'it is also reasonable to infer, based on the past frequency of [his or] her visits and the proximity of [the public accommodation] to [his or] her home, that [he or she] intends to return to [the public accommodation] in the future.' " *Harty,* 428 F. App'x at 71 (*quoting Camarillo v. Carrols Corp.,* 518 F.3d 153, 158 (2d Cir.2008)). Furthermore, "a plaintiff seeking injunctive relief cannot rely only on past injury to satisfy the injury requirement but must show a likelihood of future harm." *Id.*

**\*12** Likewise, the Connecticut Supreme Court has adopted the three-part test for individual standing set forth in *Lujan.* In *Gay and Lesbian Law Students Ass'n at Univ. of Conn. School of Law v. Bd. of Trustees, Univ. of Conn.,* 236 Conn. 453 (Conn.1996), the Connecticut Supreme Court, in crediting plaintiff's argument for standing, which relied exclusively on *Lujan,* noted that "[t]here is little material difference between what we have required and what the United States Supreme Court in *Lujan* demanded of the plaintiff to establish standing." *Id.* at 465–67, 466 n. 10. In so stating, the Connecticut Supreme Court tacitly adopted the three part test articulated in *Lujan.*

Here, Plaintiff has failed in his complaint to allege facts sufficient for the Court to reasonably infer that, based on the past frequency of his visits and the proximity of Water's Edge to his home, Plaintiff intends to return in the future. Plaintiff's complaint does not allege that he has stayed at Water's Edge in the past nor that he regularly visits the Westbrook, Connecticut area for business or personal reasons. However, Plaintiff has submitted an affidavit with his Opposition to Defendants' Motion to Dismiss, declaring his "every intention of utilizing the Water's Edge for both personal and business visits in the future, but for the existing access issue." [Dkt. 21–1, Green Aff. at ¶ 2]. Plaintiff affirms that he frequently visits Connecticut in his role as coordinator of his law firm's nationwide practice group, has tried cases in Connecticut and expects to do so in the future, and frequently engages in

business development, client activities and social occasions in Connecticut. [*Id.* at ¶¶ 3–6]. Plaintiff also asserts that his law firm's "managing partner has a weekend residence in Connecticut and he initially identified the Water's Edge as a potential location to host client meetings and partner recreational visits." [*Id.* at ¶ 7].

In bringing a challenge to standing, "the proper procedural route is a motion under Rule 12(b)(1)." *Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.,* 436 F.3d 82, 88 n. 6 (2d Cir.2006). *See also McDermott v. New York Metro LLC,* 664 F.Supp.2d 294, 296 n. 1 (S.D.N.Y.2009) (holding same). In considering a 12(b)(1) motion, as enumerated above, the court may consider evidence outside the pleadings. *Morrison,* 547 F.3d at 170. Here, Plaintiff has failed to plead in his complaint any intent to return to Water's Edge but has specifically indicated such intent in his affidavit, which the court may consider for purposes of a 12(b)(1) motion. *See, e.g., Harty,* 428 F. App'x at 71–72 (holding that plaintiff's amended complaint and affidavit in opposition to defendant's motion to dismiss "are sufficient to support a plausible inference at the pleading stage that [plaintiff] will likely return to the [place of public accommodation]" for personal and business reasons). Thus, Plaintiff's allegations are sufficiently pled to establish standing under the ADA based upon a plausible intention to return to Water's Edge.

**\*13** Plaintiff, though, has failed to meet his burden of establishing standing based on the likelihood of future harm. Here, Plaintiff alleges only a temporary disability (as discussed supra), and has failed to allege a continuing disability such that it is reasonable to infer that the discriminatory treatment against him will continue. Because "a plaintiff seeking injunctive relief cannot rely only on past injury to satisfy the injury requirement but must show a likelihood of future harm," (*Harty,* 428 F. App'x at 71 (*quoting Camarillo,* 518 F.3d at 158)), Plaintiff has failed to sufficiently demonstrate that he has standing under the ADA based on a likelihood that the discriminatory conduct will continue against him. As Connecticut law follows the three part test enumerated in *Lujan,* Plaintiff's state law claim fails for the same reason as his ADA claim.

Thus, the Court GRANTS Defendants' entreaty to dismiss the complaint for lack of standing under Rule 12(b)(1).

### d. *Claims Against Individual Defendants*
Defendants contend that the complaint should be dismissed in its entirety as against individual defendants Claudio Marasco,

Michael Dattilo, and Tina Dattilo, and as against Water's Edge Realty for failure to state a claim under either the ADA or Connecticut law.

#### i. *ADA*
Title III of the ADA states that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C.A. § 12182(a). The regulations implementing Title III provide that discrimination is prohibited by any "private entity who owns, leases (or leases to), or operates a place of public accommodation," 28 C.F.R. § 36.201(a), and that "private entity" means "a person or entity other than a public entity." 28 C.F.R. § 36.104. "In determining whether an individual is a proper defendant under the ADA, the inquiry must focus on the issue of control, i.e., whether the named defendant 'operates' a place of public accommodation within the meaning of the ADA ... The term 'operate' has been interpreted as being in a position of authority and having the power and discretion to perform potentially discriminatory acts." *Bowen v. Rubin,* 385 F.Supp.2d 168, 180 (E.D.N.Y.2005); *see also Coddington v. Adelphi Univ.,* 45 F.Supp.2d 211, 215 (E.D.N.Y.1999) (holding same and reviewing cases). Under Title III, " 'to operate' means 'to put or keep in operation,' 'to control or direct the functioning of,' or 'to conduct the affairs of; manage.' " *Celeste v. East Meadow Union Free School Dist.,* 373 F. App'x 85, 91 (2d Cir. Apr. 21, 2010) (*quoting Lentini v. Cal. Ctr. for the Arts,* 370 F.3d 837, 849 (9th Cir.2004) (internal quotations and citations marks omitted).

Defendants urge the Court to find that the individual defendants are not liable under the ADA because "when the public accommodation is owned and run by an institution, the courts have consistently held that an individual employee of the institution is not a proper defendant even if that individual had broad authority to manage the affairs of the institution, and by extension, the affairs of the place of accommodation." *Schenk v. Verizon,* No. 10 Civ. 6281(GBD)(MHD), 2010 U.S. Dist. LEXIS 142140, at \*9 (S.D.N.Y. Dec. 9, 2010) (holding that individual employee did not exert such control over corporation that she could be said to have operated it within the meaning of the ADA). The correct analysis, however, as noted above, is one of control; while often individual employees are improper defendants as they lack the requisite control over the institution under the statute,

this is not always the case. *See, e.g., Bowen,* 385 F.Supp.2d at 180–81 (finding that individual defendant could be held liable under Title III, where defendant was sole shareholder and president of the place of accommodation, which had no boards of directors, and where individual was "in a position of authority and with power and discretion to operate the facility and to make decisions regarding the training and supervision of the corporations' employees."); *Coddington,* 45 F.Supp.2d at 215–16 (noting that "Applying the 'control' test, courts have been reluctant to hold individual employees who are not policy makers liable under the ADA," but further noting that, in certain cases, "an individual defendant may be characterized as the owner or operator of a public accommodation under the ADA."). It is conceivable, then, that the executive vice president, the president, and the general manager of Water's Edge *might* be proper defendants in this action, if they exercised the requisite control over Water's Edge. As the *Coddington* court noted, "[t]he common thread running through these cases [in which courts consider an individual's liability] is the search for identification of the proper defendant. Merely holding that an individual is the proper defendant in an ADA public accommodations lawsuit, however, is not tantamount to holding that there is personal liability. It stands merely for the proposition that an individual may be the proper entity to name as a defendant in a particular lawsuit." 45 F.Supp.2d at 216.

 *14 Here, Plaintiff does not allege any facts in his complaint that would allow the Court to conclude that Marasco, Michael Dattilo, Tina Dattilo, or Water's Edge Realty exercised such control over the functioning or affairs of Water's Edge, were in such positions of authority, or had such power and discretion to perform potentially discriminatory acts that they "own[ ], lease [ ] (or lease[ ] to), or operate[ ] a place of public accommodation" under Title III of the ADA. Rather, Plaintiff merely asserts in his complaint the names of the individual Defendants and their titles (Executive Vice President, President, General Manager), and that Water's Edge Realty is a limited liability company located at the same address as Water's Edge. [Dkt. 1, Compl. at ¶¶ 6–9]. Plaintiff also alleges that Water's Edge Realty is a public accommodation under the ADA, but fails to allege any facts that would support this contention, nor does he allege any other connection between Water's Edge and Water's Edge Realty. Thus, because Plaintiff's complaint only offers "naked assertion[s] devoid of further factual enhancement" such that the Court is unable to "draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal,*

556 U.S. at 678 (citations and internal quotations omitted), the Court GRANTS Defendants' Motion to Dismiss Plaintiff's ADA claim as to Defendants Marasco, Michael Dattilo, Tina Dattilo, and Water's Edge Realty.

#### ii. *Connecticut Law*

In addition to the insufficiencies in Plaintiff's complaint detailed above, Plaintiff offers no facts to connect any of the individual Defendants to the conduct complained of, and does not allege discriminatory conduct by any of these Defendants personally. The complaint is devoid of any allegation that the individual defendants engaged in any conduct that denied Plaintiff "full and equal accommodations in any place of public accommodation" or discriminated against him based on his physical disability in violation of Conn. Gen.Stat. §§ 46a–64(a)(1) or (2). Thus, the Court GRANTS Defendants' Motion to Dismiss Plaintiff's Connecticut law claim as to Defendants Marasco, Michael Dattilo, Tina Dattilo, and Water's Edge Realty.

#### e. *Defendants' Request for Attorneys' Fees*

Lastly, Defendants request that this Court award them attorneys' fees because "Plaintiff's claims have no basis in law," and because "a reasonable inquiry would also have informed Plaintiff that Conn. Gen.Stat. § 46a–64 does not permit a private right of action against places of public accommodation," among other reasons. [Dkt. 16–1, Ds' MTD at p. 16]. Despite Defendants' contentions, there is no evidence in the record that Plaintiff has brought his claims in bad faith and, as enunciated in great detail above, Defendants' assertions about the scope of Conn. Gen.Stat. § 46a–64 are erroneous. Therefore, the Court DENIES Defendants' claim for attorneys' fees.

### V. *Conclusion*

For the foregoing reasons, Defendants' [Dkt. 16] Motion to Dismiss Plaintiff's ADA and Conn. Gen.Stat. § 46a–64(a) claims against all Defendants is GRANTED. However, the Court DENIES Defendants' request for attorneys' fees.

 *15 IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 395484

**Green v. DGG Properties Co., Inc., Not Reported in F.Supp.2d (2013)**

2013 WL 395484

---

**End of Document**    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3827742
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Benedict R. GENCO, Plaintiff,

v.

SARGENT & COLLINS LLP, Defendant.

18-CV-0107-LJV-MJR
|
Signed 06/01/2018
|
Filed 06/04/2018

**Attorneys and Law Firms**

Benedict R. Genco, N. Tonwanda, NY, pro se.

Richard G. Collins, Sargent & Collins, LLP, Williamsville, NY, for Defendant.

REPORT AND RECOMMENDATION

HONORABLE MICHAEL J. ROEMER, United States Magistrate Judge

## INTRODUCTION

**\*1** This case has been referred to the undersigned pursuant to Section 636(b)(1) of Title 28 of the United States Code, by the Honorable Lawrence J. Vilardo, for hearing and reporting on dispositive motions for consideration by the District Court. Before the Court is defendant's motion to dismiss plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 3). For the following reasons, it is recommended that defendant's motion to dismiss be granted and the complaint dismissed with prejudice.

## RELEVANT FACTS AND BACKGROUND

Plaintiff Benedict Genco ("plaintiff" or "Genco"), who is proceeding *pro se*, filed the instant complaint against the law firm of Sargent & Collins, LLP ("Sargent & Collins" or "defendant") on January 22, 2018. (Dkt. No. 1). The allegations in plaintiff's complaint are, in large part, difficult to follow or fully understand. In light of plaintiff's *pro se* status, the Court has attempted to discern

the causes of action asserted. Plaintiff's claims appear to be premised upon Sargent & Collins' legal representation of his employer, Starpoint Central School District ("Starpoint"), in or around January of 2017. (*Id.*). Plaintiff contends that, on account of his various disabilities, Starpoint placed him on administrative leave pursuant to Section 72 of the New York State Civil Service Law and forced him to undergo a fitness for duty medical examination. (*Id.*). He claims that by serving as legal counsel to Starpoint during this time, Sargent & Collins also discriminated and retaliated against him on the basis of his disabilities. [1] (*Id.*). Plaintiff alleges that Sargent & Collins contacted the doctor who performed the examination, that they engaged in the "unauthorized disclosure" of his medical records, and that they "assisted" Starpoint in placing him on unpaid leave. (*Id.*). Plaintiff indicates that the nature of his suit against Sargent & Collins is "disability discrimination, retaliation, providing unauthorized medical records and failure to accommodate." Genco's complaint further alleges that: (1) Starpoint failed to accommodate his disability with respect to boiler training; (2) his fitness for duty examination was improper because the doctor who performed the examination was not a physician; [2] and (3) the fitness for duty examination as well as his placement on administrative leave violated the New York State Civil Service Law and the New York State Education Law. (*Id.*).

[1] Genco has filed a separate suit in this Court against Starpoint alleging employment discrimination, retaliation and failure to accommodate in violation of the Americans with Disabilities Act. (*See Genco v. Starpoint Central School District*, Case No. 1:17-CV-01168). Starpoint moved to dismiss plaintiff's *pro se* complaint. Today, the Court issued a Report recommending that Starpoint's motion to dismiss plaintiff's complaint be denied. (Case No. 1:17-CV-01168, Dkt. No. 26). Plaintiff further filed suit, also on a *pro se* basis, against the law firm of Webster Szanyi LLP. (*See Genco v. Webster Szanyi, LLP*, Case No. 1:18-CV-00093). Webster Szanyi, who is representing Starpoint in the course of plaintiff's employment discrimination lawsuit, moved to dismiss the complaint. Today, this Court issued a Report recommending that the complaint against Webster Szanyi be dismissed with prejudice. (*Id.* at Dkt. No. 18). It is also noted that plaintiff filed a previous employment discrimination lawsuit against Starpoint, in this

2018 WL 3827742

Court, in March of 2013. In February of 2015, the Honorable William M. Skretny granted summary judgment in favor of Starpoint. *See Genco v. Starpoint Central School District*, 1:13-CV-301, 2015 WL 540217 (WDNY Feb. 10, 2015).

2    The complaint states that Michael P. Santa Maria, Ph.D. performed plaintiff's medical examination. (Dkt. No. 1). Defendant's response papers indicate that Dr. Santa Maria is a board-certified neuropsychologist and that he performed a neuropsychological evaluation and independent medical examination of plaintiff. (Dkt. No. 5).

**\*2** On February 20, 2018, Sargent & Collins filed the instant motion to dismiss the complaint on the basis that plaintiff fails to assert any viable claims for relief. (Dkt. Nos. 3-5). Plaintiff filed responses in opposition to the motion to dismiss. [3] (Dkt. Nos. 8, 10). The responses allege, for the first time, that Sargent & Collins committed the criminal offense of "offering a false instrument for filing" and that their motion to dismiss his complaint was untimely. Defendant filed a reply in further support of the motion to dismiss on March 29, 2017. (Dkt. No. 9). On April 16, 2018, this Court heard oral argument as to defendant's motion to dismiss. [4]

3    The allegations and arguments in plaintiff's responses, like those in his complaint, lack clarity or coherence. His disjointed narrative sets forth a litany of grievances against Starpoint, Sargent & Collins, and Dr. Santa Maria. He attaches various documents including letters from Sargent & Collins and Starpoint relative to his leave and fitness for duty examination, Dr. Santa Maria's report from his neuropsychological evaluation and independent medical examination, a "transcript" of the medical examination that plaintiff transcribed himself, HIPAA releases provided to Dr. Santa Maria, plaintiff's individualized education plan from when he was enrolled in the Starpoint School District, internet research regarding Dr. Santa Maria's practice and areas of specialty, a decision in a prior federal lawsuit filed by plaintiff against Starpoint, and information regarding the elements of the crime of filing a false instrument. As best the Court can ascertain, plaintiff's chief complaint against defendant is that by providing legal representation to Starpoint when plaintiff was

placed on administrative leave, Sargent & Collins discriminated against him.

4    Also at that time, this Court heard oral argument as to the motion to dismiss and a request for a filing injunction on behalf of Starpoint in *Genco v. Starpoint Central School District*, and oral argument as to the motion to dismiss in *Genco v. Webster Szanyi LLP*.

## DISCUSSION

A defendant may move to dismiss a complaint on the ground that the complaint fails to state a claim on which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). In order to state a claim on which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). In reviewing a complaint in the context of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept as true all factual allegations and draw all reasonable inferences from those allegations in favor of the plaintiff. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). Specifically, a complaint must plead "enough facts to state a claim to relief that is plausible on its face", *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and must "allow[ ]the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The Supreme Court has further instructed that "[d]etermining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Bell Atl. Corp.*, 550 U.S. at 679.

**\*3** Additionally, the court must be mindful when an individual is proceeding *pro se*. "[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) ("[T]he submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest."). However, even a *pro se* complaint will be dismissed if it does not contain "sufficient

Genco v. Sargent & Collins LLP, Not Reported in Fed. Supp. (2018)

2018 WL 3827742

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 85 of 87

factual matter, accepted as true, 'to state a claim to relief that is plausible on its face'." *Ashcroft,* 556 U.S. at 678; *quoting Bell Atl. Corp.,* 550 U.S. at 570.

In reviewing Genco's complaint and response to the motion to dismiss, the Court has accepted as true all factual allegations, drawn all inferences in plaintiff's favor, and held plaintiff's *pro se* pleadings to a less stringent standard than those drafted by an attorney. Moreover, the Court has attempted to interpret Genco's lengthy, disjointed and confusing allegations and arguments in a manner consistent with a claim or claims upon which relief may be granted. However, the Court concludes that plaintiff has not stated a claim for relief that is plausible on its face.

Genco alleges that his placement on administrative leave and the requirement that he undergo a fitness for duty examination amounted to disability discrimination by Starpoint, his employer. He contends that Sargent & Collins also discriminated and retaliated against him based upon his disabilities by providing legal representation to Starpoint at the time these actions were taken. Indeed, plaintiff cannot maintain a cause of action against Sargent & Collins pursuant to the Americans with Disabilities Act ("ADA"). Title I of the ADA prohibits employers from discriminating against a qualified individual with a disability in regard to any aspect of employment. 42 U.S.C. § 12112(a) ("no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... the hiring, advancement, or discharge of employees ... and other terms, conditions, and privileges of employment."). Genco admits in his complaint that he is not a current or former employee of Sargent & Collins. Therefore, he cannot sue defendant for disability discrimination pursuant to Title I of the ADA. [5] *See Curry v. Town of Islip,* 13-CV-3597, 2017 U.S. Dist. LEXIS 203382, *10 (EDNY Dec. 8, 2017) (*sua sponte* recommendation that plaintiff's ADA claim be dismissed because she was not an employee or a former employee of defendant); *Lauria v. Donahue,* 438 F. Supp. 2d 131, 140 (EDNY 2006) (because plaintiff "was neither an employee, nor former employee of [the company], her claim under the ADA was dismissed."); *Morgenthal v. AT&T,* 97-CIV-6443, 1999 U.S. Dist. LEXIS 4294, at *4 (S.D.N.Y. 1999) (holding that because the plaintiff was not an employee of the defendant he could not be considered a "qualified individual" under the ADA).

[5]    Likewise, the facts of this lawsuit have nothing to do with the other four titles of the ADA,

which prohibit disability discrimination in: (1) access to public services, programs and activities provided by public entities (Title II); (2) access to public accommodations, such as hotels and theaters, provided by private entities (Title III); and (3) telecommunications (Title IV). *See* 42 U.S.C. §§ 12101-12213.

Plaintiff also seems to claim that in providing legal representation to Starpoint and communicating with the doctor who performed the fitness for duty examination, Sargent & Collins "assisted" Starpoint in placing plaintiff on unpaid leave. His complaint further alleges, albeit in a vague and confusing manner, that Starpoint failed to accommodate his disability with respect to a boiler training. However, it is unclear exactly how Sargent & Collins was involved in the alleged failure to accommodate. For the reasons just stated, to the extent that plaintiff is claiming that he suffered adverse employment actions on account of his disabilities during his tenure at Starpoint, his cause of action rests with his employer and not his employer's legal counsel. [6]

[6]    Similarly, plaintiff has failed to establish any viable claim for relief against Sargent & Collins based upon his allegations that the doctor who performed the fitness for duty examination was not a physician and that the examination was not performed in accordance with the New York State Civil Service Law or New York State Education Law. Plaintiff acknowledges in his complaint that Starpoint, his employer, placed him on administrative leave and sent him for a medical examination. No cause of action exists against Sargent & Collins for their role in facilitating the medical examination or communicating Starpoint's position to plaintiff or others. *See Hills v. Praxair, Inc.,* 11-CV-678, 2012 U.S. Dist. LEXIS 74125 (WDNY May 29, 2012) (dismissing plaintiff's complaint against the attorneys who represented his employer in defense of plaintiff's EEOC charge because, *inter alia,* statements made in quasi-judicial proceedings, such as arguments submitted in response in an EEOC charge or while representing a client at a hearing, are protected by absolute privilege).

*4    Further, even if plaintiff were able to bring a claim against Sargent & Collins under the ADA, Genco's conclusory allegations of discrimination fail to explain how benign actions taken by the law firm in course of representing a client, such as writing letters on behalf of their client or facilitating

Case 5:22-cv-00199-DNH-TWD    Document 7    Filed 04/05/22    Page 86 of 87
Genco v. Sargent & Collins LLP, Not Reported in Fed. Supp. (2018)
2018 WL 3827742

an independent medical examination and communicating the results, are in any way discriminatory or otherwise connected to plaintiff's disabilities. *See Iqbal*, 556 U.S. at 678 (Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully harmed-me accusation ... [n]or does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (internal citations and quotations omitted); *Reyes v. Fairfield Props.*, 661 F. Supp.2d 249, 268-269 (EDNY 2009) (conclusory statements that defendants retaliated and discriminated against plaintiff based upon race "do not establish plausibility on [their] face and are insufficient to satisfy even the liberal pleading standards under *Rule 8(a)* and *Iqbal*.").

Genco's allegations that Sargent & Collins was involved in the "unauthorized disclosure" of his medical information also fail to state a claim under federal law. Even if the Court were to construe these vague allegations as a claim under the Health Insurance Portability and Accountability Act ("HIPAA"), no such cause of action exists here. Sargent & Collins is not a health care provider and HIPAA does not provide private rights of action to individuals. *See Mathie v. Lawrence Womack*, 14-CV-6577, 2015 U.S. Dist. LEXIS 11266 (EDNY Jan. 29, 2015) (there is no private right of action under HIPAA and HIPAA enforcement actions are "in the exclusive purview of the Department of Health and Human Services"); *Hunt v. Conry, Simberg, Gannon, Drevans, Abel, Lurvey, Morrow & Schefer, P.A.*, 13-CV-1493, 2013 U.S. Dist. LEXIS 187052 (NDNY Dec. 11, 2013) (dismissing plaintiff's claim that law firm defendant disclosed medical information about plaintiff during the law suit because "the law firm is certainly not a health care provider, and plaintiff has no private right of action under HIPAA.").

Finally, to the extent plaintiff is attempting to assert causes of action based upon allegations that Sargent & Collins filed an untimely motion to dismiss or offered "a false instrument for filing", his claims lack even an arguable basis in law or fact. Offering a false instrument for filing is a violation of Section 175.35 of the New York State Penal Law, for which there is no private right of action. Furthermore, the record is bereft of evidence that defendant filed any document containing false or fraudulent information. Likewise, no cause of action exists for the untimely filing of a motion to dismiss a complaint nor is the instant motion to dismiss untimely. Genco served the summons and complaint on defendant on January 30, 2018. (Dkt. No. 2). Rule 12 of the Federal Rules of Civil Procedure indicates that a party has twenty-one days to answer or move to dismiss a complaint. *See* Fed. R. Civ. P 12(a). Rule 5 of

the Federal Rules of Civil Procedure provides that service is "complete upon mailing." *See* Fed. R. Civ. P. 5(b)(2)(C). Defendant filed the motion and mailed a copy to plaintiff on February 20, 2018, which is twenty-one days after the motion to dismiss was served.

For these reasons, the Court finds that plaintiff has not alleged a claim for relief that is plausible on its face and recommends that the complaint be dismissed. The Court now turns to whether the complaint should be dismissed with or without prejudice. The Second Circuit has advised that "[a] *pro se* complaint should not be dismissed without the Court's granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (internal citations omitted). However, leave to replead may be denied where it is apparent that no amendments would cure the deficiencies of the pleading and an attempt to replead would be futile. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("The problem with [plaintiff's] cause[ ] of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). *See also Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) ("[W]here the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied."). Here, the Court cannot identify any allegations in plaintiff's complaint that, even if properly pled, would constitute a viable claim under the law. The deficiencies are substantive in nature and cannot be remedied by amendment or repleading. Therefore, it is recommended that plaintiff's complaint against Sargent & Collins be dismissed with prejudice.

## CONCLUSION

**\*5** For the foregoing reasons, it is recommended that Sargent & Collins, LLP's motion to dismiss the complaint be granted and the complaint dismissed with prejudice. (Dkt. No. 3).

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby **ORDERED** that this Report, Recommendation and Order be filed with the Clerk of Court.

Unless otherwise ordered by Judge Vilardo, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules

2018 WL 3827742

72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and W.D.N.Y. L. R. Civ. P. 72. Any requests for an extension of this deadline must be made to Judge Vilardo.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*** *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See* Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988).

*Finally, the parties are reminded that, pursuant to W.D.N.Y. L.R.Civ.P. 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority."* ***Failure to comply with these provisions may result in the District Court's refusal to consider the objection.***

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3827742

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.